## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| _____ | ) | |
| 1. **MITCHCO INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. **CIV-20-1200-JD** |
| | ) | |
| 1. **UNITED STATES DEPARTMENT** | ) | |
| **OF EDUCATION, and** | ) | |
| | ) | |
| 2. **HONORABLE BETSY DEVOS, in** | ) | |
| her official capacity as Secretary, U.S. | ) | |
| Department of Education, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT FOR INJUNCTIVE
## AND DECLARATORY RELIEF

Plaintiff Mitchco International, Inc. ("Mitchco"), through its undersigned counsel, respectfully files this Complaint for Injunctive and Declaratory Relief against the U.S. Department of Education (the "Department" or "DoE") and Honorable Betsy DeVos, in her official capacity as Secretary of DoE.

1.     This Complaint seeks a declaration that the "action, findings and conclusions" of the Department, acting through an arbitration panel convened by the Department's Rehabilitation Services Administration pursuant to 20 U.S.C.

§ 107d-1 and 34 C.F.R. § 395.37 (the "Arbitration Panel"), are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," Administrative Procedure Act ("APA") 5 U.S.C. § 706(2)(A), and otherwise violative of the APA, *id.* § 706(2)(B)-(F), and they therefore must be "held unlawful" and "set aside." *Id.* Mitchco further seeks the injunctive relief set forth below. *Id.*

2.    As discussed below, the Oklahoma Department of Rehabilitative Services ("ODRS") held a procurement to provide cafeteria food services at the U.S. Army base at Fort Sill, Oklahoma (the "requirement"). In the procurement, ODRS was a qualified offeror under the Randolph-Sheppard Act ("R-SA"). The R-SA requires blind vendors to register with a State Licensing Agency ("SLA"), which in turn competes for relevant federal contracts. 34 C.F.R. § 395.33. If the SLA is successful, then in the resulting contracts, the SLA then assigns a blind vendor to the requirement. *See id.* §§ 395.2-395.17.

3.    The U.S. Army conducted a competitive procurement to perform the requirement, open to the SLA and to commercial entities. Under such circumstances, Department regulations dictate that the SLA receives a "priority" (*i.e.,* U.S. Army consultation with the Department) only when the U.S. Army judges the SLA's proposal to be within the "competitive range" of proposals. *Id.* Plaintiff Mitchco, ODRS, and others, submitted proposals. The U.S. Army

decided that ODRS's proposal was not within the "competitive range" under Federal Acquisition Regulation ("FAR") 15.306, because ODRS's past performance was rated "Unacceptable" and its proposed price was "unreasonably high" (and by far the most expensive proposal submitted). The U.S. Army awarded the contract for the requirement to Mitchco.

4.     During the past two years, ODRS and its would-be subcontractors have instituted _twenty-two_ procurement protests, preliminary injunction requests and arbitration requests regarding this requirement, attempting to exploit piecemeal legal action to try to prevent the U.S. Army from replacing ODRS with a more competent, less expensive contractor, *i.e.,* Mitchco. Every single one of the procurement protests and preliminary injunction requests was denied or dismissed, except for one ODRS request for reconsideration pending at the U.S. Government Accountability Office ("GAO").

5.     Three of ODRS's 22 legal actions were arbitration requests. When there is a dispute between an SLA and a federal contracting agency in which the SLA alleges a violation of the R-SA, the R-SA authorizes the Department, upon complaint by an SLA, to convene an arbitration panel to arbitrate the dispute. 20 U.S.C. § 107d–1(b). ODRS instituted such a complaint to the Department, triggering appointment of the Arbitration Panel and the arbitration decision that is the subject of this action.

6.     The Department Arbitration Panel's June 22, 2020 Decision (the "Decision") (Attached hereto as Exhibit 1) concluded that the U.S. Army improperly denied ODRS a contract award (and the U.S. Army exercise of a contract option), in violation of the R-SA.  It recommended that the U.S. Army permit ODRS to complete the option terms of its contract, include ODRS's proposal in the competitive range, and commence negotiations with it.

7.     As discussed below, in numerous respects, the Panel's Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise violative of the APA, and therefore it must be "held unlawful" and "set aside" under APA § 706(2).  The Decision also was directly contrary to this Honorable Court's rulings on the exact same legal issues, when this Court twice denied ODRS's motions for preliminary injunctions.[1]  The arbitration panel refused to be guided by this Court's rulings on these pure issues of law, even though the law provides for judicial review of the panel's decision by this Court.[2]

---

[1] For instance, this Court ruled that options are optional, while the panel ruled that options are mandatory.

[2] The Decision is a public document, but some of the prior proceedings were under protective order.  In order to facilitate the production of the administrative record, Mitchco is filing a motion for protective order, for those parts of the record that might require it.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction with regard to the R-SA); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); and APA § 702 (providing for judicial review of agency action under the APA).

9.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claim occurred in this District.  Fort Sill is located within this judicial district, and the subject of the arbitration was the award of a contract to be performed (and now being performed) in this judicial district.  The prior litigation here by ODRS asserted venue on this basis.

## PARTIES

10.     Plaintiff Mitchco is a corporation with offices at 4801 Sherburn Lane, Suite A, Saint Matthews, Kentucky 40207.  Mitchco is the contractor now performing the requirement, and therefore an interested party for purposes of judicial review.  Mitchco intervened in the arbitration proceedings now subject to judicial review.

11.     Defendant U.S. Department of Education is an agency of the United States established pursuant to the Department of Education Organization Act,

Pub. L. No. 96-88, 93 Stat. 668 (Oct. 17, 1979).  The R-SA gives the Secretary of Education the responsibility of administering the Act and issuing interpretive regulations.  *See* 20 U.S.C. § 107(b).  This responsibility includes, upon complaint by an SLA like ODRS, the convening of an arbitration panel.  20 U.S.C. § 107d–1.

12.     Defendant Honorable Betsy DeVos is Secretary of the Department of Education.  She is sued in her official capacity only.

## FACTUAL BACKGROUND

13.     In 2018, ODRS, Cantu Services, Inc. ("Cantu") and Altstatt Services LLC ("Altstatt") were the "team" performing the requirement at issue here, until they were replaced by awardee Mitchco.  ODRS was the prime contractor; Cantu served as a subcontractor; and Altstatt served as the "legally blind vendor" for purposes of the R-SA.

14.     In February of 2018, the U.S. Army informed ODRS that it did not intend to exercise contract options under ODRS's contract, after the option period ending a year later, on March 31, 2019.[3]

---

[3] This appears in the findings of the Oklahoma District Court in its first decision denying the ODRS's TRO application, *State of Oklahoma v. Mattis,* No. 5:18-cv-01197-SLP (Dec. 17, 2018), slip op. at 2-3 ("Oklahoma TRO Denial I"; the subsequent denial is "Oklahoma TRO Denial II.")

15.     On April 19, 2018, ODRS filed the first of three R-SA arbitration requests with the Department.

16.     On June 6, 2018, the U.S. Army issued Request for Proposals ("RFP") No. W9124J-18-R-0011, for food services and dining facility attendant services at Ft. Sill, Oklahoma.  On July 12-16, 2018, ODRS, Cantu and Altstatt filed the first four of what will eventually total _fourteen_ proceedings at the GAO [B-416577.1, .2, .3 and .4, and later B-416851.1, .2, .3, .4, .6, .7, .8, .9, .10 and .11 (collectively, the "GAO Protests")].  During these first four protests,[4] the RFP was canceled and later reissued, with minor changes not relevant to the Decision or the S-LA.[5]  On August 14, 2018, the GAO protests themselves were dismissed.

17.     As enumerated below, ODRS, Cantu and Altstatt subsequently filed more GAO protests regarding this requirement.[6]  Ultimately, all 14 of them were dismissed, except for the pending request for reconsideration (B-416851.11).

---

[4] One of these appears to have been an amended protest.  The GAO dockets amended protests as protests.  We will follow the GAO's convention in this brief.

[5] The changes incorporated certain "commercial item" standard federal contract clauses into the RFP.  No changes were made relating to the R-SA.

[6] As noted below, ODRS also filed one "agency-level" procurement protest with the Contracting Officer, under 48 C.F.R. § 33.103, which was denied.

18.     As noted, on August 31, 2018, the Government issued slightly-revised Request for Proposals No. W9124J-18-R-0024.  The evaluation scheme stated that award would be made to the lowest-priced technically acceptable ("LPTA") proposal, allowing for the R-SA "priority" if (and only if) the R-SA offeror's proposal were in the competitive range.  Proposals initially were due on Sept. 21, 2018.

19.     On September 20-21, 2018, ODRS and Cantu filed three more bid protests at the GAO.  On October 26, 2018, all three of these GAO protests were dismissed.

20.     On November 29, 2018, ODRS filed a second arbitration demand with the Department.  This new request reiterated the ODRS arguments made in the dismissed GAO protests, alleging R-SA errors in the Solicitation.  As this Honorable Court would later note, the Department has no jurisdiction to rewrite Solicitations issued by other agencies.

21.     On December 11, 2018, ODRS filed a Complaint here in federal district court in the Western District of Oklahoma, No. 5:18-cv-01197-SLP (the "Oklahoma case," mentioned above).  ODRS sought a temporary restraining order ("TRO") against the competition.  The Complaint made arguments essentially indistinguishable from the arguments that ODRS later would make in the arbitration that is the subject of this action.  In that litigation, ODRS sought a

temporary restraining order not once but twice, and both applications were denied. ODRS did not seek a writ of mandamus from the Court requiring the Department to rule on its arbitration claims, a strategic decision by ODRS that ultimately led to ODRS being replaced at Fort Sill before the Arbitration Panel was even convened for a hearing.

22.    On December 13, 2018, the Government filed its opposition to ODRS's TRO application.  Among other things, the Government noted that ODRS had misinterpreted the Federal Acquisition Regulation ("FAR"), which requires a ceiling on indefinite-quantity, indefinite-delivery ("IDIQ") requirements.  ODRS had argued to the Court that such a ceiling was prohibited.

23.    On December 17, 2018, the Oklahoma Court denied the TRO, because ODRS "has not invoked a cognizable exercise of the Court's equity powers."  The Court quoted *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004): "the plaintiffs had no cause of action against the defendants upon which the injunction was based." *Id.* ("Oklahoma TRO Denial I") at 3-4.  The Oklahoma Court also denied the TRO because: "Rather than seeking to maintain the status quo through a TRO or injunction until the Court can reach the merits of the parties' dispute, the ODRS would accomplish its ultimate litigation objective if the Court ruled for it on its motion. This would not be a proper use of the Court's equitable powers . . . ." *Id.* at 4-5.  The Court

meticulously reviewed ODRS's arguments on the merits, and ruled them all baseless.

24.     On December 18, 2018, *one day after* the Court denied a TRO, ODRS filed a grossly repetitive agency-level bid protest under 48 C.F.R. ("FAR") § 33.103.  Nowhere in that very lengthy agency-level protest did ODRS explain why the agency could, would, or should disagree with the GAO's or the Court's rulings.  In fact, ODRS did not even mention the Court ruling.

25.     On December 19, 2018, the proposal due date, multiple proposals were submitted.  Mitchco's proposed price was approximately $94 million.  The Independent Government Cost Estimate ("IGCE") was $95.4 million.  ODRS's proposed price was $145.6 million, which was 54% higher than the IGCE. Decision at 14.

26.     On January 23, 2019, ODRS's agency-level protest was denied.

27.     On March 14, 2019, after examining and evaluating all seven proposals, the Government decided that ODRS's proposal was not within the "competitive range" under FAR 15.306, both because ODRS's past performance was "Unacceptable," and because its proposed price is "unreasonably high." Decision at 15.[7]  ODRS's proposal was the only one where past performance was

---

[7]  The competitive range is "comprised of all of the most highly rated proposals."  FAR 15.306(c).

rated "Unacceptable," and its proposed price was the most expensive by far. Only the proposals of Mitchco and one other offeror were rated as Acceptable on both the Past Performance and the Technical evaluations, and also Reasonably Priced (Decision at 95), so they were literally "the most highly rated proposals," *id.,* and they properly comprised the competitive range.  The Government then proceeded to negotiations with the two offerors in the competitive range (including Mitchco), in accordance with FAR 15.306(d).

28.     On March 22, 2019, ODRS filed a third arbitration demand with the Department, complaining that its proposal should have been included in the competitive range.

29.     On March 25, 2019, ODRS again sought a TRO from the federal court in Oklahoma, based on the same arguments that it made in its third arbitration demand to the Department.

30.     In the time frame of March 26, 2019 - Apr. 1, 2019, with ODRS's latest TRO application pending and unresolved, the Government had no choice but to award ODRS a "bridge" contract, initially for two months, without competition, for ODRS to continue performance of the requirement (Delivery Order No. W9124L-19-D-0001).

31.     On April 12, 2019, in a "mandate letter," the Department authorized the formation of the Arbitration Panel, based on ODRS's three arbitration

demands.  Despite having a case pending in federal court, ODRS did not pursue any legal action that would require the Department to proceed expeditiously, presumably because it had extracted the bridge contract from the Government. This was, in effect, an election of remedies by ODRS.

32.    On April 16, 2019, for a second time, the U.S. District Court in Oklahoma denied ODRS a TRO.  The Court again reviewed ODRS's arguments on the merits, and again ruled them all baseless.  The Government then awarded a contract to Mitchco for $94,250,932, Contract No. W9124J-19-D-0012, beginning with delivery order W9124J-19-D-0010 to "phase in" performance.

33.    On April 26, 2019, ODRS filed yet another GAO protest.  On May 9, 2019, this ODRS GAO protest was dismissed.

34.    On May 23, June 7 and June 14, 2019, ODRS filed three more GAO protests.  Apparently due to the pendency of these three GAO protests, the Government extended ODRS's performance of the bridge contract.   On July 3, 2019, these three ODRS GAO protests were dismissed.

35.    On July 16, 2019, ODRS filed a complaint at the U.S. Court of Federal Claims ("CFC"), raising many of the same issues that ODRS had raised

unsuccessfully in this Honorable Court.[8]   Cantu and Altstatt intervened.   On August 12, 2019, the CFC denied ODRS's motion for preliminary injunction, after which ODRS stipulated to a dismissal with prejudice.

36.     On Sept. 30, 2019, ODRS's "bridge" contract at Ft. Sill expired. Mitchco took over performance of the requirement at Ft. Sill and, notably, ODRS took no action in court to require that the arbitration hearing take place before that happened.

37.     The Department's mandate letter to the Arbitration Panel limited the issues before the Panel to the following four:

> Arbitration Count No. 1 – whether the U.S. Army violated the R-SA by not exercising its third option under the incumbent contract.
>
> Arbitration Count No. 4 – whether the U.S. Army violated the R-SA by using meal bands in the Solicitation.
>
> Arbitration Count No. 5 – whether the U.S. Army violated the R-SA when it allegedly "failed to follow the stated evaluation criteria in evaluating [ODRS's] proposal."
>
> Arbitration Count No. 6 – whether the U.S. Army violated the R-SA when it allegedly "failed to properly determine whether [ODRS's] proposal could provide [cafeteria food] services at a reasonable cost."

Mandate Letter at 1-2.

---

[8] ODRS argued that this Court's rulings were of no significance, because they were made upon motions for a preliminary injunction, rather than on motions for a permanent injunction.

38.   On January 14-16, 2020, the arbitration hearing was conducted.  The parties then submitted post-hearing briefs and Reply Briefs, and the record was closed on May 10, 2020.

39.   On June 22, 2020, the Department's Arbitration Panel issued its Decision.  For the reasons explained below, the Decision in numerous respects is arbitrary, capricious, an abuse of discretion, not in accordance with law, or otherwise in violation of the APA.[9]

## COUNT ONE:  VIOLATIONS OF THE APA

### A.   The Arbitration Panel Exceeded Its Jurisdiction.

40.   As explained above, this arbitration arises under the R-SA, and it is restricted to whether the challenged actions of the U.S. Army violate the R-SA. Therefore, the first threshold question is whether the four allegations in the Mandate Letter – *regardless of the evidence* – can establish any violation of the R-SA.

41.   On this question, the applicability of the R-SA to cafeteria food services contracts is limited and specific.  The R-SA creates a "priority" for "blind persons licensed by a State agency" regarding the "operation of vending facilities":

---

[9] As noted, there were yet more ODRS GAO protests, which all were dismissed, aside from the pending ODRS motion for reconsideration.

> In authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency as provided in this chapter . . . to the extent that any such facility or facilities would not adversely affect the interests of the United States.

20 U.S.C. § 107.

42.     As noted above, the R-SA and the associated Department Regulations establish an arbitration mechanism only when a SLA [like ODRS, here] claims that a federal agency is: "<u>failing to comply with the provisions of this chapter</u> [meaning the R-SA <u>or any regulations issued thereunder</u>." 20 U.S.C. 107d-1(b) (emphasis added). Therefore, Step One of any arbitration under the R-SA is for the claimant to identify the specific R-SA or R-SA regulation provision with which the agency purportedly has failed to comply. The Mandate Letter went beyond this narrow jurisdictional scope, and therefore was *ultra vires*.

43.     Regarding the "priority" for blind persons licensed by a state agency in the award of cafeteria contracts under the R-SA, the R-SA regulations set forth that "priority," in its entirety, as follows:

> (a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

(b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, <u>the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated</u> by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. <u>If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award,</u> the property managing department, <u>agency,</u> or instrumentality <u>shall consult with the Secretary</u> as required under paragraph (a) of this section. <u>If the State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary</u> under the provisions of § 395.37. . . .

34 C.F.R. § 395.33 (emphasis added).  These are the *only* parts of the R-SA

Regulations that govern SLA priority in the award and performance of cafeteria

contracts.

44.     Therefore, as to Arbitration Count No. 1, for instance, *i.e.*, whether

the U.S. Army violated the R-SA or its implementing regulations when it

decided not to exercise the remaining options under ODRS's Ft. Sill contract,

<u>there is no part of the R-SA or the Regulations</u> governing the exercise of

contract options, there is no such provision with which an agency must

"comply" [20 U.S.C. § 107d-1(b)], and therefore the Arbitration Panel had no

jurisdiction of such a claim.

45.     As to Arbitration Count No. 5, regarding the U.S. Army's
evaluation of ODRS's proposal: (A) ODRS was invited to respond to the
solicitation, and did so respond; and (B) ODRS's proposal was "judged" to be
outside the competitive range.  Therefore, the U.S. Army was under no
obligation to "consult with the Secretary" (and the Army therefore did not do
so).[10]

46.     Despite the above jurisdictional limits on the arbitration panel's
authority, the Decision ruled as follows:

> The Army argues that it did not terminate the ODRS contract; it just did
> not renew it under its discretionary right in the contract.  The Army's
> action, however, limited future operations for a blind vendor who had
> already demonstrated the feasibility and right to provide services at Fort
> Sill for five years.  Regardless of the choice of words, its action brought
> to a halt, ended, stopped, terminated an already demonstrated right to a
> priority. It was a limitation. The issue is not whether the Army had the
> right to limit its operation of its cafeteria to an already qualified blind
> vendor, but whether it was required under the RSA to seek approval of
> the Secretary of the DOE before doing so. The Statute is clear that it was
> required to do so.

Decision at 53-54.  The Decision therefore was "arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law," or otherwise in

---

[10]  *If* ODRS's proposal had been within the competitive range, then the
Regulations would have imposed a duty on the Army to consult with the
Secretary, but the Army "judged" that ODRS's proposal was outside the
competitive range, and the Mandate Letter itself recognized that this
extinguished any consultation requirement.  Mandate Letter at 2.

violation of the APA, and it therefore must be "held unlawful" and "set aside."

APA § 706(2).

B.   <u>ODRS's Prior Litigation Barred its Arbitration Claims</u>

47.     As noted above, before the arbitration hearing even began, ODRS

filed 11 GAO protests, one agency-level protest and three applications for

temporary restraining orders and motions for preliminary injunctions (in two

different federal courts), over two years of litigation.  In those legal

proceedings, ODRS made the same legal arguments about the same

procurement that they made in the arbitration.  The relevant tribunals

categorically rejected these legal arguments.

48.     One of many examples is this Honorable Court's ruling on Dec.

17, 2018, denying ODRS's first TRO application and establishing the law of the

case, with preclusive effect.  *See Commissioner v. Sunnen,* 333 U.S. 591, 597

(1948).  This Court ruled as follows:

> The ODRS identifies four merits-based issues on which it claims it will
> prevail. [**Arbitration Count No. 1:**]  It first argues that the Army should
> not have declined the third option year on their existing contract because
> doing so imposed a "limitation" as described in 20 U.S.C. § 107(b). The
> Court finds no support in § 107(b) for its potential applicability to a
> decision of whether a contract option must be accepted. Section 107(b)'s
> requirement that the DOE justify "[a]ny limitation" applies to "the
> placement or operation of a vending facility." *Id.* Here, the Army's
> decision to decline the third option year of the contract does not "limit[]"
> the "placement or operation" of its facilities. *Id.* Rather, it opens the
> possibility of the opposite occurring—the Army seeks to include

additional food service locations at Fort Sill within the new contract which are not included in the current ODRS contract.

During the TRO hearing, the ODRS asked the Court to consider *Magic Brite Janitorial v. United States*, 72 Fed. Cl. 719 (2006), in which the Court of Federal Claims observed that "one supposes that the government, in obtaining an option, *could* cabin its discretion and make the exercise of an option less optional, via statute, regulation, or the terms of a contract." *Id.* at 721. That statement may be correct but, even if so, it is inapplicable here. Nothing in § 107(b) indicates it is meant to apply to contract option determinations and to "cabin [the Army's] discretion." *Magic Brite Janitorial*, 72 Fed. Cl. at 721. Absent contractual language providing otherwise (which has not been provided by the ODRS), the general rule for an option seems to apply: "the holder of an option has discretion to exercise the option or not" and "the mere existence of an option does not require the holder to exercise it." *Id.*

[**Arbitration Count Nos. 2 & 7:**][11]  Second, the ODRS indicates it will prevail because the Army is required to consult with the DOE before eliminating the ODRS (or any state licensing agency) from contention for a new contract. The ODRS bases its argument in 34 C.F.R. § 395.33(a). But part (b) of that regulation indicates that a DOE consultation is only required after proposals have been received and initially reviewed, with those falling outside the relevant competitive range having been rejected: "*If* the proposal received from the State licensing agency is judged to be within a competitive range *and* has been ranked among those proposals which have a reasonable chance of being selected for a final award, the [Army] shall consult with the [DOE] as required under paragraph (a) of this section." 34 C.F.R. 395.33(b) (emphasis added). The ODRS's proposed order of actions makes no sense in light of the conditional language used in the regulation that requires consultation only after an initial judgment by the Army. *See Ga. Vocational Rehab. Agency*, 2018 WL 6503512, at *6 ("[T]he Government was only required to consult with the [DOE] after a determination that the bid was 'judged to be

---

[11] In the Mandate Letter, the Department accepted only Arbitration Counts 1, 4, 5 and 6 for arbitration.  This did not prevent ODRS from arguing the other, *ultra vires* counts to the Court.

within a competitive range.'" (quoting 34 C.F.R. § 395.33(b))); *see also id.* (collecting cases).

[**Arbitration Count Nos. 3 & 4:**]  Finally, the ODRS argues that certain aspects of the new procurement process applicable to all bidders—specifically, (i) a $111 million "price ceiling" for the entirety of the new contract and (ii) the use of "meal bands" in forecasting the number of meals to be served on various days during the term of the new contract—violate the RSA. The ODRS tries to tie these general contract procurement terms to the RSA through a regulation indicating that RSA priority is given when the facility's "operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided." 34 C.F.R. § 395.33(a); *see also* 20 U.S.C. § 107d-3(e) (requiring that the DOE issue regulations implementing the RSA for those facilities where operations "can be provided at a reasonable cost with food of a high quality comparable to that currently provided").

The Court is not convinced that this regulation can be tied to the Army's procurement process in the way proposed by the ODRS. The ODRS wants to use the "reasonable cost" requirement to impose a floor on the price at which services are provided to the Army. But a common-sense reading of the regulation is that the "reasonable cost" requirement instead imposes a price ceiling. That is, the regulation indicates that if the price proposed by the ODRS (or another state licensing agency) is above a reasonable cost or the food to be provided is not of a high-enough quality, the ODRS (or other state licensing agency) need not be chosen by the contract-awarding agency regardless of the preference otherwise provided by the RSA. The regulation protects the United States from contracts which harm it through unreasonably high prices or unreasonably poor quality of products and services. Nothing in the implementing regulation or in the RSA indicates that "reasonable cost" is intended to prohibit the ODRS (or other state licensing agency) from submitting a relatively low bid which does not provide as much profit to a blind vendor as a bid for a higher amount would provide.

Legitimate complaints may exist regarding the $111 million cap indicated for the to-be-awarded contract and the use of meal bands in seeking submissions as part of the procurement process. But these are not RSA issues, and the Court's consideration of these issues is limited to whether success is likely in light of the RSA alone.

> For these reasons, the Court finds that the ODRS has not shown a substantial likelihood of prevailing on the merits and a TRO should not be issued.  IT IS THEREFORE ORDERED that Plaintiff's Application for Temporary Restraining Order and Injunctive Relief [Doc. No. 2] is DENIED as set forth herein.

Oklahoma TRO Denial I at 7-10.  This Honorable Court therefore decided these Arbitration Counts against ODRS, as a matter of law, in its first decision denying ODRS a TRO.[12]  Yet ODRS sought new rulings on the *exact same issues* in the arbitration.

49.    After the U.S. District Court ruling cited above, ODRS's proposal was found to be outside the competitive range.  ODRS then returned to this Court and re-argued its case, trying to treat this development as "news."  On April 16, 2019, this Honorable Court issued a second decision ("Oklahoma TRO Denial II").  As the U.S. Court of Federal Claims would later observe, this Honorable Court pointedly noted that ODRS was simply repeating itself in most respects:

> The district court determined that many of the arguments in ODRS' first amended complaint were identical to those in its original complaint, and

---

[12] The only reason why this Court didn't reject Arbitration Count Nos. 5 & 6, as well as Arbitration Counts 1-4 & 7, is that ODRS hadn't raised them yet.  This Court rendered its first TRO denial on Dec. 17, 2018, and ODRS raised Arbitration Count Nos. 5 & 6 by letter to the Department on March 22, 2019.

thus the district court declined to 're-address[]' these arguments, as the '[c]ourt's ruling regarding them remains the same.'

*State of Okla. v. United States,* No. 19-1022C, slip op. at 6 (Fed. Cl. Aug. 12,

2019).

50.     As to ODRS's then-new arguments, this Honorable Court, once

again, emphatically rejected these arguments as a matter of law:

> [**Arbitration Count No. 5:**] First, the ODRS argues that a TRO should
> issue because the Army improperly excluded the ODRS from the
> competitive range established in the bid process for the new contract. The
> ODRS asserts that it was excluded from the competitive range because
> "Defendants fail[ed] to follow the stated evaluation criteria." Mot. 8,
> Doc. No. 14. But the ODRS provides no explanation of what the Army's
> to-be-followed evaluation criteria were, which of them were not
> followed, or how. Rather, the ODRS only indicates that it was rated
> "acceptable" on one criterion, "unacceptable" on another criterion, and
> was not rated on a third criterion (though the last criterion—price—if
> rated, would not likely assist the ODRS in the Army's evaluation because
> the ODRS was simultaneously informed that its bid included an
> "unreasonably high price" which was "not competitive"). Letter from
> Gary L. Stevens to Charles Pride (Mar. 14, 2019), Doc. No. 14-7. Absent
> some indication from the ODRS regarding why and how the Army
> allegedly did not follow its own evaluation criteria in the bid process, the
> Court cannot find that the ODRS has made a "strong showing . . . with
> regard to the likelihood of success on the merits" (*Fish*, 840 F.3d at 724
> (quotation marks and citation omitted)) or even "a substantial likelihood
> of success on the merits." *Dominion Video Satellite*, 269 F.3d at 1154.
> The ODRS's attempted explanation (submitted without a supporting
> affidavit on this issue (*see* Mot. 17, Doc. No. 14)) and the testimony
> provided at the TRO hearing were both conclusory and the Court does
> not find them sufficient for the ODRS to meet its burden to obtain a
> TRO. Although one of the ODRS's witnesses indicated that the
> inspections performed by the Army during the ODRS's performance of
> the current contract were, in his experience, more rigorous than what he
> experienced regarding other government contracts, no indication that

such rigorous inspections were not allowed under the law and under the parties' contract has been presented.

[**Arbitration Count Nos. 2 & 7:**]  Second, the ODRS indicates that it will succeed on the merits because the Army was required, and failed, to consult with the DOE before excluding the ODRS from the competitive range in the bid process for the new contract. For the reasons stated in the Court's prior TRO order, the Court disagrees. *See* Order of Dec. 17, 2018, at 8-9, Doc. No. 10. Moreover, as the Army persuasively argued at the recent TRO hearing, under the ODRS's preferred order of consultation with the DOE—i.e., that consultation with the DOE is required before any state-licensing-agency applicant can be excluded from the competitive range—the ODRS could bid any amount (e.g., $10 trillion on a contract estimated to include services totaling no more than $10,000) and the Army would be unable to exclude the uber-high bid without engaging in the consultation process. In addition to this being an untenable result, the ODRS provides no authority that this process was intended by the Randolph-Sheppard Vending Facility Act of 1936, 20 U.S.C. §§ 107-107f ("RSA"). *See Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States*, No. 4:18cv148, 2018 WL 6503512, at *6 (E.D. Va. Dec. 11, 2018) ("[T]he Government was only required to consult with the [DOE] after a determination that the bid was 'judged to be within a competitive range.'" (quoting 34 C.F.R. § 395.33(b))).

[**Arbitration Count No. 6:**]  The ODRS's argument that the Army's decision to exclude it from the competitive range is a "limitation on the placement or operation of a vending facility" that requires consultation with the DOE is not persuasive. 20 U.S.C. § 107(b)(2). By re-bidding food service at Ft. Sill, the Army is not "limit[ing] . . . operation of a vending facility." *Id.* In fact, by expanding the scope of the contract awarded (as compared to the current contract), it is doing the opposite. And, because the bid process is being undertaken pursuant to the RSA—even if the final award is not to an RSA vendor—no limitation on which vending facilities are subject to the RSA during the bidding process has occurred. Were the Army attempting to abandon the applicability of the RSA to the bidding process and complete the bid process without complying with the RSA (for example, by proceeding through a bid process under the Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501-8506, instead of pursuant to the RSA—as in a recent Eastern District of Virginia decision), the ODRS's argument might be persuasive. *See*

> *SourceAmerica*, 2019 WL 1233855, at *12 (cited by the ODRS in its
> TRO motion). There is no indication that is the case here.

Oklahoma TRO Denial II at 9-12.  The Court later dismissed the case.

51.     In the same repetitive manner, before the arbitration panel even
convened for its hearing, ODRS already had made the same erroneous legal
arguments in (by that time) 11 dismissed GAO protests, and in the one denied
agency-level protest.  ODRS, Cantu and Altstatt then forum-shopped their
claims to the U.S. Court of Federal Claims on July 16, 2019, filing three
separate complaints – all of which neglected to inform the Court of Federal
Claims that ODRS, Cantu and Altstatt already had been denied – *ad nauseum* -
the same relief that they were requesting from the CFC.  *State of Okla. v.
United States,* No. 19-1022C (Fed. Cl. Aug. 12, 2019).[13]

52.     The CFC endorsed this Court's earlier rejection of ODRS's
arguments on the merits, in both Oklahoma TRO Denial I and II.  With regard
to the first decision, the CFC ruled:

> The district court also found that "ODRS cannot show a substantial
> likelihood of success on the merits" of its claim. District Ct. Order at 7.
> First, the court found ODRS' argument about the language of 20 U.S.C. §
> 107(b) to be unpersuasive. Rather than agreeing with ODRS that the
> Army's declining the third-year option imposed a "limitation" prohibited
> by 20 U.S.C. § 107(b), the court found "the general rule for an option
> seems to apply." *Id*. at 8. In that respect, an option contract allows the

---

[13] "In its original complaint [to the Court of Federal Claims, ODRS] raised
claims under the Randolph-Sheppard Act."  *Id.* at 4.

holder of the option discretion whether to exercise that option. [**Arbitration Count No. 1**]  Second, the court disagreed with ODRS' argument, based on 34 C.F.R. § 395.33(a), that the Army was required to consult with the Education Department before acting adversely to ODRS. *Id.* at 8-9 ("ODRS'[] proposed order of actions makes no sense in light of the conditional language used by the regulation that requires consultation only after an initial judgment by the Army.")  [**Arbitration Count Nos. 2 & 7**]

*Id.* at 5.  The CFC also endorsed the district court's second decision:

> First, "ODRS argue[d] that a TRO should [be] issue[d] because the Army improperly excluded ODRS from the competitive range established in the bid process for the new contract." District Ct. Apr. Order at 9. But the district court found that ODRS' "attempted explanation . . . and []testimony" in support of its argument "were both conclusory and [not] sufficient for [] ODRS to meet its burden to obtain a TRO." Id. at 10. [**Arbitration Count Nos. 5 & 6**]  Second, ODRS argued "that it [would] succeed on the merits because the Army was required, and failed, to consult with the [Education Department] before excluding ODRS from the competitive range in the bid process." Id. at 10-11. The district court was similarly unpersuaded by this argument, as "ODRS provides no authority that this process was intended by the [RSA]," among other reasons. Id. at 11-12.  [**Arbitration Count Nos. 2 & 7**]

*Id.* at 6.

53.    The CFC concluded:

> The district court twice found ODRS' arguments in favor of temporary injunctive relief to be unpersuasive. . . .  Here, as in the district court, ODRS has not shown a substantial likelihood of prevailing on the merits.

*Id.* at 14.  The CFC denied a restraining order and an injunction, *id.,* and the CFC case was later dismissed *with prejudice*.[14]

54.    *A fortiori*, ODRS's arguments to the Arbitration Panel were barred by *res judicata* and related preclusive doctrines – because they already have been rejected in the numerous prior proceedings, "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose" – and those matters must now be taken as resolved against ODRS, long before the arbitration panel's Decision.  *Sunnen*, 333 U.S. at 597.

55.    Despite the prior decisions on issues of law enumerated above, the Arbitration Panel ruled that ODRS's claims were not barred by *res judicata*, collateral estoppel or other preclusion doctrines.  Decision at 45-48.  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," otherwise violated the APA, and therefore must be "held unlawful" and "set aside."  APA § 706(2).

C. Failure to Comply with Department Rules.

56.    The Department has promulgated rules regarding R-SA arbitration proceedings.  *Policies and Procedures for Convening and Conducting an*

---

[14] The Decision does not address the legal effect of dismissal of the CFC case with prejudice.

*Arbitration Pursuant to Sections 5(b) and 6 of the Randolph-Sheppard Act as Amended* (the "Arbitration Rules"), Rule 3(b) states:

> The [arbitration] complaint may be filed by the State Attorney General on behalf of the State licensing agency, or by the State licensing agency with the written concurrence of the State governor.[15]

It is undisputed that the "arbitration complaints" filed by ODRS were not filed by the Oklahoma State Attorney General, and they were not filed with the written concurrence of the State governor.  ODRS thus proceeded *ultra vires,* in violation of APA §§ 706(2)(b) & (d).[16]

57.    Citing Department interpretation of Rule 3, the Decision ruled that a state may appoint a private attorney to represent it.  See Ex. 1 at 46-47.  The Department erroneously interpreted Rule 3 (because there is no basis in the Rule 3 for its interpretation), and the Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it

---

[15] The Federal Government, and generally the States as well, have rules restricting agencies from litigating without such approval.  *See, e.g.,* 28 U.S.C. § 516 (2012); 28 C.F.R. § 0.5.

[16] This is an issue of the arbitration panel's subject-matter jurisdiction. Because of its fundamental importance, subject-matter jurisdiction may be challenged at any time by the parties, or even by the tribunal *sua sponte*. *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004).  In any event, Mitchco raised the issue with the arbitration panel.

otherwise violated the APA, and therefore it must be "held unlawful" and "set aside." APA § 706(2).

D.  Violation of APA § 556 and the
Due Process Clause of the Fifth Amendment, U.S. Const. amend. V

58.    Arbitration Rule 6(a) states:

Within 15 days from the date of the notice informing the parties that an arbitration panel will be convened, each party shall designate one panel member and promptly notify the arbitration clerk of the designation . . . . Within 30 days from the date of this notice, the two panel members . . . shall designate [] the third member of the panel . . . .

*Id.; see also* 20 U.S.C. § 107d-2(b)(1).

59.    The selection of two panel members by the parties, and then the third by those two, does not promote "the appearance and reality of fairness" from the perspective of an intervenor who chose no one on the panel. *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980); *Schweiker v. McClure*, 456 U.S. 188, 195 (1982).  "The functions of presiding employees . . . shall be conducted in an impartial manner." 5 U.S.C. § 556(b).  Every hearing officer, of every kind, must comply with this provision. *See, e.g., Coyle v. Gardner,* 298 F. Supp. 609 (D. Hawaii 1969).  Intervenors, who have well-established due process rights under both the Fifth Amendment and the APA, have no one on the panel whom they chose, or can otherwise influence through the selection process.  The background and selection process for panel members also evidences unfairness to an intervenor.  This procedure, and the selection of the panel members who

conducted the arbitration here, violated APA § 556 and the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V, because it does not create a panel of impartial arbiters, both facially and as applied, as Mitchco's counsel complained by declaration to the arbitration panel.

60.    The Decision stated that there was "no evidence" of any such violation.  That clearly was incorrect; the only evidence in the record on this subject was Mitchco counsel's declaration.  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it otherwise violated the APA, and therefore it must be "held unlawful" and "set aside."  APA § 706(2).

E.   Timeliness, Waiver and Laches

61.    Every tribunal hearing a procurement protest of one kind or another has timeliness rules.  *See, e.g.,* 4 C.F.R. § 21.2 (GAO timeliness rules); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims").  In addition, every procurement tribunal applies equitable doctrines, such as equitable estoppel and laches – as the Department itself has recognized in R-SA proceedings.  *E.g.*, *id*. at 1314-15 (laches, equitable

estoppel); *State of Texas v. U.S. Air Force,* R-S/16-09 (Feb. 28, 2017) ("the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement").

62.     ODRS let years pass and allowed the *status quo* to change as it engaged in multiple litigations in federal court, without ever seeking to expedite the arbitration (through, for example, a petition for a writ of mandamus).  ODRS violated all of these legal and equitable doctrine on timeliness, preserving the status quo, and fairness to opposing parties.  Due to ODRS's failure to take action to expedite the arbitration, Mitchco entered into a binding contract with the U.S. Army, establishing Constitutionally protected property rights, long before the arbitration panel rendered its Decision.

63.     The Decision wrongly ignored the principle underlying all of these legal or equitable doctrines, and wrongly ruled that ODRS had violated none of them.  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise in violation of the APA, and it therefore must be "held unlawful" and "set aside."  APA § 706(2).

F.   Interested Party

64.     In any challenge to an agency procurement action, the challenger must be an "interested party," which generally means that the challenger must be next in line for award  28 U.S.C. § 1491(b)(1).  There were seven offerors in the

U.S. Army competition. The competition established that Mitchco was the lowest-priced, technically acceptable offeror.  ODRS was not next in line for award, or even close.  ODRS hence is not an "interested party" in these proceedings.[17]   This makes the exercise of addressing ODRS's claims an academic one, and the litigation of such claims before the Arbitration Panel pointless.  Nothing in the R-SA allows the arbitration panel to direct the Army to "jump over" not only Mitchco but also *five other offerors* in order to deliver this requirement to ODRS.

65.    The Decision does not dispute that ODRS is not an "interested party," or address the principles underlying the general requirement of interested party status, and yet it permitted the arbitration to proceed to the Decision. Decision at 48. The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise violative of the APA, and therefore it must be "held unlawful" and "set aside."  APA § 706(2).

## G.  Sham Contract/Unclean Hands

66.    The R-SA states that it is:

For the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and

---

[17] ODRS itself has recognized, by its actions, that it is not an "interested party."  For this reason, ODRS filed a GAO protest against the offeror who was next in line for award, and that protest was dismissed.

stimulating the blind to greater efforts in striving to make themselves self-supporting . . . .

20 U.S.C. 107(a).

67.     Mitchco offered evidence, without dispute, that ODRS had employed no blind persons in the Fort Sill cafeterias, and that the blind vendor whom ODRS had used to qualify as an SLA had a "no show" job, with no role in management or operations.  ODRS thus is feigning compliance with the R-SA.  ODRA has "unclean hands" and its claims therefore were not lawfully entertained and decided by the Arbitration Panel.  *E.g.*, *Olmstead v. United States*, 277 US 438, 483-84 (1928).

68.     Instead of dismissing the arbitration proceeding under the "Clean Hands" doctrine, the Arbitration Panel permitted the proceeding to continue to the Decision.  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise in violation of the APA, and therefore it must be "held unlawful" and "set aside."  APA § 706(2).

## H.   Arbitration Count No. 1

69.     As to the four counts set forth in the Mandate Letter and therefore the subjects of the Decision, Arbitration Count No. 1 challenged the U.S. Army's decision not to exercise option periods under the expired contract.  As addressed above, the R-SA and the Regulations do not regulate option exercise,

so as a matter of law, ODRS cannot establish that the Army's decision against exercising options on ODRS's contract was "failing to comply with the provisions" of the R-SA and the Regulations.  20 U.S.C. § 107d-1(b).  This Honorable Court so ruled.  Even if the R-SA extended to the exercise of options, the U.S. Army's decision not to exercise ODRS options was neither arbitrary nor capricious.

70.    The Decision nevertheless concluded that "the non-exercise of the option period by the Army under the specific facts of this case without first securing the opinion of DOE's Secretary that the non-exercise was warranted was a violation of the RSA."  Decision at 57.  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise violative of the APA, and it therefore must be "held unlawful" and "set aside."  APA § 706(2).

## I.  Arbitration Count No. 4

71.    In Arbitration Count No. 4, the "meal bands" Count, ODRS argued that "the use of meal bands to order full food services degrades the Act's priority right of the SLA."  Mandate Letter at 1.  In essence, ODRS argues that the Army manipulated the meal band system in order to cheat ODRS:  "the Army basically camouflaged the number of meals required to be served" (a very strange argument for ODRS to make, given the fact that it was the

incumbent contractor and knew exactly how many meals had been served, every day, for years).[18]

73.    As noted above, the "priority right of the SLA" (requiring consultation between the Secretary and the contracting activity) applies only when an agency judges that the SLA's proposal is within the competitive range. When a competitive range is established, an agency is required to conduct "discussions" only with offerors in the competitive range. There is no evidence in the Decision, or the hearing record, of any notable connection between meal bands in the RFP and the U.S. Army's subsequent competitive range

---

[18] ODRS's "meal band" argument, which this Court already has addressed and rejected, is so convoluted that it is difficult even to explain, but it is essentially as follows. Under this requirement, the contractor provides cafeteria labor; the U.S. Army pays separately for the food itself. Therefore, the U.S. Army decided to structure the pricing of this requirement not on the basis of how many individual meals are served, but rather on the basis of how many serving lines the contractor needs to staff. The RFP reflected this on the basis of "meal bands"; for instance, 0-1200 meals would require one serving line, and therefore be priced at a certain amount, while 1201-2400 meals would require two serving lines, and therefore be priced higher. ODRS, forced to explain why its proposal was so enormously more expensive (and thus excluded from the competitive range), seeks to blame the meal bands. But the meal bands structure applied equally to all offerors, including Mitchco. There is no disparate impact on ODRS. Also, neither ODRS nor the Department has any authority to question the Army's decision in this regard; it simply isn't an R-SA issue. ODRS's "camouflage" argument is even more convoluted than this, but the same principles apply. If the U.S. Army had "camouflaged" anything, it would have had no greater impact on ODRS than on any other offeror.

determination.  In addition, ODRS's "meal band" excuse for its exorbitant price evaporates when one realizes (as the Decision reflects) that ODRS's proposed price was completely out of line as to every other offeror, even though the meal band pricing applied equally to everyone.  Not surprisingly, in ODRS's serial prior legal actions, the same argument was made and rejected *on seven occasions*, including by this Honorable Court.

74.     The Decision nevertheless found that "the Army chose not to clarify any confusion as to how many meals would actually be served and because ODRS was not placed in the competitive range, did not conduct meaningful discussions about pricing with it."  Decision at 65.  The Decision concluded that "ODRS's bid could have been lowered had the Army and both agreed to be contractually bound to provide three-day notice of meal counts and properly conducted meaningful discussions with ODRS as to its price."  *Id*. at 67.  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it otherwise violated the APA, and it therefore must be "held unlawful" and "set aside."  APA § 706(2).

## J.   Arbitration Count No. 5

75.     Arbitration Count No. 5 argued that the U.S. Army violated the R-SA because, allegedly, "in finding the proposal outside of the competitive range, it failed to follow the stated evaluation criteria."  Mandate Letter at 2.

Yet ODRS did not discuss (in its arbitration count) the "stated evaluation criteria" in the Solicitation, or how the U.S. Army failed to follow them.[19]  This argument simply is baseless, and even if it were true, it is not a proper function of an R-SA arbitration panel, with its limited jurisdiction, to resolve it.

76.    ODRS's primary "gripe" regarding the evaluation of its proposal is that its Past Performance was rated "Unacceptable."  Mitchco provided testimony from ODRS/Cantu's own senior staff that ODRS's performance was, in fact, appalling.  In any event, the U.S. Army's evaluation of ODRS's Past Performance was not "arbitrary or capricious" under the APA, nor does a Department arbitration panel have any authority to review such evaluations under the R-SA.  As the Court of Federal Claims noted when it rejected ODRS's legal argument, proposal evaluation of such evaluation factors as past performance is assessed by the agency exercising its reasonable discretion, consistent with the terms of the pertinent solicitation and the FAR.   Not only was the Army's evaluation proper in that regard, but the R-SA also does not provide the rules for an agency's assessment of past performance.  The Arbitration Panel therefore lacked the jurisdiction to address this argument.

---

[19]  In fact, ODRS presented these arguments to the CFC, where they were heard on the merits and rejected, as shown above.

77.     Furthermore, the U.S. Army adjudged ODRS's proposal to be outside the competitive range because its Past Performance was rated "Unacceptable," and because its proposed price was by far the most profligate. The Arbitration Panel has no authority whatever to "second-guess" the Army's competitive range determination.

78.     Review of the record here will show that before the Arbitration Panel, ODRS never addressed the stated evaluation criteria for Past Performance.  Even if ODRS had done so, its objection to the U.S. Army's evaluation of its past performance was shown at the arbitration hearing to be entirely without merit.

79.     At the hearing, two former ODRS/Cantu managers proffered as witnesses by Mitchco frankly admitted that Cantu's poor performance resulted from a deliberate decision by Cantu to understaff the ODRS contract.  They also confirmed that the Army's evaluation of ODRS's horrible past performance was accurate.

80.     Despite the above, the Arbitration Panel ruled that "the past performance evaluation conducted by the Army violates the Past Performance Criteria of the Solicitation and 34 C.F.R. § 395.33(b) and should not been used by the Army to exclude ODRS from the competitive range."  Decision at 64-

65.[20]  The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise violative of the APA, and therefore must be "held unlawful" and "set aside."  APA § 706(2).

### K.  Arbitration Count No. 6

81.    Arbitration Count No. 6 is whether the U.S. Army "failed to properly determine whether [ODRS's] proposal could provide services at a reasonable cost."  Mandate Letter at 2.

82.    ODRS's proposed price was $145.7 million, while the historical average price was $102.5 million.  Decision at 14.  ODRS's proposal was 54% higher than the Government estimate (the ICGE).  *Id.*  In other words, ODRS was trying to parlay its atrocious past performance into, approximately, a 50% raise for substantially the same work.  By any rational standard, ODRS's proposed price was absurdly extravagant.  Mitchco's winning price proposal, by contrast, was less than one percent higher than the historical average price.

83.    Without citing any supporting legal authority, ODRS has attempted to expand the jurisdiction and authority of the Arbitration Panel into a reviewing body regarding agency competitive range determinations under

---

[20] With all due respect to the arbitration panel, any review of the transcript of even only the third day of hearing testimony demonstrates that this conclusion is unsupported by substantial evidence, and in fact it is wildly at odds with the evidence.

agency solicitations and the FAR.  The R-SA does not empower the Arbitration Panel to pass judgment on price reasonableness or competitive range determinations by the agency.  Other statutes and regulations give agencies, the GAO and the Court of Federal Claims jurisdiction of such matters.

84.      Assuming, *arguendo,* that this Arbitration Panel did have such authority, it would have to conclude that the U.S. Army's competitive range determination was correct here, under controlling legal authority.  As noted in the Regulations, a proposal in the competitive range is one that "has been ranked among those proposals which have a reasonable chance of being selected for final award." 34 C.F.R. § 395.33.  The U.S. Army judged that ODRS's proposal did not have a reasonable chance of being selected for final award.  For reasons discussed above, that was an exceedingly easy decision for the U.S. Army to make.  ODRS was not in the competitive range, and it could not lawfully have been included in the competitive range.  *See* FAR 15.603(c) ("the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals").  In no way, shape or form was ODRS's proposal one of "the most highly rated proposals."

85.      The Decision does not directly address this issue.  Tangentially, the Decision states that "ODRS's bid could have been lowered had the Army and both agreed to be contractually bound to provide three-day notice of meal

counts and properly conducted meaningful discussions with ODRS as to its price."  Decision at 67.  This is essentially a *non sequitur;* the arbitration panel has no authority to rewrite the Solicitation to change the requirement to ODRS's liking, regarding "three-day notice of meal counts" or anything else.[21] The Decision therefore was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise violative of the APA, and it therefore must be "held unlawful" and "set aside."  APA § 706(2).

## REQUEST FOR RELIEF

For the reasons stated above, as applied to each argument, the Decision is:

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
**(B)** contrary to constitutional right, power, privilege, or immunity;
**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
**(D)** without observance of procedure required by law;
**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of [T]itle [5] or otherwise reviewed on the record of an agency hearing provided by statute; or
**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

---

[21] Moreover, nothing in the record suggests that the presence or absence of "three-day notice of meal counts" accounted (or could account) for the $50+ million price difference between the ODRS and Mitchco proposals, or explain why ODRS's proposal was, by far, the most expensive.  Here again, such rules applied equally to all offerors.

*Id.*

**WHEREFORE**, Plaintiff Mitchco respectfully requests judgment as follows:

86.    A declaration that the Department's Decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and otherwise in violation of the APA, and therefore it is "unlawful" under APA §§ 556, 706(2)(b) & 706(2)(d);

87.    An injunction that "set[s] aside" the Decision, *id*. § 706(2), and that permanently enjoins the Department and the U.S. Army from implementing or otherwise enforcing any part of the Decision; and

88.    Such other relief as the Court deems just and proper, including without limitation reasonable attorneys' fees and costs.

Respectfully submitted,

*/s/ Susan F. Kane*
Susan F. Kane, OBA No. 19455
RYAN WHALEY COLDIRON JANTZEN
    PETERS & WEBBER, PLLC
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
Telephone: 405-239-6040
Facsimile: 405-239-6766
susanfkane@gmail.com
ATTORNEY FOR PLAINTIFF,
MITCHCO INTERNATIONAL, INC.

*Pro hac vice request pending:*
*/s/ Alan Grayson*
Alan Grayson
D.C. Bar No.: 388633
1300 I St., NW, Suite 400E
Washington, DC 20005
(mailing address:
8419 Oak Park Road
Orlando, FL 32819)
Telephone: 407-493-9633
Facsimile: none
Email: grayson@graysonlaw.net
Attorney for Plaintiff,
Mitchco International, Inc.