**BEFORE THE REHABILITATION SERVICES ADMINISTRATION
DEPARTMENT OF EDUCATION**

OKLAHOMA DEPARTMENT
OF REHABILITATIVE SERVICES

        Complainant

      Vs.                                            Case No. RS/18-09

THE UNITED STATES DEPARTMENT OF THE ARMY,
FORT SILL

        Respondent

---

Appearances:

For the Complainant:

                Peter A. Nolan, ESQ.
                Winsted P.C.
                Andrew J. Schumacher, ESQ.
                Winsted P.C.

For the Respondent:

                Shawn C. Butler ESQ.
                Army-Advisor (Contracts)
                Kevin D. Cox, ESQ.
                Mission and Installation Contracting Command,
                U.S. Army

Interested Parties

                Alan Grayson, ESQ.,
                for Mitchco International, Inc.

                Bryan N.B. King, ESQ.,
                Fellers Snider
                for David Altstatt Sr., and Cantu Services, Inc.

## DECISION OF THE ARBITRATION PANEL

### INTRODUCTION

Congress passed the Randolph-Sheppard Act (RSA) in 1936 to provide blind persons increased employment opportunities through the operation of vending facilities on federal property. 20 U.S.C. §107(a) and (b).  The RSA was amended in 1974, and implementing regulations were enacted in 1977 at 34 Code of Federal Regulation ("C.F.R.") 395.1 et seq. The Department of Education regulations have not been amended since their inception in 1977.

The United States Department of Education (DOE) administers the RSA, and the Secretary of Education designates "state licensing agencies" to license blind persons to operate vending facilities. The Complainant, Oklahoma Department of Rehabilitation Services (ODRS), is the State Licensing Agency (SLA) for Oklahoma.

Under the RSA, blind vendors do not apply directly for government contracts.  Id.§107a(a)(5). The RSA provides for blind individuals licensed by an SLA to operate vending facilities on Federal and other property,[1] The SLA in turn applies for contracts (or permits for locations other than cafeterias)[2] involving the operation of vending facilities. 34 C.F.R. §395.33. The State Licensing Agencies bid for particular federal contracts, and then assign blind vendors to operate the facility.[3] See id. §§395.2-395-17. A cafeteria contract is awarded in the name of the SLA and managed by the blind manager licensed by the SLA. 34 CFR § 395.33(b).

Military dining facilities, including the dining facility at Fort Sill, are vending facilities to which the RSA's priority applies. 20 U.S.C. §§ 107e(7), 107d-3(e); 34 C.F.R. §§ 395.1(d), 395.33;

---

[1]      20 U.S.C. § 107a(b), 20 U.S.C. § 107d-4.
[22]      34 C.F.R. § 395.16.
[3]      All Federal agencies are required to take "all steps necessary to assure that, wherever feasible ... one or more ending facilities for operation by blind licensees shall be located on all Federal property[.]" 34 C.F.R. § 395.30(a).  The only exception to this requirement is where the Federal agency has sought and received from the DOE Secretary "a determination that the placement would adversely affect the interests of the United States."  20 U.S.C. § 107(b).

*NISH v. Rumsfeld*, 348 F.3d 1263, 1270-71 (10th Cir. 2003); *NISH v. Cohen*, 247 F.3d 197, 204-06 (4th Cir. 2001). Under 20 U.S.C. § 107d-3(e), Congress established regulations for establishing a priority for blind vendors as follows:

> "The Secretary, through the Commissioner, shall prescribe regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise."

The DOE is the agency charged with not only implementing the Act, but also enforcing the Act when federal agencies seek to limit the economic opportunities for the blind. 20 U.S.C. § 107(b). This provision provides that a "limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interest of the United States shall be fully justified in writing to the Secretary."

The DOE has explained how it fulfills its congressionally mandated duties to enforce the Act in its manual, the "Administration of the Randolph-Sheppard Vending Program by Federal Property Managing Agencies (FPMAs)"[4] which provides:

> "4.c. Limitation on Placement or Operation of a Vending Facility - In essence, the final paragraph of Section 1 is clearly intended to preclude an arbitrary or unjustified decision on the part of a FPMA to not allow or unduly curtail the operation of a vending facility on Federal property. Any supportable position to do so specifically must be justified in writing to the Secretary, ED. The Secretarial Determination on the issue is binding upon the FPMA and requires publication in the Federal Register. Substantiation would be required to support such a written justification for a "limitation."

The DOE has provided guidance to federal property managers on how the priority is afforded the blind vendor in a competitive bidding process.

In order to establish the ability of blind managers to operate a cafeteria, the appropriate SLA

---

[4] The Army points out that this is not a Regulation, since it was not published in the Federal Register, but a Policy Statement giving guidance explaining how it fulfills its congressionally mandated duties to enforce the RSA.

should be invited to respond to solicitations for offers when a cafeteria contract is contemplated. 34 CFR § 395.33(b). If the Army determines that the State can provide the service and has a reasonable chance of being selected for award, the State is placed in a competitive range.

In this case, ODRS filed a Complaint with the DOE alleging that the Army violated provisions of the RSA. Pursuant to the RSA, the DOE convened a panel to hold a hearing to examine the allegations in the Complaint and provide the DOE a decision on its Finding of Facts and Conclusions of Law. Mr. Steven Fuscher, Ms. Susan Gashel, and Mr. Jerry Sellman, as Chair, were appointed to the Panel. This matter comes before the Panel pursuant to 20 USC 107d-1 (b) and CFR 395.37. A hearing was held in the above matter on January 14-16, 2020, at Fort Sam Houston in San Antonio, Texas. The parties, as well as designated interested persons, were given the full opportunity to present testimony and evidence. The hearing was transcribed by a court reporter, and the parties received the transcript of the hearing on or about January 31, 2020.  The parties then submitted post-hearing briefs and Reply Briefs, and the record was closed on May 10, 2020. The Panel has considered the testimony, exhibits and arguments of the parties in reaching its decision.

## STATEMENT OF THE CASE

The DOE, on April 12, 2019, charged the panel to address the following two issues:

Issue 1. Whether the Army's decision not to exercise the third option year on its contract for dining facility services with the Oklahoma SLA is a limitation on the placement or operation of a vending facility that must be justified to the Secretary of Education under 20 U.S.C. § 395.30(b), and then, whether the Army violated the Randolph Sheppard Act (RSA)(Act) at 20 U.S.C. §107(b) and implementing regulations 34 C.F.R. §§395.30(b) and 395.33(b) by not exercising its third option year on its contract with the Oklahoma SLA (placing a limitation on the operation of a vending facility) and issuing a new FFS solicitation, without fully justifying to the Secretary its decision that such operation of a vending facility (i.e., the continued operation of the Oklahoma SLA contract) would adversely affect the interests of the United States. (Arbitration Count No.1 in ODRS Complaint).

Issue 2. Whether the Army violated 20 U.S.C. §107d-3(e) of the RSA and 34 C.F.R. §§395. 33(a) and (b) by failing to judge the proposal received from the Oklahoma SLA (ODRS) to be within the competitive range on solicitation W9124J-18-R-0024 for dining facility services

at Fort Sill and to be ranked among those proposals which have a reasonable chance of being selected for the final award. (Arbitration Count Nos. 3,4,5,6.in ODRS Complaint).

The issues before the panel are based on the following counts alleged by ODRS:

Count 1. The Oklahoma SLA (ODRS) alleges that the Army engaged in several actions that violated the RSA and its implementing regulations at 34 C.F.R. part 395.  ODRS was awarded the most recent contract for cafeteria services at Fort Sill by the Army.  That contact included one base year and four options years.  After ODRS performed two years of that contract, the Army decided to exercise its option to opt out of the rest of the contract and subsequently issued Solicitation W9195-18-R0024 in the third year, applying the priority under the Act.  At that point, the Oklahoma SLA filed a request for arbitration on April 19, 2018, alleging that before exercising the option to decline further option years on the contract with the Oklahoma SLA, the Army was required under Section 107(b) of the Act and 34 C.F.R. §394.30(b) to fully justify in writing to the Secretary of Education (Secretary) its limitation on the continued operation of a vending facility by a blind manager.  Oklahoma alleges the Army did not do so.

Count 2. On November 29, 2018, ODRS amended its request for arbitration, alleging that the Army's Solicitation W9195-18-R0024 for its full food service (FFS) contract at Fort Sill violated Section 107d-3(e) of the Act and 34 C.F.R §395.33(a) by allowing the Army to award the contract to a vendor other than ODRS if the Army determines that the SLA is outside the competitive range without first consulting the Secretary.

Count 3. ODRS also alleged that the solicitation's $111 million program price ceiling was arbitrary and failed to consider whether the SLA can operate the Fort Sill dining facility at a reasonable cost.

Count 4. The Oklahoma SLA's final allegation regarding the terms of the solicitation was that its use of meal bands to order full food services degrades the Act's priority right of the SLA.

Count 5. Although ODRS submitted a bid for the contract, the SLA was informed, on March 14, 2019, that it was eliminated from the competition.  A second amended complaint and request for arbitration followed on March 22, 2019, which complied all previously alleged claims and added three new ones.  ODRS alleges that the Army violated Section 107d-3(e) of the Act and 34 C.F.R. §395.33(a) and (b) because, in finding the proposal outside the competitive range, it failed to follow the stated evaluation criteria in evaluating ODRS's proposal.

Count 6. The Army failed to properly determine whether ODRS's proposal could provide services at a reasonable cost.

Count 7. ODRS alleges that the Army violated Section 107d-3(e) of the Act and 34 C.F.R. §395.33(a) by failing to consult with the Secretary after determining that ODRS was outside the competitive range but before it awarded the contract to a vendor other than the SLA (ODRS).

Arbitration Counts No. 2 and 7 are not within the scope of this Arbitration pursuant to a finding by the Secretary of the Department of Education that Section 395.33(b)'s requirement for an Agency to consult with the Secretary is only after and SLA is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award. If a federal agency finds an SLA outside the competitive range, and the SLA determines that the Federal agency is failing to comply with the Act or its implementing regulations, the SLA's recourse is to request arbitration, as the Oklahoma SLA has done here. See 20 U.S.C. §107d-1(b).

## FINDING OF FACTS

The Parties did not agree to a Stipulation of Facts prior to the start of the hearing. Therefore, the panel relies on the following facts to state its final decision.

This proceeding involves the awarding of cafeteria services at Fort Sill in Oklahoma. Fort Sill is one of the Army's largest and most active military installations in the United States. It currently has six (6) Dining Facilities ("DFACs") in different levels of operation. The DFACs located in Buildings 2755, 3720, 5965, and 5966 are receiving full contractor support, to feed Soldiers of the Fires Center of Excellence, Soldiers in basic training, other tenant organizations, and associated units. The DFAC located in building 3443 is currently only receiving limited contractor support. While the DFAC located in building 2811 is not currently being used for food services. The scope of the cafeteria services is brought into perspective by the fact that from January 2018 through January 2019, 4,556,117 meals were prepared and served.

From October 1, 2001 to September 30, 2015, ODRS, through a licensed blind vendor and his teaming partner, provided cafeteria services at Fort Sill for multiple dining facilities. Each contract covered all of the dining facilities and was for five (5) years, consisting of a base year with four one-year options.[5] Initially, on the current contract, ODRS used Mr. Robert Brown along with his partner, Blackstone, to manage the contract.

---

[5] See R/S 15-10, September 2, 2016, available at https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-15-

6

In preparation for the next five-year period, the Army divided the dining facilities into two groups and issued two solicitations. However, the Army sought to limit the application of the RSA to apply to only one of the solicitations (Arbitration Decision at FOF 22).

ODRS requested that both solicitations comply with the RSA on December 15, 2014, but the Army denied its request on January 12, 2015 (Id. at FOF 49).

On February 3, 2015, ODRS contested the actions of the Army and requested an arbitration panel be convened to adjudicate the matter (Id. at FOF 57).

On December 23, 2016, the arbitration panel found that the Army violated the RSA.

In compliance with the ruling of the arbitration panel, a new five-year contract was awarded to ODRS on April 1, 2016, (W9124L-16-D-0001) ("2016 Contract") with a base year period with four one-year options for most of the dining facilities. Therefore, if all four option years would have been exercised under the 2016 Contract, then ODRS would have performed at Ft. Sill through March 31, 2020. One remaining dining facility continued to be operated by ODRS under the provisions of the previous contract from 2009. (W9124J-09-D-0003) ("2009 Contract").

In 2017, Ft. Sill believed it had "relationship" problems with the blind manager, Robert Brown, and rated his management on the 2016 Contract as unsatisfactory from April, 2016 through March 31, 2017. Mr. Brown's teaming partner for the 2016 Contract was Blackstone.

In order to resolve these "relationship" problems, on August 1, 2017, ODRS replaced the management team on both contracts with a new manager, David Altstatt (Altstatt), and his new teaming partner, Cantu Services, Inc. (Cantu) Cantu remained as the teaming partner with David Altstatt until the end of ODRS's contract with the Army.

When the Altstatt/Cantu team took over on August, 1, 2017, it did not have a typical phase-in period associated with a new contractor, but was judged as an existing contractor. Even this was a

---

10.pdf  (the "Arbitration Decision), at FOF 16

new licensed blind vendor and a new teaming partner, the Army considered the provision of service to be on-going, since the contracts were with ODRS.

Contractors providing cafeteria services are subject to inspections to determine compliance with contract requirements. At Ft. Sill, the Installation Medical Authority ("IMA") performed monthly, unscheduled inspections at the dining facilities operated by ODRS and its team members. Each of these IMA inspections scored ODRS as "fully compliant." Two such inspections during recent past operations of ODRS were concluded with accolades of "Facility was well cleaned and maintained. Great Job!   and "Floor(sic)was very well kept and maintained."

The Army's Food Management Assistance Team ("FMAT") also conducts regular inspections, which are more detailed inspections than the Army's regular inspections. Prior to providing services at Ft. Sill, Cantu had provided cafeteria services at other Army facilities for a number of years. In a confidential survey, the FMAT at Ft. Sam Houston indicated that Cantu and its SLA teaming partner had performed services at Ft. Sam Houston in a satisfactory performance manner across all functional areas.

Ft. Sill had its own Contracting Officer Representative (COR) that was responsible for conducting inspections of the dining facilities for contract compliance. When the Altstatt/Cantu team started performing services in August 2017, an inspection team under the direction of COR Buchanan was responsible for ODRS's contract performance and began conducting inspections of the dining facilities.

From August through December, 2017, ODRS received Contract Discrepancy Reports (CDR) every month. Each report included a threatened deduction for non-compliance with the contract. Upon receipt of each CDR, ODRS responded in writing to the Contracting Officer (CO) Ms. Abraham, indicating that the inspections were overzealous and the inspection methodology were not consistent with the requirements of the contract. Many of the alleged "defects" did not rise to the

level of a defect under the contract and were not the basis for any "deductions (letter dated October 11, 2017: letter dated October 16, 2017; letter dated December 11, 2017; letter dated January 11, 2018; letter dated March 26, 2018; letter dated September 6, 2018); and letter dated October 22, 2017.) Examples of the basis for complaining were:

- Defects were given for failing to enter certain information into the computer system, even though ODRS complained that the 72-hour window to enter this information had not expired;

- A shift leader did not sign a production form, which is a correctible administration error, not a defect;

- A correction was made on a production form and there was no corresponding set of initials marking the correction;

- An observed defect for accumulation of grease and dirt in the dish room, even though ODRS complained that the inspectors did not give it the 90 minutes after a meal period allotted by the contract to clean this area;

- Repeated citations for pest infestation, even though ODRS complied with its obligation to put down boric acid and the pest control was managed as an integrated program which included work performed by another contractor and the government over which they had no control; and,

- Inspections were being conducted over a 7+ hour periods, which was unusual and indicative of a concerted effort to find a minor deficiencies).

After discussing these CDRs with Ms. Abraham, no action was taken and no deductions were made. When Ms. Abraham was asked on cross examination at the hearing if she independently investigated whether ODRS's complaints about Mr. Buchanan and his investigation team were true, she testified that she conducted a cursory and informal review of one instance of Mr. Buchanan's work. Eventually she admitted that she did not understand what constituted a proper inspection under the contract.

Throughout 2018, while inspections continued, the Army did not issue any CDRs to ODRS.

In January 2018, ODRS Managers were given completed Inspection forms that contained the language "Acknowledge and understand deficiencies noted" above the signature line. At the

instruction of ODRS, the Managers would acknowledge receipt of the inspection results, but sign above the signature line or cross out the "understand deficiencies noted" language and sign the form. ODRS noted that it disagreed with many of the "findings" as a defect or a violation of the contract and did not want their managers to "acknowledge and understand deficiencies noted" when ODRS did not consider it a deficiency. It would have been an inaccurate and untruthful acknowledgement in ODRS's opinion. ODRS Managers signified receipt of the forms, but did not acknowledge "deficiencies noted." ODRS sent copies of inspection forms from the Department of the Army prototype inspection form, Ft. Sam Houston, and Ft. Lee, which only require acknowledgement and not an acknowledgement of a deficiency.[6] Ft. Sill had developed its own form.

On March 19, 2018, ODRS received Observation Reports from the Army indicating evidence of improper cooking habits (raw chicken observed being served), expired food, mislabeled food, time and temperature control checks not being performed, and food packaging in storage areas without integrity exposing raw food items, which occurred at the end of February to early March period.  On March 22, 2018, ODRS sent a letter to the Contracting Officer and Contract Specialist addressing all of the issues raised, that it took full responsibility for the fulfillment of the contract and the associated health and well-being of all diners, and presented a plan of action to ensure that the instances would not reoccur.

While these deficiencies were highlighted by the Army and Mitchco at the hearing, evidence indicates that ODRS did not ever receive any deductions for these non-compliance issues.

In February 28, 2018, the Army notified ODRS that it was not going to exercise the remaining option years on both the 2009 Contract and the 2016 Contract. Prior to the award of Contract W9124L-16-D-0001 on 1 April 2016 as an ID/IQ contract, the Army elected to not exercise the third-

---

[6] This was ODRS's response to the January 2018 COR Monthly Report, which was received in March of 2019.

year option in Contract W9124L-16-D-0001. Contract W9124L-16-D-0001 authorized the provision of FFS contract services for one twelve-month base year and four twelve-month option periods. The Army contracting officer made a "decision" to issue a new solicitation to combine the work authorized by this contract at Fort Sill with another contract being performed by ODRS rather than exercise option two of the contract.  As a result, none of the remaining options were exercised under contract W9124L-16-D-0001.

Army witness, Robert Tryan, who had worked with the Ft. Sill contract for 15 years, testified that the new solicitation was issued because it was determined that it was in the best interest of the Army to do so. Army Witness Stevens testified that the reason for re-procuring the Ft. Sill FFS contract was ostensibly because the Army was implementing a new Army-wide program that changed the way the Army purchased these services to try to standardize full food services across the United States. He stated that the goal of the program was to standardize criteria, such as evaluation criteria, contract clause, and solicitation provisions in all resulting contracts. He testified that the Army decided to try to increase competition, stay within the realm of the Randolph-Sheppard Act, and also realize some savings. The program had resulted in the millions of dollars per year savings with a goal of about five percent savings.  So far, the Army has realized about a 16 percent savings over the life of a contract. He indicated that to his knowledge, the Ft. Sill FFS contract was the only contract where additional option years were not exercised to start the new program and that the termination was purely discretionary. He further indicated that as of the date of the hearing, all but one full food services contract was awarded to an SLA and in that case, the SLA did not propose.

The Army did not attempt to justify its determination to the Secretary of Education that it was in the "best interest of the Army" to terminate this R/S opportunity for Mr. Altstatt.

On March 9, 2018, ODRS formally objected to the Army's actions by filing an agency level protest with Contracting Officer Abraham that the Army did not consult with the Secretary of the DOE before making a determination not to exercise any remaining options under the contract.

On March 27, 2018, Ms. Abraham denied ODRS's agency level protest and overruled ODRS's objection to the Army's failure to consult with the DOE Secretary.

Consequently, on April 19, 2018, ODRS filed its complaint under 20 U.S.C. § 107d-1(b) with the DOE Secretary challenging the Army overruling ODRS's objection.

After informing ODRS that it was not exercising the options on its contracts, it issued a new Solicitation which contemplated an award to the lowest priced, technically acceptable (LPTA) offeror and it included three evaluation factors - technical capability (including two subfactors, key personnel and qualifications, and staffing plan), past performance, and price. That is, the successful offeror needed an acceptable technical proposal, an acceptable satisfactory past performance rating, and a fair, reasonable and balanced proposed price. With respect to the past performance evaluation, the Army stated that it would consider information available from "the Past Performance Information Retrieval System (PPIRS), Federal Awardee Performance and Integrity Information System (FAPIIS), Electronic Subcontractor Reporting System (eSRS) or other databases; and may be obtained from other sources available to the Government, such as the Defense Contract Management Agency; and interviews with program managers, contracting officers, fee determining officials." The Army also stated that "All past performance comments received will be taken into consideration.

ODRS prepared a proposal on behalf of ODRS' team member Altstatt/Cantu Services, Inc., which included past performance reports and pricing. The past performance reports documented ratings of "Exceptional", "Very Good" and "Satisfactory" performance on other full food service contracts by ODRS's team member, Cantu Services, Inc. at Ft. Dix and Ft. Sam Houston.

It also submitted proposed pricing on "meal bands", which is pricing for a range of meals to be served each day in each dining facility. (The bidders were furnished information about how many days of a given meal band each facility would have in a given year. As an example, if a building serves three meals per day, it would have 3 meal bands that might be used on any given day ranging from 1-2400, 2401-4800, or 4801-7200). In preparing a bid based upon meal bands, the bidder had to determine which of the three bands would be applicable for each meal period (three meals per day). The successful bidder would need to be prepared to staff and prepare meals for an entire band per meal and the Army would pay based upon each band. As an example, if 2400 soldiers showed up for a meal, the Army would pay a fixed fee under the first band (1-2400). If 2401 soldiers showed up for a meal, the Army would pay a fixed fee under the second band (2401-4800).

Even though the ODRS team had available information from historical head count information from its past and current operations at Ft. Sill, it requested additional information to help pinpoint the number of troops to be served each day. Cantu had provided services to the Army at Ft. Lee in Virginia under a meal band and there were problems with knowing how many soldiers would be at each meal. As a result, ODRS specifically asked if the Army were going to provide the number of meals to be served. It did not provide a written answer ODRS's questions, but instead referred ODRS to historical data that did not give ODRS the answer to how many troops would show up at a particular facility on a particular day. Army witness Tryan testified that a site visit was conducted where all offerors were present, including ODRS, and Mr. Brian Buchanan indicated that meal counts would be given three days in advance. Cantu's Director of Operations testified that he was at the site visit and was not aware that such information was given. Further, he indicated that the question and Army answer in regard to meal counts was after the site visit.[7]

---

[7] While such information was not provided during the bid submission and question and answer period in writing. the Army is currently furnishing the dining facilities contractor estimates of how many troops to expect at each meal, each day for each facility. These are provided three days in advance

13

All offerors were provided the same information.

ODRS' bid of $145.7 million based upon providing staff sufficient to feed troops at the top of each anticipated meal range of each band. According to the Government's Price Analysis Memorandum, the historical average price to serve the troops at Ft. Sill was $102.5 million. The Government prepared its own Independent Government Cost Estimate ("IGCE"). The IGCE was somewhat lower than the historical average price, at $94.4 million, meaning that ODRS's proposal was 54% higher than the ICGE. The winning bidder's price proposal, by contrast, was less than one percent higher than the historical average price.

On February 25, 2019, and during the initial evaluation of proposals, the Army sent a communication to ODRS under the authority of Federal Acquisition Regulation (FAR) 15.306(b)(i), which covers communications with an offeror before establishment of the competitive range. The communication's purpose was to provide ODRS with the opportunity to review and respond to adverse past performance information sent with the communication concerning the new Solicitation. The adverse performance information included internal Army COR monthly reports, quality assurance inspections reports, monthly meetings between the Army and ODRS, interactive customer entry comments (ICE comments), and other information that the Army was seeking feedback from ODRS to utilize in establishing the competitive range.

The monthly COR Reports covered the period from January 2018 through January 2019. These internal Reports contained internal findings of Marginal Performance for each of the 13 months. Since none of these Reports had been distributed to ODRS until February 2019, ODRS had no contemporaneous opportunity to respond to the comments.

On March 1, 2019, ODRS provided a response to the Army's communications regarding the adverse past performance, noting the delay, inconsistencies among the reports, ODRS plans of action that were not recorded in the Reports, reported deficiencies labeled critical that were not under the

14

contract, and findings of alleged long-term habits of not following terms of contract and regulatory requirements that were communicated to ODRS for more than 13 months.

On March 14, 2019, the Army informed ODRS that it was not being included in the competitive range due to being found unacceptable for past performance and because its price was unreasonably high and thus, not competitive.

Because a "bridge contract" was needed to cover the gap from operations under existing contracts and the issuance of a new contract, on March 22, 2019, Ms. Abraham, in her capacity as a Contracting Officer for the Army, certified that ODRS was a "responsible contractor" entitling ODRS to the award of the full food service bridge contract at Ft. Sill beginning April 1, 2019, and ending November 30, 2019. She certified that ODRS was a responsible contractor with a satisfactory past performance record at Ft. Sill and a satisfactory record of integrity and business ethics.

On 22 March 2019, the Army provided a written debriefing to ODRS under the authority of FAR 15.505, pre-award debriefing, which provided the basis for ODRS exclusion from the competitive range. ODRS was the only offeror (out of 7 offerors) to receive an "Unacceptable" past performance rating from this evaluation team. There were four technically acceptable offers and two of the four were put in the competitive range because their price was very similar.

ODRS past performance evaluation was conducted by a two-person evaluation team which included Mr. Brian Buchanan, who was the COR and chief inspector of ODRS's contract performance on the previous full food services contract at Ft. Sill. With the exception of the inspection reports generated by Mr. Buchanan and his inspectors, all other past performance information available to the evaluation team showed that Altstatt/Cantu Team's past performance ranged from satisfactory to exceptional.

Testimony was given to describe the source selection process, which involves separate teams that evaluate parts of an offeror's proposal. The Army separates the proposals into Technical, Past

Performance, and Pricing.  There was a separate team that evaluated ODRS's technical proposal for compliance and conformance to the technical requirements of the solicitation.  A different team evaluated the past performance of offerors.  Finally, a pricing team conducted a cost and price analysis of proposals. Each team was sequestered from the other two teams, so the three teams did not have access to proposal information that was evaluated by another team.  The names of the offerors were redacted so the members of these evaluation teams did not know the name of an offeror who submitted a proposal.

Mr. Colson and COR Buchanan, provided the past performance report to the contracting officer, Mr. Stevens.  The Report was added to the source selection file.  Mr. Stevens accepted and reviewed the report. Mr. Stevens testified that he found nothing in the report that suggested bias by either Mr. Colson or Mr. Buchanan.

Upon receipt of the Technical Report, Past Performance Report and Pricing Report, Mr. Stevens initiated the competitive range determination.   The competitive range determination summarized the evaluation results of the Technical Panel, the Past Performance Panel and the Pricing Team.

The Army Contracting Officer overseeing the last 17 months of the ODRS contract at Ft. Sill testified that based on her personal experience, the Altstatt/Cantu team could provide the food service at Ft. Sill for a reasonable price.

The Solicitation and the follow-on contact have been the subject of various disputes including procurement protests to the Government Accountability Office (GAO) and the Court of Federal Claims (COFC), and requests for preliminary injunctive relief both in Western District of Oklahoma Federal District Court or COFC to prevent either award or performance under the follow-on contract to Mitchco, the successful bidder.

In November 2018, ODRS amended its first arbitration request. In March 2019, ODRS made a second amended request for arbitration. ODRS's third arbitration submission included its counts from its prior submissions and proffered a total of seven arbitration counts.

In correspondence dated April 12, 2019, the DOE responded to ODRS's various submissions and authorized "the convening of an arbitration panel to hear and render a decision on the issues raised in the complaint."

On November 26, 2019, the Panel conducted a Preliminary Hearing at which time pre-hearing matters were mutually determined a hearing date was set. Subsequent to the issuance of the Scheduling Order, Mitchco International, Inc., David Altstatt, Sr., and Cantu Services, Inc, filed motions requesting that they be permitted to intervene in the proceeding as Interested Persons, which was granted on a limited basis.

A hearing was conducted at JBSA-Fort Sam Houston. At the hearing were representatives from Department of the Army, ODRS, Mitchco, Altstatt and Cantu.

## **Position of the Parties**

Position of ODRS

ODRS argues that the RSA places an affirmative obligation upon the Army to help ODRS's blind vendor, David Altstatt, obtain and retain his priority right to the economic opportunity of the Ft. Sill dining facilities contract. The Army is not a disinterested party. It is an active participant in assuring the blind vendor's priority right to the economic opportunity at Ft. Sill, whenever feasible. However, the Army violated the Act in the following manner: (1) the Army terminated the five-year contract of ODRS for its own convenience (by failing to exercise the renewal option) without securing the approval of the Secretary of Education; (2) in the subsequent solicitation, the Army evaluated the past performance of the ODRS team unfairly to improperly eliminate ODRS from the

new Solicitation's competitive range based on poor past performance; and (3) the Army improperly chose not to conduct meaningful discussions with ODRS to clarify any confusion as to how many meals would actually be served, for if the Army had clearly stated that it would timely provide the amount of meals to be served, as it had in past solicitations, ODRS would have submitted a price proposal acceptable to the Army just as it had done for decades.

The Army did not have the discretion to terminate ODRS's contract and Altstatt's RSA opportunity at Fort Sill as being in "the best interest of the Army" without justifying that limitation to the Secretary of Education. This discretionary termination of ODRS's contract by not exercising the succeeding option periods was a severe limitation on the economic opportunity for the blind vendor, and it was improper because approval by the Secretary of Education was not secured. U.S.C. § 107(b). Section 107(b) directs that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified." *Id*. Section 107(b) was added to the RSA, in part, because "[f]ederal agencies had not done all they could to insure the establishment and the maintenance of blind vendors on property under their control" *SourceAmerica v. United States Dep't of Educ.*, 368 F. Supp. 3d 974, 995-996 (E.D. Va., March 15, 2019).

The RSA's goal of providing the blind with meaningful employment opportunities, with the DOE's oversight, is also echoed in the DOE's guidance entitled, "Administration of the Randolph-Sheppard Vending Program by Federal Property Managing Agencies" which provides:

> "4.c. Limitation on Placement or Operation of a Vending Facility - In essence, the final paragraph of Section 1 is clearly intended to preclude an arbitrary or unjustified decision on the part of a FPMA to not allow or unduly curtail the operation of a vending facility on Federal property. Any supportable position to do so specifically must be justified in writing to the Secretary, ED. The Secretarial Determination on the issue is binding upon the FPMA and requires publication in the Federal Register.

Substantiation would be required to support such a written justification for a "limitation"

The Army has been seeking to limit the RSA opportunity at Ft. Sill since 2015 when it split the dining facilities contract into two contracts and refused to apply the RSA to the larger of the two contracts. After an arbitration panel found that the Army violated the RSA, the Army awarded ODRS the 2016 Contract in compliance with the arbitration panel's ruling. But the Army then terminated the 2016 Contract with options remaining so that it could issue the 2018 Solicitation.

Rather than undertaking its affirmative obligation to protect the priority for blind licensees and to establish vending facilities, the Army's actions in terminating the ODRS 2016 contract prematurely by not exercising the remaining options resulted in eliminating a longstanding RSA opportunity in the cafeterias on Fort Sill.

While ODRS had the opportunity to bid on the 2018 Solicitation, even a fair opportunity to bid on a new contract would not change the fact that the Army eliminated a blind manager's existing opportunity by not exercising the remaining options. Any lottery winner would prefer to have their million-dollar payment rather than a chance to win the money again.

The Army argues that the Secretary's approval is not necessary because when the government holds an option, it may employ whatever lawful criteria it chooses when deciding to exercise it or not. See, *Mktg. & Mgmt. Info, Inc. v. United States*, 62 Fed. Cl. 126, 130 (2004). But the United States Court of Federal Claims recognizes that the government can limit such discretion "and make the exercise of an option less optional, via statute, regulation, or the terms of the contract." See *Magic Brite Janitorial v. United States*, 72 Fed. Cl. 719, 722 (2006). This is exactly what Congress did in drafting Section 107(b) to address the Senate's concerns that federal agencies were not doing enough to ensure that blind vendors continue to operate dining facilities. See S. REP. NO. 93-937, at 16. The Army had the right (or not) to exercise the options, but only in accordance with the law. The issue is

19

that the Army's otherwise lawful decision to eliminate the existing opportunity still needed to be reviewed in accordance with the RSA, which required that the decision be approved by the Secretary of Education because it was a limitation on the placement or operation of a vending facility. See 20 U.S.C § 107(a)(b). Accordingly, the Army violated the RSA by failing to secure the appropriate approval from the Secretary of Education.

The Army evaluated the past performance of the ODRS team unfairly to improperly eliminate ODRS from the new Solicitation's competitive range based on poor past performance. Under the RSA, ODRS should have been awarded the contract if it could provide satisfactory service at a fair price. 20 U.S.C. § 107d- 3(e). Past performance can be used as an indicator of ability to satisfactorily perform the contract. The past performance evaluation was flawed because: (1) it excluded relevant information of past, satisfactory performance by the Altstatt/Cantu team and included irrelevant past performance data from the Brown/Blackstone team; (2) it relied almost exclusively on the biased and flawed evaluations of Brian Buchanan; and, (3) one of the two members of the past evaluation team, Brian Buchanan, had a conflict of interest. The evidence produced at the hearing was that ODRS could satisfactorily perform the contract.

Here, ODRS was not placed in the competitive range, in part, because of an "Unacceptable" past performance rating resulting from the Army's evaluation. RSA regulation 34 C.F.R. § 395.33(b) mandates that this past performance evaluation be performed consistent with the neutral, pre-published solicitation criteria and applicable procurement regulations. It was not. Instead, the Army's decision to re-procure the FFS at Ft. Sill was a continuation of its plan to limit or remove ODRS as the dining facilities contractor and deny ODRS the contract priority it is entitled to under the RSA. The evidence at the arbitration hearing confirms this point.

In 2015, the Army concluded that it had to split the current Ft. Sill dining facilities contract into two separate contracts. Most of the dining facilities would be under a Dining Facility Services

(DFA) contract. The remaining dining facilities would be under a Full Food Services (FFS) contract. Two solicitations were issued, but ODRS was only allowed to bid on the FFS contract. ODRS challenged the Army's decision to limit the blind vendor's opportunity and divide the dining facilities among separate contracts. Ultimately, a three-member arbitration panel appointed by DOE found the Army had violated the RSA by removing the DFA dining facilities from ODRS. The Army was then forced to issue contracts to ODRS to operate all of the dining facilities. Soon thereafter, the Army developed a scheme to get around the arbitration panel's ruling by resoliciting all of the facilities (now in one contract again) prematurely and developing information to indicate a poor past performance that would exclude ODRS from the new Solicitation.

The Solicitation at issue here required offerors to submit past performance information to the Army which included the past performance information associated with any major subcontractor. Here, ODRS used the team of Mr. David Altstatt (the licensed blind vendor) and Cantu Services, Inc. to perform the FFS contract. The Solicitation promised the following with respect to how this past performance information would be presented and used in the evaluation:

> **c. Volume III – Past Performance.** The Past Performance evaluation will be accomplished by reviewing aspects of an offeror's recent Past Performance, focusing on and targeting performance which is relevant to the effort. Past performance information described herein is required on the offeror and all subcontractors, teaming partners, and/or joint venture partners proposed to perform 25% of the proposed effort based on the total proposed price. . . . .
>
> All past performance comments received will be taken into consideration and could affect the overall rating. . . . .
>
> Past Performance Questionnaire – See Attachment 3 Past Performance Questionnaire. The offeror shall forward a copy of the Past Performance Questionnaire for each of the contracts identified on the specific relevant contract reference to the points of contact responsible for monitoring performance. The points of contact shall return the questionnaires directly via email to the Contracting Officer and Contract Specialist at the following email addresses:

Gary.l.stevens.civ@mail.mil and Karina.s.haddix.civ@mail.mil no later than the proposal due date. Questionnaires not submitted directly to the Contracting Officer or Contract Specialist will not be reviewed and evaluated. The information contained in the properly executed and returned questionnaires will be used to evaluate the offeror's past performance.

The Army never considered any of the other past performance information provided with ODRS's past performance proposal which included several reports showing "Exceptional", "Very Good" and "Satisfactory" performance on other full food service contracts by ODRS's team member, Cantu Services, Inc., specifically at Ft. Dix and Ft. Sam Houston. It is clear that the Army's past performance team did not meaningfully consider the Army's Food Management Assistance Team's evaluation ("FMAT") at Ft. Sam Houston, which conducts more detailed inspections than the Army's regular inspections. In fact, all other inspection reports conducted by inspection teams other than the team of inspectors at Ft. Sill supervised by Mr. Buchannan, scored ODRS and its team members as "Satisfactory" or better.

At Ft. Sill, the Installation Medical Authority ("IMA") performed monthly, unscheduled inspections at the dining facilities operated by ODRS and its team members. The IMA is a different organization than Mr. Buchanan's organization, the Logistical Readiness Center ("LRC") and, as such, Mr. Buchanan did not attend the IMA inspections. The IMA inspection also focused upon sanitation and other similar areas regarding food preparation and storage. Each of these IMA inspections scored ODRS as "fully compliant". Two such inspections were concluded with accolades of "Facility was well cleaned and maintained. Great Job!" on May 29, 2018 and "Floor(sic) was very well kept and maintained" on July 23, 2018. ODRS provided these IMA inspections to the past performance team for confirmation that ODRS is capable of performing the work required by this Solicitation. Yet, the past performance team (to include Mr. Buchanan) rejected these IMA inspections as "misleading."

Not only was it a conflict of interest for Mr. Buchanan, as one of only two evaluators, to prepare the Past Performance Evaluation of ODRS. He relied upon his own reports based upon inspections that were flawed, unfair, improper, and biased due to the inspector's failure to follow the guidelines in the contract. ODRS was given "defects" in the reports relating to issues that were not defects. The Reports cited critical defects in ODRS's performance, but the observed events did not meet the contract's definition of "critical services or tasks."[8]. In objecting to the inspections, ODRS pointed out that:

1. ODRS received a defect from Mr. Buchanan and his inspection team for failing to enter certain information into the computer system even though the 72-hour window to enter this information had not expired. In this case, ODRS was not given the time allocated under the contract to perform this work before a "defect" was noted by the inspection team. Additionally, failing to enter this information into the computer system (before it was actually due) does not meet the definition of "critical services or tasks" under the contract.

2. ODRS received a defect from Mr. Buchanan and his inspection team when a shift leader did not sign a production form. As Mr. Handy testified such a deficiency did not meet the definition of "critical standard or task" under the contract. In that case, the meal was served, the soldiers were fed, and no one's health or well-being was impacted.

3. ODRS received a defect when a correction was made on a production form and there was not a corresponding set of initials marking the correction This also does not meet the definition of "critical standard or task" because all soldiers were fed properly and there was no impact to solder's health and well-being.

4. ODRS received a defect for accumulation of grease and dirt in the dish room even though the inspectors did not give ODRS the 90 minutes after a meal period allotted by the contract to clean this area. The inspector left 60 minutes after the end of the meal period.

---

[8] "Critical Services or Tasks" is defined under the ODRS contract as "Those requirements which, when not performed at the time or in the manner described, would be detrimental to the health or well-being or would delay or interrupt the scheduled activities of the person or organization receiving or using the finished product or service, thereby causing the value of the products or service to be partially reduced or valueless" (ODRS Ex. 19 at ODRS 234). Conversely, "Non-Critical Services or Tasks" is defined under the ODRS contract as "Those requirements necessary for satisfactory performance. However, when performed unsatisfactory and corrected, would not be detrimental to the health or well-being; or would not delay or interrupt the scheduled activities of the person or organization receiving or using the finished product or service, and would not reduce the value of the product or service to the Government."

5. ODRS received a defect for pest infestation even though the pest control was managed as an integrated program which included work performed by another contractor and the government.

6. Mr. Buchanan and his inspectors would routinely conduct 7+ hour inspections in an effort to find a minor deficiency. In decades of services with the Army, ODRS did not see an inspection go for this long of time.

Even though ODRS sent detailed written responses to the Army to address all of the alleged defects and why the issues were not defects under the term of the contract, these responses were not considered by the Past Performance Evaluation team. ODRS complained to the Contracting Officer, Ms. Abraham, on numerous occasions that Mr. Buchanan's inspections were improper, overzealous, and inconsistent with the contract, yet she testified that she conducted a cursory and informal review of a single instance of Mr. Buchanan's work. Eventually she admitted that she did not understand what constituted a proper inspection under the contract.

Significant emphasis was placed on complaints of undercooked food, yet the plan of action put in place immediately upon being informed of a complaint to prevent future incidents was unreported in the COR Reports. Complaints of not responding to proper pest control were inaccurate. ODRS complied with contract requirements, but the pest situation could only be controlled by an integrated program which included work performed by another contractor and the government, over which ODRS had no control. Further, ODRS could only use products that the government authorized them to us. While undercooked food is unacceptable under any circumstances, the COR Reports, upon which the evaluation team relied, only identified 24 customer comments or complaints during the 13-month period of reporting, while at the same time 4,556,117 meals were prepared and served. This was not taken in perspective.

The only other evidence not mentioned above that used by the two-member past performance evaluation team was the past performance of a previous licensed blind manager (Robert Brown) and

his different teaming partner (Blackstone). The past performance of the Brown/Blackstone team was irrelevant as to whether the proposed Altstatt/Cantu team could provide good service at a fair price.

It is for these reasons why the Army's evaluation of ODRS's past performance is unreasonable and cannot support the Army's decision to eliminate ODRS from the competitive range. Accordingly, the Army's past performance evaluation violated 34 C.F.R. § 395.33(b) in that the Army did not fairly and properly apply the neutral, pre-published evaluation criteria to ODRS's past performance.

Because Mr. Buchanan's COR inspection reports were used to evaluate ODRS's past performance and ODRS had, on numerous occasions, complained about these inspections, Mr. Buchanan should not have been a member of the two-member past performance evaluation team. Based upon his clear bias, he was unable to render impartial assistance or advice to the Government on ODRS' past performance. The holding in *DZS/Baker LLC*, B-281224 et al., Jan. 12, 1999, CPD ¶19 at 4, confirms that evaluations from government evaluators who possess an impaired objectivity, a conflict of interest, are invalid and cannot be used in making an award decision, let alone a competitive range determination.

The Army violated the RSA by unfairly evaluating ODRS's price. The Solicitation was written to obligate the contractor to staff the contract to provide more food service than the Army would pay for. Historically, the Army would procure food services at Ft. Sill in a manner which allowed the contractor to accurately determine the amount of meals it would be required to serve and calculate the cost for providing the food services. All witnesses agreed the contractor must be informed in advance of how many troops are going to be fed in each facility on each day to accurately calculate the staffing and cost of the contract.

In the new Solicitation, the contractor was obligated to feed every soldier who was sent by the Army to each dining facility, but the Solicitation did not require the Army to give accurate and timely head count information to the contractor before the scheduled meal period.

ODRS informed the Army of the head count issue and requested clarification of how the contractor would be informed of the number of meals served, but the Army simply referred ODRS to the historical meal counts. It was unrefuted at the hearing that the historical meal counts were of little use because the Army now had an economic incentive to send just enough troops to a dining facility to meet the high end of a meal range. By way of example, building 2755 provided for 3 possible meal bands:

> Three meals a day, 1-2400.
> Three meals per day, 2401-4800.
> Three meals per day, 4801-7200.

Because a flat fee is charged for each meal band, the contractor receives the same compensation to prepare and serve 2401 meals as it does to prepare and serve 4,800 meals. The evidence at the hearing was that the price savings to the Army to send troops to building 2755 at the top of the first meal band rather than the bottom of the second meal band would be $2,500,000 over a 5-year period. Contract wide, the economic incentive of the Army to send troops to a facility toward the top of a meal band was 10's of millions of dollars.

As ODRS would still be required to perform in the highest portion of the meal band ordered should those troops present themselves for meals at the dining facility, ODRS prepared a price proposal that addressed (1) the Army's likelihood it would seek performance in the highest portion of each meal band, and (2) the contractual obligation to be prepared to perform in the highest portion of each meal band at every facility. In so doing, ODRS submitted a price proposal that addressed the reasonable costs associated with contract performance given the Army's refusal to provide accurate meal count information. Since the requirements of the Act are to provide remunerative employment

26

for a blind vendor, the dining facilities contract must be operated at a fair profit by the blind vendor. Given the contractual requirement to be prepared to serve at the top end of a meal band for each facility and the requirement to provide remunerative employment for a blind vendor, the bid of ODRS was reasonable.

The Army admitted it was giving the current contractor estimates of how many troops to expect at each meal, each day, for each facility. The estimates are being provided three days in advance, and give the same type of information requested by ODRS in its questions to the Army. If the Army had placed ODRS in a competitive range where it could have conducted meaningful discussions with ODRS to state that information on head counts would be given, ODRS could have reduced its price to more accurately reflect the amount of meals served.

The RSA requires the Army to assure that ODRS is afforded a meaningful opportunity to bid for the operation of the dining facilities. "The [RSA] regulations place a high degree of trust in contracting officers to assure that they negotiate and award contracts consistent with the intent of the Act." "Considering the clear intent of the Act, the determining factor for judging whether a proposal [of the SLA] should be within the competitive range is if the offer can be made acceptable by conducting meaningful discussions….A proposal must be considered within the competitive range unless it is technically inferior or contains unduly high prices… that the possibility of being made acceptable through meaningful negotiations is precluded."

If the Army had placed ODRS in a competitive range where it could have conducted meaningful discussions with ODRS to state that information on head counts would be given, ODRS could have reduced its price to more accurately reflect the amount of meals served.

The primary cost of this contract is labor. The process for developing a reasonable price for labor is to determine the number of meals to be served, determine the staffing to accomplish that, and apply the union wage rates to the staffing. The Army should have informed ODRS that it would not

have to always prepare to staff at the high end of the meal rage at every facility because it would receive accurate estimates of head counts three days in advance. The Army violated the Act by not conducting meaningful discussions with ODRS to determine if it were possible for ODRS to provide a fair price.

The Army that must convince this Panel that its application of the RSA was both permissible and correct. See, *Nish v. Cohen*, 247 F.3d. 197, 206 (4th Cir. 2001). This is the opposite of presuming the agency has taken the proper action when limiting an RSA opportunity. As recognized in a previous RSA panel decision:

> In order to make certain that the RSA achieves its central purpose of increasing employment opportunities for blind people, a federal agency's decision to exclude the bid of an SLA from the competitive range is reviewable under a more rigorous standard because excluding a blind vendor from the competitive range undermines the remedial purposes of the RSA, and subjecting such exclusion decisions to a deferential standard of review such as abuse of discretion would make it far too easy for federal agencies to evade the RSA's requirements. *Missouri Dep't of Social Services*, Case No. R-S/16-13 (May 1, 2019), available at: https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-16-13.pdf

Position of the Army

ODRS has the burden of proof to establish whether the Army violated the RSA. Title 5, Chapter 5, subchapter II provides that the arbitration panel is directed to "give notice, conduct a hearing and render a decision…" 20 U.S.C. § 107d-2(a). That subchapter also provides that the proponent of an order has the burden of proof, and an order may issue "in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d). "Substantial evidence is that amount and/or quality of evidence that leads the trier of fact to conclude that the evidence presented is more probable than not." *Sheets v State of California, Department of Rehabilitation* R-S/13-08. Therefore, the ODRS has the burden to establish that the Army violated the RSA, in other words the Army acted irrational, unreasonably, contrary to law, or abused its discretion by (1) not exercising the options

under contract W9124L-16-D-0001 and (2) failing to judge ODRS proposal to be within the competitive range under solicitation W9124J-18-R-0024.

The Army argues that the Arbitration Panel should dismiss the issues before it under the theories of *Res Judicata*, *Collateral Estoppel*, and/or *Law of the Case* through the adoption of Mitchco's January 9, 2020, Motion to Dismiss (Mitchco Motions). Should these issues not be dismissed based on *Res Judicata, Collateral Estoppel*, and/or *Law of the Case*, the Army argues that (1) it did not violate the RSA by failing to exercise the Second Option Year of Contract W9124L-16-D-001 because the RSA does not apply to contracting administration matters for awarded contracts, which an option clause is considered, and the Army's decision did not prevent ODRS from bidding on the new solicitation; (2) it did not violate the RSA nor it's implementing regulations when the Army judged the proposal received from ODRS to be not within the competitive range based on unacceptable past performance and unreasonable high price, which was consistent with the Solicitation; and (3) once the proposal was determined to be outside the competitive range, it had no obligation to enter into further discussions with it.

The Army, through the adoption of Mitchco Motions, argues that the case should be dismissed as *Res Judicata, Collateral Estoppel*, and/or *Law of the Case*. The Army and Mitchco argue that the same issues before this Panel were raised at the Court of Federal Claims, the General Accounting Office, and the District Court for the Western District of Oklahoma, and this arbitration is nothing more than a different forum in which it seeks a ruling on these same issues.

It maintains that the issues before the Panel as *Res Judicata* based upon the general rule that bars repetitious suits involving the same cause of action. ODRS filed bid protests before the CFC and GAO, as well as sought a temporary injunction, to challenge the awarding of the contract under provisions of the Federal Acquisition Regulations. It argues that *Collateral Estoppel* applies, because the concept is applicable to relieve the government and the taxpayer of "redundant litigation of the

29

identical question of the statute's application." Under these principles, it argues that, before the Arbitration Panel can weigh any evidence, it must first determine to what extent these ODRS arguments already have been rejected in the numerous prior proceedings, "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." Citing *Commissioner v. Sunnen*, 333 U.S. 591 (1948). While not specifically stated, it appears from the arguments made supporting the Motion to Dismiss that the application of the principle "*Law of the Case*" is that this panel is bound by the GAO, CFC, and District Court decisions on the issues before the Panel.

The Army did not violate the RSA by failing to exercise the Second Option Year of Contract W9124L-16-D-001, because the RSA does not apply to contracting administration matters for awarded contracts, which an option clause is considered, and the Army's decision did not prevent ODRS from bidding on the new solicitation. A decision from the Arbitration Panel finding the Army violated the RSA in deciding not to exercise an option under a contract would be an expansion of the RSA's reach without authority in the statute or implementing regulations and without case precedent. The Arbitration Panel in finding a violation would necessarily have to disregard and then suspend the rules in the FAR and the Contract Disputes Act statute (CDA) and substitute them with heretofore unidentified standards for contracts awarded to an SLA under the RSA and Army Regulation (AR) 210-25. The Arbitration Panel finding would result in creating "super-contracts" for blind vendors which federal agencies must form and administer with continuous permission and oversight by the Department of Education. A clear and far reaching expansion of the RSA and disregard of the FAR and CDA.

The RSA arbitration process as set forth in 20 U.S.C. §107d-1(b) does not create an alternative dispute resolution process parallel to what Congress already has provided in the Contract Disputes Act (CDA), 41 U.S.C. §7101 et seq. The CDA affords contractors ample appeal either to COFC or,

for contracts awarded by the Department of Defense (DOD) to the Armed Services Board of Contract Appeals. This is the sole avenue of relief for disputes under all DOD contracts. See Id., at §7103(g). Moreover, the Army Regulation governing awards to SLAs (AR 210-25), specifically in paragraph 2-5b(3), states that normal contract administration procedures, including the application of the CDA, apply to contracts for operation of the DFAC by the SLA and its blind vendor. Finally, ODRS contract contained Clause 52.212-4(d) and through it, Clause 52.233-1, which together require all disputes under the contract to be subject to the CDA. ODRS accepted those terms and conditions upon award of the contract. ODRS cannot now complain that it should not be bound by them and then ask this Arbitration Panel hear its dispute over the Options when these disputes are under the CDA exclusive to other forums than this Panel.

Further, the RSA does not expressly address the opportunity to challenge contract administration actions, including filing a contract dispute. The RSA does not expressly address options in its language. Nor does the implementing regulations address Options. It does address, contrary to ODRS's position in its complaint, in 34 CFR §395.35(f) that "[t]he operation of a cafeteria by a blind vendor shall be covered by a contractual agreement and not by a permit." AR 210-25(6)(c)(3) likewise provides, "[t]he operation of a cafeteria by a blind vendor will be governed by contractual agreement, not by a permit. Normal contract administration procedures will apply, except that termination actions will not be taken without prior coordination…." As such, the RSA is clear that operation of the cafeteria is governed by the terms of the contract. The contract provides the disputes concerning it are handled under the CDA.

The Options within ODRS federal contract at issue here do not create a contractual right until the Government exercises that right. ODRS' complaint mischaracterizes the Army's decision not to exercise the contract Option as "prematurely terminating the ODRS contract…" The Army cannot terminate a contract/option that has not been executed. As GAO has acknowledged, an option is

merely "an unaccepted offer which becomes a binding contract once the option is accepted."

*International Business Invest. Inc. v. The United States*, 19 Cl. Ct. 715, 720 (1990). The GAO has

previously decided:

> "In order for a binding contract to result, the contracting officer must unequivocally express an intent to accept an offer. Also, the acceptance of a contractor's offer by the Government must be clear and unconditional; it must appear that both parties intended to make a binding agreement at the time of the acceptance of the contractor's offer." Comp. Gen. Dec. B-200815

Contract terminations are governed by FAR Part 49. No termination can occur without the

existence of a contract. The exercise of contract options, however, are governed by FAR 17.2.

Options are a contracting tool allowing the government the convenience of entering into contracts

with additional years of performance if the needs of the government are best served. The option is

exercised by the Government, not the Contractor. The decision to exercise an option is at the sole

discretion of the Government exercised by a lawfully warranted contracting officer. FAR 17.207(c).

When a contract "is renewable 'at the option of the Government,'" it is a "true option," does

not "commit the government to renewal, or regulate the conditions under which it could decide to

forego the exercise of its option to renew," and is "within the complete discretion of the government."

*Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed. Cir. 1988). The Army's election

not to execute the option year does not implicate nor violate the RSA, the reported cases related to

RSA arbitration deal exclusively with questions of federal cafeteria contract formation and award to

blind vendors. No reported RSA arbitration case, to our knowledge, deals with contract

administration or disputes.

The only authority cited by ODRS, 20 U.S.C. § 107(b)(2), is completely irrelevant and

misplaced. That provision merely states that a "limitation on the placement or operation of a vending

facility based on a finding that such placement or operation would adversely affect the interest of the

United States shall be fully justified in writing to the Secretary." But the decision not to execute an

option year with a vendor is not a "limitation on the placement or operation of a vending facility." Indeed, as the subject solicitation W9124J- 18-R-0024 makes clear, the placement and operation of the vending facility will continue. In fact, ODRS was invited and submitted a proposal to the solicitation is proof that ODRS was not being limited and was allowed to bid on the requirement.

The Army did not violate the RSA nor it's implementing regulations when the Army judged the proposal received from ODRS to be not within the competitive range based on unacceptable past performance and unreasonably high price, which was consistent with the Solicitation. The Army issued solicitation number W9124J-18-R-0024 to acquire Full Food Services and Dining Facility Attendants support at Fort Sill, Oklahoma. ("Full Food Services" and "Dining Facility Attendants"). The solicitation resulted in contract number W9124J-19-D- 0012. Aspects of the solicitation pertinent to ODRS's complaint concerning its exclusion from the competitive range include: (1) past performance evaluation factor and (2) price factor analysis, and (3) and the competitive range determination. The solicitation was subject to both the RSA and the FAR.

In the solicitation, past performance evaluation was factor 2 was defined as:

"Factor 2 – Past Performance. The past performance evaluation will assess the offeror's probability of meeting the solicitation's requirements as indicated by that offeror's record of past performance. Past performance is assessed at the factor level after evaluating aspects of the offeror's recent past performance and focusing on performance that is relevant to the services being procured under this solicitation. Offerors are cautioned that in conducting the performance risk assessment, the Government may use data provided in the offeror's proposal and data obtained from other sources available to the Government to include, but not limited to the Past Performance Information Retrieval System (PPIRS), Federal Awardee Performance and Integrity Information System (FAPIIS), Electronic Subcontract Reporting System (eSRS), or other databases, and may be obtained from other sources available to the Government, such as Defense Contract Management Agency, and interviews with program managers, contractors, or fee determining officials."

The past performance areas of evaluation include: business relations, quality of service, schedule, customer satisfaction, and compliance with social-economic goals. The factor was rated on an acceptable or unacceptable basis. An acceptable rating was defined as "based on the offeror's

performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort." An unacceptable rating was defined as "based on the offeror's performance record, the Government does not have a reasonable expectation that the offeror will be able to successfully perform the required effort."

The Solicitation provided that price was not scored or rated. Instead, price was evaluated using one or more of the proposal analysis techniques in FAR 15.404-1(b) to determine if a price was reasonable, complete, and balanced. The total evaluated price for award purposes was calculated as follows from the schedule of supplies/services of the solicitation: total price of phase-in CLIN, total price of project management for all years; total price of each dining facility CLIN for all years that contained estimated days; total price of the option to extend services, and total price for contract management report.

The Solicitation provided that the Army would be establishing a competitive range. The competitive range would be comprised of all of the most highly rated proposals. While the RSA and its implementing regulations provide no definition for competitive range, the Federal Acquisition Regulation (FAR) does provide a definition and per the terms of the solicitation was applicable to this procurement. FAR 15.306(c)(1) governs the establishment of the competitive range. FAR 15.306(c)(1) states that "[b]ased on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals."

In the absence of clear language under the RSA and the clear applicability of the FAR per the terms of the solicitation, the arbitration panel should apply, as noted in the relevant law section above, the standards of the FAR and judicial case law in determining whether the Army's decisions were reasonable in establishing the evaluating ODRS under past performance factor 2, determining ODRS price as unreasonably high, and establishing the competitive range that excluded ODRS based on the

unreasonably high price and unacceptable past performance. In doing so, the arbitration panel will find that the Army's actions are reasonable, consistent with the solicitation, and not an abuse of discretion, Thus, not a violation of the RSA.

The Army documented its decision that ODRS was unacceptable for past performance under factor 2 in the source selection evaluation board report and is consistent with the terms of the solicitation. The Army did not utilize or rely on information that per the solicitation terms ODRS was not put on notice that it might use for evaluation under the past performance factor 2. As noted above, the solicitation provided for past performance factor 2 the Army could utilize information in its own systems, interviews, and other sources in determining whether ODRS was acceptable or unacceptable under past performance factor 2.

In accordance with the Solicitation, the report states the Army reviewed ODRS's past performance data for four contracts submitted by ODRS which included the recent and relevant ODRS's contracts at Fort Sill for dining facility services. Further, the Army considered for those contracts ODRS's business relations, schedule, quality of services, and customer satisfaction as part of the evaluation. The issuance of the Contract was conducted in accordance with the FAR and at no time violated the RSA.

In reviewing these prior contracts and as allowed under the solicitation, the Army interviewed the prior Contracting Officer Representative (COR) and the prior Contracting Officer. The Army reviewed information contained within Army's past performance information record system (PPIRS) for ODRS. The Army reviewed ODRS's Fort Sill prior quality inspection reports, adverse contract performance information found in contractor performance reports, customer interactive comment cards (ICE), and other relevant information. The Army even provided ODRS a chance to respond adverse performance information during the evaluation process for determining whether they were unacceptable for past performance to assist in establishing the competitive range.

35

The Army's decision that ODRS was unacceptable for past performance under factor 2 was reasonable. As documented in the source selection evaluation report, the Army determined that ODRS was unacceptable for past performance factor 2 because "the Government does not have a reasonable expectation that the offeror will be able to successfully perform the required effort as specified within the solicitation without high risks associated with poor performance, cleanliness, quality of food and other factors as identified."

The Army based these determinations, as documented in the report and noted in the paragraph above, on information it was allowed to consider under the terms of the Solicitation. In addition, the Army even took the step to provide ODRS a chance to respond to adverse past performance information and considered their response in making the evaluation.

Taken into account everything noted above, the Army's determination that ODRS was unacceptable was not made in a vacuum or without any basis which would render the decision arbitrary or irrational. Instead, it is clearly documented in the record and explained during the hearing that the decision was consistent with the solicitation, based on relevant and recent past performance information.

Further, to elaborate on the above, the Army thoroughly rational and documented decision was based on:

(a) Interviewing the COR for the ODRS's Fort Sill contracts whom provided documented evidence of poor performance as indicated within the Army's Past Performance report for ODRS.

(b) Reviewing information from PPIRS (past performance information record system), which found ODRS received unsatisfactory in management, and unsatisfactory in regulatory compliance for performance period between 1 April 2016 to 31 March 2017. The PPIRS information also showed ODRS received marginal in management and marginal in regulatory compliance for performance period between 1 April 2017 to 31 March 2018. Of significant note, the contracting officer noted she would not recommend contracting with ODRS again for this requirement. Id.

(c) Reviewing the COR monthly reports for ODRS Fort Sill contracts for the performance period from January 2018 to January 2019. Also, included in this review was the associated quality assurance inspection reports. The monthly reports showed a continued and trending unsatisfactory to

36

marginal performance concerning sanitation issues, cooking issues, deliverables, and customer satisfaction, staffing.

(d) Considering ODRS's response to the adverse past performance which included the above COR monthly reports, quality assurance inspections, monthly meeting notes that were communicated to ODRS on 25 February 2019.

(e) Considering the Contracting Officer for ODRS's current contracts response to ODRS comments under the FAR to the provided adverse past performance information. The contracting officer noted and disagreed with ODRS response. The contracting officer stated she did not agree with ODRS statements or position regarding these deficiencies raised in their response.

As such, the Army decision was not fanciful. It was not based on nothing. Instead, it was based on allowable and relevant information that ODRS was on fair notice would be reviewed to determine whether ODRS was acceptable and unacceptable for past performance. The Army acted reasonable concluding, based on the above, that ODRS was unacceptable for past performance.

Finally, the Army was not biased in its evaluation of ODRS performance under the prior contract thereby tainting the Army's determination ODRS was unacceptable for past performance under the solicitation. This claim rests solely on a claim of bias related to a single government employee. The Arbitrating panel should not give any weight to this claim because the dispute over prior performance must be brought before Armed Services Board of Contract Appeals or COFC under the CDA. As noted by COFC and cited above, the disagreement with the underlying facts regarding performance does not mean the Army's evaluation was unreasonable given the Army perception of the past performance is reasonable as shown above. Moreover, during the arbitration hearing, the Army clearly established that other Army employees, not challenged by ODRS as being allegedly bias, had reached independent conclusion that ODRS performance was poor which support finding the Army acted reasonable in determining ODRS was unacceptable for past performance under the solicitation as shown above.

It is also important to note that the past performance evaluation decision was reviewed and approved by Army employees that ODRS has not challenged as being biased, which removes any risk of bias from a single employee affecting the source selection process.

The record demonstrates that ODRS had a continuing trend of marginal to unsatisfactory performance for quality of services, schedule, business relationship, and customer satisfaction over the years concerning performance on contracts at Fort Sill that would reasonably support a finding of unacceptable under past performance factor 2.

The solicitation stated that price would be analyzed for reasonableness, balance, and completeness utilizing the offeror's submitted pricing information and FAR 15.404-1(b) price analysis techniques.  The Army recorded its analysis and findings in the price report, source selection evaluation report, and in the competitive range determination. In accordance with the solicitation and record, the Army reviewed the pricing information for ODRS contained in its proposal which showed a total evaluated price for award purpose of $145,697,796.00 or approximately $145M. In accordance with FAR 15.404-1(b) and allowed under the Solicitation, the Army used price analysis techniques that determined ODRS's price was unreasonably high.

The Army used the comparison with the independent government estimate (IGE), the average price amongst the technically acceptable offers, and the historical pricing at Fort Sill for dinning facility services. With the methods above, the Army found ODRS pricing was 54% / $51,270,224.87 (approximately $51 million) over the IGE; 21% /$24,828,054.87 (approximately $24 million) over the average price of the offers; and 42% / $43,158,128,30 (approximately $43 million) over the historical average pricing based on contracts W9124L-16-D-0001 and W9124J-09-D-0003 which were both with ODRS.

It was shown that ODRS pricing was $42,535,477.50 (approximately $42 million) more than Mitchco, the awardee. Moreover, ODRS pricing was $36,786,968.78 (approximately $36 million)

more than one of the other offers included within the competitive range.  It was, in fact, the highest price offered amongst the technically acceptable offers. Based on this information, the Army determined ODRS pricing was unreasonably high which is reasonable given the above analysis.

The Army's decision that ODRS prices was unreasonably high was reasonable based on the above analysis, the record, and the hearing testimony. The Army applied allowable techniques that objectively showed the difference in money between ODRS offer and the other technically acceptable offers in the competition. The difference in ODRS's bid compared to the others was not trivial nor insignificant. The difference clearly represented a sum of money that a reasonably prudent person would not pay given the alternative for an equally technically acceptable performance from a significantly (approximately $42 million for Mitchco and approximately $36 million for the other offer in the competitive range) cheaper comparable commercial offers in the market place. The price was not a competitive price when compared to the competitively submitted offers to the same solicitation.

ODRS's claim at the hearing that the banding utilized for pricing was unfair and created an unequal competition is unfounded and speculative. It is unfounded and speculative because ODRS claims lacks any logical connection to unfairness and unequal competition to them from the banding. ODRS was in possession of the same information provided to all of other offerors through the solicitation and was even, in fact, in possession of non-public information as the incumbent to help inform its bid price for a band. ODRS made the business decision to bid at the price it did based on this information. Not the Army. Other offerors made similar decision to bid at the price they did based on the same pricing matrix and had to bid to the same banding. As such, ODRS operated under the same information as all other offerors and bid against the same banding as all other offerors. That despite having headcount data for the previous years as the incumbent and no other Offeror

submitting prices anywhere near that contained in ODRS proposal, ODRS argument here is disingenuous.

Once the proposal was determined to be outside the competitive range, the Army had no obligation to enter into further discussions with ODRS. The Army is obligated to enter into meaningful discussions with a SLA, in this case ODRS, after it is determined they are in the competitive range, and priority to blind vendors to operate its food facilities, but the RSA establishes a precondition which requires the SLA to be judged to be within the competitive range established by the contracting officer before the priority is applied. Without such a finding by the Army, the regulations authorize the Army to eliminate the SLA from further consideration. Section (b) states "[t]he priority is mandated in those cases where the proposal received from the State licensing agency... is judged to be within the competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the ... agency ... shall consult with the Secretary as required under paragraph (a)." 34 C.F.R. § 395.33(b)

The RSA does not define the term competitive range. The priority is only applied once the contracting officer determines that the SLA is within the competitive range. Since the DOE Arbitration Panel is not a court of law, the panel should be guided by applicable federal law and decisions of federal courts. *Richmond, Fredericksburg & Potomac R.R. v. Transportation Communications Int' I Union*, 973 F.2d 276, 279 (4th Cir. 1992). While the RSA does not define competitive range, Courts have established the standard of review for an agency decision under the RSA in establishing the competitive range is "abuse of discretion." *Southfork Systems v. United States*, 141 F.3d 1124 (Fed. Cir, 1998). The Court in *Southfork* held that "the contracting officer had broad discretion to consider the evaluation of each factor as part of a totality of the circumstances in order to determine whether a proposal belonged in the competitive range" when making a competitive range determination. *Id.* In *Southfork*, Southfork Systems (Southfork) lost its contract with the Air

Force when the contracting officer included a proposal from the Texas Commission for the Blind, an SLA, was within the competitive range. Southfork challenged the KO's decision to include the proposal, but the Court rejected that challenge based on the KO's broad discretion in determining the competitive range. As such, *Southfork* provides guidance that under a solicitation subject to the RSA, the agency procurement decision for competitive range will be judged by a federal court utilizing the universal standard of "abuse of discretion." The panel should be guided by this well establish standard for agency procurement decision under a solicitation subject to the RSA, as we have here.

Mitchco Arguments

In addition the underlying arguments in Mitchco's Motion to Dismiss on the basis of *Stari decisis, Res judicata, Collateral Estoppel, Law of the Case* and *Comity* principles, as discussed and adopted by the Army and discussed above, Mitchco further argues that ODRS failed to state any claim supporting an RSA violation; the complaint of ODRS is defective for failure to comply with Rule 3(b) of the Arbitration Rules because the Complaint was not filed by the State Attorney General on behalf of the State licensing agency, or by the State licensing agency with the written concurrence of the State governor; the Panel members should recuse themselves because the Panel is not comprised of impartial arbiters and violates the Due Process Clause of the Fifth Amendment and the U. S. Constitution; the RSA complaint is untimely, ODRS has waived its right to file a complaint, and the complaint is barred by laches; ODRS is not an interested party as defined by the Statute; and the ODRS contract is a sham contract, because the work at the cafeteria is not performed by blind individuals.

Mitchco argues, on the merits, that the Army did not violate the RSA on the basis of the same or similar arguments made by the Army.

## Opinion and Analysis

The issues presented are whether (1) whether the Army's decision not to exercise the third option year on its contract for dining facility services with the Oklahoma SLA is a limitation on the placement or operation of a vending facility that must be justified to the Secretary of Education under 20 U.S.C. § 395.30(b), and then, whether the Army violated the Randolph Sheppard Act (RSA)(Act) at 20 U.S.C. §107(b) and implementing regulations 34 C.F.R. §§395.30(b) and 395.33(b) by not exercising its third option year on its contract with the Oklahoma SLA (placing a limitation on the operation of a vending facility) and issuing a new FFS solicitation, without fully justifying to the Secretary its decision that such operation of a vending facility (i.e., the continued operation of the Oklahoma SLA contract) would adversely affect the interests of the United States and (2) whether the Army violated 20 U.S.C. §107d-3(e) of the RSA and 34 C.F.R. §§395. 33(a) and (b) by failing to judge the proposal received from the Oklahoma SLA (ODRS) to be within the competitive range on solicitation W9124J-18-R-0024 for dining facility services at Fort Sill and to be ranked among those proposals which have a reasonable chance of being selected for the final award?

The burden is on the SLA to show by substantial evidence that the Army violated the Act. See 5 U.S.C. 554-557. Also, see *Dickinson v. Zurko*, 527 U.S. 150,164 (1999).

> Evidence is substantial in the APA sense if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact. Illinois Central R.R v. Norfolk & Western Ry. 385 U.S. 57, 66, 87 S.Ct. 255, 17 L. Ed. 162 (19). "This is something more than a mere scintilla but something less than the weight of the evidence." *Pennaco Energy*. 377 F. 3d at 115 (Citations omitted)

Prior to addressing the Merits of this case, the Panel is obligated to examine and rule on threshold and jurisdictional issues properly brought before it by the parties. For the reasons set forth below, the Panel rules that the jurisdictional and threshold issues raised in this hearing are without merit.

A.      Threshold/jurisdictional Issues

After this Panel was convened by the Secretary of Education and selected by the parties as required by RSA, Mitchco, Altstatt, and Cantu requested that they be permitted to intervene as interested persons pursuant to 5 U.S.C. § 555(b). In granting the requests, the Panel made it clear that while an "interested person" may appear before the agency (Panel), permission to appear under U.S.C. § 555(b) does not grant an interested person standing as a Party to the proceeding. It does allow them, where permitted, to appear to make their viewpoints known to the Arbitration Panel. When Mitchco filed Motions to Dismiss and Motions *In Limine* prior to the commencement of the hearing, the Panel ruled the Mitchco had no standing to file motions limiting the scope of the arbitration and has no standing to file any dispositive motions. The Panel affirms that ruling here.

Since the Army subsequently adopted Mitchco's Motion to Dismiss on the grounds of *Res Judicata, Collateral Estoppel, or Law of the Case,* those issues were deemed properly before the Panel. While not obligated to do so, the Panel will also address the additional meritless jurisdictional claims raised by Mitchco.[9]

---

[9] It is the opinion of this Panel that admitting "interested persons" is problematic in the RSA context for the following reasons: (1) Non-SLA bidders have no rights under the RSA to seek arbitration. *Colo. Dep't of Human Servs. v. United States*, 74 Fed. Cl. 339, 345 (Fed. Cl. 2006); (2) Bidders other than SLAs are not within the zone of interests of the RSA, the two part test of which requires (a) to discern the interests arguable to be protected, and (b) whether the interested person's interests affected by the agency are among the interests to be protected. *TAP Pharmaceuticals v. U.S. Dep't of Health & Human Serv's*, 163 F.3d 199, 203 (1998). DOE advised the Panel that the intervention request should be reviewed under the standards of 5 U.S.C. § 556(b), which permits "interested persons" to appear "for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding," "so far as the orderly conduct of public business permits." *Id.* In the context of an administrative hearing, in *Envirocare of Utah, Inc. v. Nuclear Reg. Com'n*, 194 F.3d 72, 75 (D.C. Cir. 1999), "the Commission looked to "current judicial concepts of standing," finding that "purely competitive interests, unrelated to any radiological harm to itself, do not bring it within the zone of interests of the AEA for the purpose of policing the license requirements of a competitor." *Id.* Applying the "zone of interests" test to the request to be made an interested party, "where a statute defines a group subject to its provisions, a party asserting commercial interests satisfies the zone of interests test only if its interests put it in the same position as a member of the subject group or a commercial competitor of such a member." *TAP.* at 208. Here, the test would ultimately turn on whether Congress intended for non-SLA bidders to "challenge agency disregard of the law." *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984). Where a statute provides for only particular persons to challenge agency actions, the presumption favoring judicial review is overcome. *Id.* at 350-351. Here, the "zone of interests" is clearly that of providing SLA-licensed blind individuals with employment opportunities. Nevertheless, the Panel construed the requests to intervene as requests to appear at the hearing, based on "direct economic interest," finding that the request to appear was "appropriate in this situation" to supplement the evidence presented. Without any guidelines limiting the scope of participation of the "interested party" appearances, the hearing in this matter occupied three days, resulted in numerous pre- and post-hearing motions, and even the filing of a 107-page post-hearing brief by "interested person," Mitchco. Given that this is the first RSA arbitration hearing where interested persons were permitted to appear, the Panel urges that the Secretary of DOE determine that "interested person"

The panel has jurisdiction to hear this matter under 20 U.S.C. § 107d-1(a).[10] It has broad powers under the RSA and its implementing regulations to hear arbitration cases.  The ODRS has petitioned the Secretary alleging violations of the RSA contract priority right under 20 U.S.C. § 107d-1(b).[11]  The Secretary has appointed this panel to hear the issues identified by the Appointment Letter.[12](See also 34 C.F.R. §§ 395.37). The panel has provided this opinion to advise the Secretary as to whether the Army violated the RSA.  The panel is not bound by the Army's decisions challenged by ODRS, and is charged with reviewing those decisions to determine if the Army complied with 20 U.S.C. § 107(b)(2) that charges federal agencies to place one or more vending facilities on Federal property "to the extent that any such facility or facilities would not adversely affect the interests of the Unites States." Both the Secretary's and the panel's decision are a final agency action subject to appeal and review.[13]

---

appearance is not appropriate under 5 U.S.C. § 556(b) because, in the view of the Panel, the additional participation by Mitchco, Cantu and Altstatt acted more to impede "the orderly conduct of public business" than promote it, as required by 5 U.S.C. § 555(b), or at least promulgate policy on the scope of participation of "interested parties."   This is especially so because Congress sought to have "prompt and satisfactory" resolution of SLA complaints by enacting the arbitration provision. S. REP. NO. 93-937.

[10] 20 U.S.C. § 107d-1(a) Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d–2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

[11] 20 U.S.C. § 107d-1(b) States: Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder (including a limitation on the placement or operation of a vending facility as described in section 107(b) of this title and the Secretary's determination thereon) such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d–2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

[12] April 12, 2019 Department of Education letter reference Oklahoma v. Department of the Army, Fort Sill, Case no. R-S/18-09, Carol L. Dobak, Acting Deputy Commissioner

[13] 34 C.F.R. §§ 395.37 (a) Whenever any State Licensing Agency determines that any department, agency, or instrumentality of the United States which has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of the  Act or of this part and all informal attempts to resolve the issues have been unsuccessful, such licensing agency may file a complaint with the Secretary.

(b) Upon receipt of a complaint filed under paragraph (a) of this section, the  Secretary shall convene an ad hoc arbitration panel which shall, in accordance with the provisions of 5 U.S.C. ch. 5, subchapter II, give notice, conduct a hearing and render its decision which shall be final and binding on the parties except that such decision shall be subject to appeal and review as a final agency action for purposes of the provisions of 5 U.S.C. ch. 7

The Army, through the adoption of Mitchco's Motion to Dismiss, argues that ODRS' claims are barred by *Stari decisis, Res judicata, election of remedies, collateral estoppel, judicial estoppel, law of the case,* and *comity* principles, principally because it is alleged that the same issues before this Panel were raised at CFC, GAO, and District Court without success, and this arbitration is nothing more than a different forum in which it seeks a ruling on these same issues. This argument has no merit.

ODRS action seeking injunctive relief from the United States District Court for the Western District of Oklahoma has no preclusive effect on this Panel. While the Court denied the injunctive relief requested, it did not give a final judgment on the merits, but instead the case was dismissed without prejudice. A dismissal without prejudice is a dismissal that does not operate as an adjudication upon the merits, and thus does not have *res judicata* effect. See, *Rolls-Royce Corp. v Heros, Inc.*, 576 F.Supp.2d 765, 776 (N.D. Tex. 2008) citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001).

The GAO lacks jurisdiction to review SLA complaints about agency compliance with the RSA because Congress has specifically authorized the Secretary of the DOE, not GAO, to review such complaints, as argued by ODRS. In its decision, the GAO confirms that ODRS properly filed its arbitration demand challenging its elimination from the competitive range with the DOE Secretary. In dismissing the protest of ODRS the GAO stated:

> In our view, this means that complaints, such as the resolution of the SLA's challenge of its exclusion from the competitive range, are subject to the RSA's binding arbitration provisions and are not for consideration by our Office under its bid protest jurisdiction. Maryland State Dept. of Educ., B-400583, B-400583.2, Nov. 7, 2008, 2008 CPD~ 209 at 5. Thus, the DOE, rather than our Office, is the appropriate party to hear Oklahoma's challenge to the elimination of its proposal from the competitive range.  As stated above, Oklahoma did not raise this challenge with our Office and instead properly filed an arbitration demand with DOE regarding this issue.

The Claims before the Court of Federal Claims[14] were not challenges to the application of the RSA, and therefore, not the issues with which this Panel is tasked.

Simply, this is not a bid protest case, but an examination of whether the Army's actions were in compliance with the provisions of the RSA.

Mitchco's argument that this Complaint is defective for failure to comply with Rule 3(b) of the Arbitration Rules because the Complaint was not filed by the State Attorney General on behalf of the State licensing agency, or by the State licensing agency with the written concurrence of the State governor, has no merit. The DOE determined a year ago, when ruling on an Army request to dismiss a similar Randolph-Sheppard Act arbitration, that a State may engage a private counsel to represent it on these issues. The DOE stated:

> Although Section 3(b) of the "Policies and Procedures for Convening and Conducting an Arbitration" does not explicitly acknowledge the possibility of a private attorney filing a complaint and request for arbitration on behalf of an SLA, we recognize that in the reality of State agency administrative and litigation matters, particularly in the Randolph- Sheppard Act area, a State may decide to engage private counsel to represent it in on these issues. As long as the Department of Education is made aware of the fact that the filing of the complaint and/or the engagement of the private counsel to represent the State agency in this matter is authorized by the legal representative authorized to represent the State licensing agency or by the State Governor, we conclude that the requirements of section 3(b) of the "Policies and Procedures for Convening and Conducting an Arbitration" have been met.

ODRS is represented in this action by Winstead PC and the Oklahoma Office of the Attorney General. Assistant Attorney General Richard D. Olderbak was co-counsel of record in this action and filed an Application for Access to Information under Protective Order by Outside Counsel confirming his representation of ODRS on behalf of the Oklahoma Office of the Attorney General. Counsel for Winstead PC represented to this Panel in a December 17, 2019 email that Mr. Olderbak unexpectedly

---

[14] *Oklahoma v. United States*, 144 Fed. Cl. 263, 268 (2019).

passed away prior to the arbitration hearing. New co-counsel for ODRS is Niki Batt, Vice Deputy Attorney General with the Oklahoma Office of the Attorney General. Ms. Batt confirmed that Mr. Olderbak, along with ODRS Executive Director Melinda Fruendt, and pursuant to Okla. Stat. tit. 7, § 71, had the power to and did approve ODRS's filing of a complaint and request for arbitration with the DOE by Winstead PC. Additionally, Ms. Batt attended each day of the arbitration proceeding as counsel.

Mitchco's argument that the Panel is not comprised of impartial arbiters and violates the Due Process Clause of the Fifth Amendment and the U. S. Constitution has no merit. Mitchco has not provided any evidence which would support a basis for any member of this Panel to recuse him/herself. It has cited no evidence to support its supposition that a three-person arbitration panel pursuant to Rule 6 of the Arbitration Rules violates due process. It provides no evidence even suggesting that any of the arbitrators have any conflict of interest or that cause exists for its request. The fact that two of the three arbitrators on a panel must agree to a resolution of the dispute, and the right of a party to appeal the Panel's Decision, negates any basis for the lack of, or even the appearance of a lack of, due process.

Mitchco's argument that the RSA complaint is untimely, ODRS has waived its right to file a complaint, and the complaint is barred by laches is not supported by any facts presented to the panel and is therefore without merit. Unlike GAO timeliness regulations, the RSA does not impose any time deadline for an SLA to bring its claims to the DOE Secretary. See 20 U.S.C. §§ 107d-1(b); 107d-2(a) (without limitation, requiring the DOE Secretary to convene an ad hoc arbitration panel upon receipt of the SLA's complaint). Consequently, the GAO bid protest deadlines referenced by Mitchco do not apply to this RSA proceeding. ODRS timely filed its Complaint with the DOE after the Army rejected its complaint that the RSA was violated by not exercising the additional option years on its contract, and then properly amended the Complaint at subsequent dates.

Under the affirmative defenses of laches, it must be demonstrated that there was an inexcusable delay by the plaintiff in filing suit coupled with prejudice to the defendant as a result of the delay. Mitchco failed to demonstrate any prejudice, let alone prejudice sufficient to establish laches or waiver.

Mitchco's argument that ODRS is not an interested party as defined by the Statute is without merit. Mitchco cites to numerous bid protest cases filed in the Court of Federal Claims which discuss the jurisdictional requirement of interested party status and prejudice under the Tucker Act. See 28 U.S.C. § 1491(b)(1). None of these COFC bid protest cases discuss applying these jurisdictional requirements to proceedings filed before a duly appointed RSA arbitration panel. This proceeding is not a bid protest proceeding and accordingly, this argument is rejected.

Mitchco alleges that ODRS's claims should be denied based upon the equitable, affirmative defense of "unclean hands." Unclean hands "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief" and originates from "the equitable maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814, 65 S. Ct. 993, 89 L. Ed. 1381, 1945 (1945). Here, this arbitration panel is not a tribunal of equity. Thus, this defense is not available to Mitchco in this proceeding.

And finally, Mitchco's argument that the ODRS contract is a sham contract, because the work at the cafeteria is not performed by blind individuals lacks merit as irrelevant to the issues in the Complaint and the jurisdiction of this panel.

B.     Standard of Review

A review of the Act, the Policies and Procedures for Converting and Conducting Arbitration Pursuant to Sections 5(b) and 6 of the Randolph-Sheppard Act as Amended (the "Rules"), and the APA demonstrate that this panel is to conduct a *de novo* review of the Army's actions and makes a

decision that is subject to judicial review based upon the administrative record created by this Panel.

The RSA is clear that this panel's decision would "be subject to appeal and review as a final agency action" under the APA and the APA's scope of review. 20 U.S.C.S. § 107d-2; see also *Tex. Workforce Comm'n v. United States Dep't of Educ.*, 354 F. Supp. 3d 722, 731 (W.D. Tex. 2018). The RSA further provides that this panel shall "give notice, conduct a hearing, and render its decision" in accordance of the provisions of 5 U.S.C. §§ 551 et seq. Thus, this arbitration is not a judicial review of the Army's actions subject to the APA but instead is the agency action that would later be subject to judicial review. *See, Randolph-Sheppard Vendors of America v. Weinberger*, 795 F. 2d 90 (D.C. Cir. 1986).  It is this Panel's decision that will be subject to judicial review pursuant to the scope of the APA, not the Army's procurement decision.

Section 107d-2(a) does not remotely suggest that the hearing is limited to a record review of the underlying agency's determination. Nor does Section 107d-2(a) suggest that, while conducting the hearing, the arbitration panel must give deference to decisions made by a contracting officer. Instead, the term "hearing" must be read consistent with the broad delegation of authority to the arbitration panel to determine whether the agency violated the RSA by not properly affording the contract priority right. This includes the taking of evidence and resolving factual disputes based upon the evidence at the hearing and not on the underlying administrative record.

Of equal significance, is that Section 107d-2(a) does not suggest that the hearing conducted by the panel is an appeal of the underlying agency decision. Congress's use of the words "petition" and "determine" rather than "appeal" is critical and shows the authorization for the arbitration panel to review the agency's actions on a *de novo* basis. See *Wilson v. Comm'r*, 705 F.3d 980, 988 (9th Cir. 2013) (the use of the words "petition" and "determine" and not "appeal" confirmed Congress's intent of de novo review.); see also, Comm'r v. Neal, 557 F.3d 1262, 1276 (11th Cir. 2009) (same).

This *de novo* review interpretation is further supported by Section 107d- 2(b)(2)(C) which

states, in part, "[i]f the panel appointed pursuant to [§ 107d-2(b)(2)] finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the head of any such department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel." 20 U.S.C. § 107d- 2(b)(2)(C). Thus, the panel has the duty to "find" (factually) as a result of the hearing (and through the evidence presented) whether the agency's "acts or practices," are "in violation" of the RSA or its implementing regulations. It is the panel's final decision which is the appealable agency action under the APA, not the contracting officer's initial determinations. Id. at § 107d- 2(a). This means the panel's review of the agency's determinations, acts, and practices under the RSA is *de novo*.

A statutory interpretation which limits the panel's review and requires deference to be given to contracting officer determinations under the RSA would be wholly inconsistent with the statutory mandate requiring the Secretary to "assure" compliance with the RSA's purposes and objectives. Accordingly, this panel has *de novo* review when examining agency's determinations, acts, and practices under the RSA. Any other standard would be contrary to the express grant of authority exclusively reserved to the Secretary under the RSA.

The position of the Army and Mitchco that this panel's review is limited to the agency's record is misplaced. The APA standard sought by Mitchco does not apply to this proceeding. Furthermore, where Congress has enacted a special statutory review process for administrative action, that process applies to the exclusion of the Administrative Procedures Act (APA). *Bowen v. Massachusetts*, 487 U.S. 879, 903, 108 S. Ct. 2722, 101 L. Ed. 2d 749 (1988); *Steadman v. SEC*, 450 U.S. 91, 105, 101 S. Ct. 999, 67 L.Ed.2d 69 (1981) ("[T]he general provisions of the APA are applicable only when Congress has not intended that a different standard be used in the administration of a specific statute." (Powell, J., dissenting)).

Here, Congress established a special statutory review process when an SLA determines that a governmental agency failed to comply with the provisions and regulations of the RSA. See 20 U.S.C. § 107d-1(b). A position that the APA standard of review when examining the agency's determinations, acts, and practices under the RSA is neither supported by the Supreme Court's holding in *Bowen* nor is it consistent with the statutory construction of the RSA.

C.    <u>Merits</u>

The first issue to examine is whether the Army's decision not to exercise the third option year on its contract for dining facility services with the ODRS was a limitation on the placement or operation of a vending facility that must be justified to the Secretary of Education under 20 U.S.C. § 395.30(b). There is no dispute as to the facts in regard to this issue.  The Army did make a determination to not exercise the third-year option under contract W9124L-16-D-0001 and the Army did not consult the Secretary prior to making that determination.  This decision is strictly limited to a statutory and regulatory interpretation of 20 U.S.C. § 107(b)(2).

As examination of this issue is not based on contract law, but whether the Army's otherwise lawful decision to eliminate the existing opportunity still needed to be reviewed in accordance with the RSA, which required that the decision be approved by the Secretary of Education if it was a limitation on the placement or operation of a vending facility. Based upon the facts presented in view of the provisions of the RSA, the Panel finds that the Army violated the RSA when it failed to exercise the Contract's Renewal Option without first seeking and obtaining the approval of the DOE Secretary. This conclusion is supported by several factors.

The legislative history of the RSA provides support for requiring a review. When the RSA was amended in 1974, Congress's purpose was to remove "major external obstacles to the growth of the blind vendor program."[15] DOE's Secretary was given the responsibility to determine whether any

---

[15] Sen Rep No. 93-937 (1974) (SR) at 3.

Federal agency limitation on the placement or operation of a blind vending facility is justified,[16] based on "a record of abuses and neglect" adequate to justify placement of increased overall authority for operation of the program with the DOE Secretary.[17] Accordingly, the DOE is "the overseer" of the RSA program "throughout the Federal government."[18]

With respect to the Department of Defense, Congress stated: "[c]ommanders of military installations are singularly insensitive to the need to develop the program,[19] and "although nonblind vending operations within the Defense Department are extensive, there is very little consideration given to the development of the Randolph-Sheppard program."[20]

Congress determined that the term "priority" was inserted to "assure that one or more blind vendors have a prior right to do business on such property, and furthermore that, to the extent that a minority business enterprise or non-blind operated vending machine competes with or otherwise economically injures a blind vendor, every effort must be made to eliminate such competition or injury.[21]

Statutory and Regulatory provisions have implemented Congress's intent that DOE's Secretary have overall authority, as overseer throughout the Federal Government, of the RSA implementation. The Secretary is given the responsibility to prescribe regulations,[22] the sole authority for a Federal agency to place a limitation on the placement or operation of a blind vending facility,[23] and the authority to convene an arbitration panel to determine if a Federal property is failing to comply with the in section 107(b).[24]

---

[16] Sen Rep No. 93-937 (1974) (SR) at 3.
[17] SR at 16, 17
[18] SR at 19
[19] SR at 10
[20] SR at 14
[21] SR at 15
[22] 20 U.S.C. § 107(b). RSA regulations are entitled to deference because Congress made an express delegation of authority to DOE. *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).
[23] Id.
[24] 20 U.S.C. § 107d-1(b).

Under the RSA, the DOE's Secretary has the exclusive authority to determine whether a Federal Agency can remove a blind vendor from a vending Facility by making a decision to cease contracting with a blind vendor. The DOE's regulation provides as follows:

> (b) Any limitation on the location or operation of a vending facility for blind vendors by a department, agency or instrumentality of the United States based on a finding that such location or operation or type of location or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary who shall determine whether such limitation is warranted. A determination made by the Secretary concerning such limitation shall be binding on any department, agency, or instrumentality of the United States affected by such determination. The Secretary shall publish such determination in the FEDERAL REGISTER along with supporting documents directly relating to the determination.
>
> 34 C.F.R. § 395.30(b). See *SourceAmerica v. U.S. Dep't of Educ.*, 368 F. Supp. 3d 974 at 981 (E.D. Va. 2019), referring to this requirement as the "Review Requirement."

The Army argues that it did not limit the operation of its vending facility for ODRS' licensed blind vendor because it had the discretionary right under the current contract to exercise or not exercise the option and, without exercising the option, there was no contract. Further, the follow-on Solicitation, which included the RSA priority, invited ODRS to submit a proposal for the FFS services, which it did. Since, the exercise of its right not to accept an additional option year was an administrative decision, the RSA does not require a federal agency to justify every administrative decision made by a contracting officer. By providing an opportunity to bid under a new solicitation at the Facility, its non-exercise of the option did not limit the opportunity of the blind vendor, which remained intact. The Panel does not find these arguments persuasive in light of the specific language of 34 C.F.R. § 395.30(b).

The non-exercise of the option had the effect of terminating the operation of a vending facility for blind vendor services which had been provided for over fifteen years, as well as the continued opportunity to provide services under additional option years. The Army argues that it did not terminate the ODRS contract; it just did not renew it under its discretionary right in the

contract. The Army's action, however, limited future operations for a blind vendor who had already demonstrated the feasibility and right to provide services at Fort Sill for five years. Regardless of the choice of words, its action brought to a halt, ended, stopped, terminated an already demonstrated right to a priority. It was a limitation. The issue is not whether the Army had the right to limit its operation of its cafeteria to an already qualified blind vendor, but whether it was required under the RSA to seek approval of the Secretary of the DOE before doing so.  The Statute is clear that it was required to do so.

As argued by ODRS, the Panel finds the ruling in *SourceAmerica*, *supra*, to be insightful in determining what is a limitation on the operation of a blind vendor. While the Army argues that the ruling in *SourceAmerica*, supra, is distinguishable because the FFS in question there was eliminating the contracting out of dining facilities altogether, which excluded the opportunity for the blind vendor to continue providing services at all. In this case, the Army did retain the FFS requirement, invited ODRS to compete, and applied the priority. The essence of the ruling of the Court in *SourceAmerica* was that "[r]emoving a vendor entirely is the most basic limitation on the operation of vending facilities at all." Id. at 995.  *SourceAmerica* also found that an RSA arbitration panel correctly ruled that the Army failed to comply with the Review Requirement.  *Id.*  The Court found that "[t]his concern—that federal agencies were not doing all they could to ensure blind vendors continued to operate dining facilities—is directly implicated by the Army's decision to cease contracting with vendors for the operation of its dining facilities. Indeed, it is the exact scenario that motivated the Senate to add the review provision. As such, the arbitration panel correctly concluded that the Army's decision to discontinue the operation of its vending facilities by a vendor triggered the RSA Review Requirement." *Id.* at 996.

The specific facts of this case bring into question whether the election of the Army not to exercise the option for an additional year and offer a new Solicitation was a ruse to avoid the

requirements of the RSA. The majority of the panel believes it was. In 2015, its attempt to reduce the dining facilities the blind vendor could service was deemed by an arbitration panel to be in violation of the RSA and contracts were extended. From April 2016 through April 2017, the Brown/Blackstone services were deemed unsatisfactory and in August 2017, because Ft. Sill believed it had "relationship" problems with the blind manager, ODRS replaced the blind vendor team with Altstatt/Cantu. Immediately upon this team's performance of services, the Army conducted increased the level of inspections through January of 2019. For every month from August through December 2017, the Army issued CDRs to ODRS. While ODRS disputed many of the inspection results as an improper application of the Contract requirements and terms, ODRS received no response to their concerns. A history of poor performance was being developed without addressing the improper application of the Contract terms. From January 2018 through January 2019, ODRS received no CDRs, yet it was revealed in February 2019 that the Army had COR Reports for 13 months all showing marginal performance. A history of poor performance was being developed. The COR Reports cited continued poor performance and problems with undercooked food and pest control. The Reports did not mention the steps ODRS took to address the problems. When the Army did not exercise the next annual option on the Contract, it knew it had accumulated evidence of poor performance, which ODRS was not given the opportunity to address until the Past Performance Evaluation was disclosed to them in 2019. The Army essentially limited ODRS opportunity to effectively bid on a new Solicitation when it caused the early termination of the option without any justification to either ODRs or the Secretary of the DOE.

Even though the Army provided ODRS with an opportunity to bid, we would agree with ODRS that an opportunity to bid is not equivalent to an exercised option to continue operations. In light of the facts above, the Army's action was a limitation on the operation of a vending facility for

blind vendor which needed to be "fully justified in writing to the Secretary who shall determine whether such limitation is warranted."

The Army claims that the decision to renew or not renew an option period in a cafeteria contract is based on the Federal Acquisition Regulation (FAR) disputes clause.[25] When conducting a procurement subject to the RSA, a federal agency's discretion is limited by the priority given to blind vendors. The Competition in Contracting Act, 10 U.S.C. §2304 (the "CICA"), enacted in 1994, directs the military to use "full and open competition" when contracting for property or services, except in the case of procurement procedures otherwise expressly authorized by statute. The provisions of the RSA fit the CICA's definition of "procurement", authorizing the Secretary of Education to secure the operation of cafeterias on federal property by blind licenses whether by contract or otherwise. 20 U.S.C. §107d-3(e). Thus, neither the CICA nor the Federal Acquisition Regulation (FAR) apply when the RSA's priority applies.[26]  The Army is not free, nor does it have the discretion, to disregard the RSA's priority given to blind vendors. The Army's argument that non-renewal of the option period is to be resolved through the Contracts Disputes Act is therefore unavailing, as the RSA is such a procurement statute under which CICA, and the FAR, do not apply except insofar as they do not conflict with DOE's regulations implementing the RSA. This is consistent with the ruling in *Magic Brite Janitorial v. United States*, 72 Fed. Cl. 719, 722 (2006), wherein the United States Court of Federal Claims recognized that the government can limit such discretion "and make the exercise of an option less optional, via statute, regulation, or the terms of the contract."

---

[25] 48 C.F.R. § 52-212-4(d).
[26] *NISH v. Cohen*, 247 F.3d 197, 201-204 (4th Cir. 2001); NISH v. Rumsfeld, 348 F.3d 1263, 1271-1272 (10th Cir. 2003)

The Panel accordingly concludes that the non-exercise of the option period by the Army under the specific facts of this case without first securing the opinion of DOE's Secretary that the non-exercise was warranted was a violation of the RSA.

The second issue to examine is whether the Army violated 20 U.S.C. §107d-3(e) of the RSA and 34 C.F.R. §§395. 33(a) and (b) by failing to judge the proposal received from the Oklahoma SLA (ODRS) to be within the competitive range on solicitation W9124J-18-R-0024 for dining facility services at Fort Sill and to be ranked among those proposals which have a reasonable chance of being selected for the final award?

As noted in addressing the threshold issues presented, the Army argues that ODRS's claims under the second issue amount to a bid protest and are not reviewable by an RSA Panel. Normally, bidders on federal contracts must file bid protests in the Federal Court of Claims under the bid protest provisions of the Tucker Act, 28 U.S.C. § 1491. But, "when a complaint alleges a violation of the RSA, the Court of Federal Claims lacks Tucker Act jurisdiction to hear the case until the RSA's administrative remedy – arbitration – is exhausted." *State of Kansas v. United States,* 192 F. Supp. 3d 1184, 1193 (D. Kan. 2016), citing *Kentucky v. United States*, 424 F.3d 1222, 1225-29 (Fed. Cir. 2005). Such is the case here.

As noted in the "Introduction," Congress passed the RSA to provide employment opportunities for the blind by granting priority to blind persons licensed by a State agency who wish to operate vending and cafeteria facilities in government buildings. 20 U.S.C. § 107(b). The Act divides responsibility for the "blind vendor" program between state and federal agencies. At the federal level, the Secretary of Education interprets and enforces the provisions of the Act and designates SLAs. 20 U.S.C. §§ 107a(a)(5) & 107b; 34 C.F.R. §§ 395.5 & 395.8.

The Department of Education regulation regarding the operation of cafeterias by blind vendors provides in pertinent part as follows:

"a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section. If the State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary under the provisions of §395.37." 34 C.F.R. § 395.33

While it is clear from the above that this Panel has the authority to review the evidence presented as to whether ODRS' proposal was properly evaluated and improperly excluded from the competitive range, the parties differ on the criteria to be used in resolving the issue. ODRS believes that under C.F.R. § 395.33(b) where "solicitations for offers shall establish criteria under which all responses will be judged," their Past Performance evaluation was not considered under the established criteria and by a biased reviewer, who was ½ of the evaluation team. As such, the Panel can examine if ODRS was non-discriminately judged under the solicitation criteria in view of the RSA.

The Army maintains that, there is no statutory or regulatory guidance on the criteria to determine if ODRS should have been included or excluded from the competitive range, and the panel must therefore look to the Army's regulations and the Federal Acquisition Regulations (FAR) that

control the competitive source selection process used by the Army to make an award decision. The solicitation included source selection terms as well as a number of regulatory and statutory clauses that are required by the FAR and Army procurement regulations. Since ODRS's objection is that its proposal was not included within the competitive range, the standard for reviewing a contracting officer's decision to determine which proposals are included in the competitive range is "abuse of discretion," as stated in *Southfork Systems v. United States*, 141 F.3d 1124 (Fed. Cir, 1998). Further, the Army argues that in examining the judgement of a contracting officer, the Panel should be instructed by rulings of the United States Court of Federal Claims (COFC) and the GAO for guidance as to how to evaluate the contracting officer's decision to exclude ODRS from the competitive range. Generally, a reviewing tribunal should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts and/or unreasonable, inconsistent with the solicitation criteria.

Under either of the above review criteria, the majority of the Panel finds that the Army did not fairly judge the past performance of ODRS, which skewed ODRS's opportunity to be judged in the competitive range. Here, the Agency did not judge ODRS's past performance consistent with the established criteria or within the framework of FAR § 3.101-1 required for every evaluation. The past performance evaluation board failed to consider relevant information ODRS provided to the Army on local COR reports and investigations, on other contracts, and the confidential survey returned by the Ft. Sam Houston Contracting Officer, even though the Solicitation promised that this type of past performance information would be considered. The Army ignored the obvious conflict of interest associated with Mr. Buchanan and allowed him to remain on the Past Performance Evaluation board despite the mandates of FAR § 3.101-1. And, in the end, the Army relied upon a March 5, 2020, letter from Ms. Abraham claiming Mr. Buchanan's inspections were "accurate and on-point" but wholly failed to consider ODRS responses to the inspection reports and her subsequent

certification less than two weeks later which said ODRS is a responsible contractor with a satisfactory performance history and a satisfactory record of ethical and business conduct.

The above conclusions result not just from the review of past performance reports, which will be discussed below, but also in light of factors that are viewed as creating a chilling effect on the obligation of the Army take action that will not limit the economic opportunities for the blind under 20 U.S.C. § 107(b) and the obligation to provide a unbiased solicitation evaluation process in conformance with the terms and conditions of the solicitation itself.

Since 2001, blind vendors and their teaming partners have provided services at the Ft. Sill cafeteria facilities through ODRS. Prior to the creation of the solicitation at issue, the Army unsuccessfully attempted to reduce the scope of the cafeteria facilities at Ft. Sill in 2014, which was ultimately deemed an unlawful limitation of economic opportunities for the blind vendors under the RSA by a DOE Arbitration Panel in December of 2016. That led to a new contract consisting of one base year and four additional option years on April 1, 2016. From April 2016 through April 2017, the Army at Ft. Sill rated the services of ODRS' blind vendor Brown and his teaming partner Blackstone as unsatisfactory and effective August 1, 2017 ODRS appointed a new blind vendor Altstatt and his teaming partner Cantu replaced the Brown/Blackstone team. As noted in the record, almost immediately upon the placement of the new team, the Army stepped up inspections and issued multiple inspection reports, the results of which were disputed by ODRS and/or were addressed with an action plan(s).

Even though ODRS complained about the methodology of the inspections, where observation reports indicated "defects," (under specific contract terms the "observed event" was not a "deficiency" or "defect" under the terms of the Contract), the Army did not respond and did not change its methodology. It also did not address the issue in meetings with ODRS or through any

correspondence. The Army also did not issue any Contract Discrepancy Reports or any Cure Notices after 2017.

The Army did, however, create monthly Contracting Officer Representative (COR) Reports with comments showing ODRS's performance from January 2018 through January 2019 to be marginal, yet none of these reports were given to ODRS or Altstatt or Cantu, until February 2019. Inspection reports were given to Altstatt/Cantu staff upon completion of an inspection, but no Contract Discrepancy Reports or Cure Notices were issued. Meeting minutes from August 2018 to December 2018 were reviewed and revealed that they did not reflect any of the alleged deficiencies.

The Army changed it Inspection Report Forms to incorporate language that the DFAC Manager receiving the inspection report "Acknowledges and understands deficiencies noted." Standard DA prototypes have a signature line for Managers to acknowledge receipt of the inspection report, but not "acknowledge deficiencies." ODRS instructed managers to acknowledge receipt, but not acknowledge deficiencies, because it had already repeatedly informed the Army that the observed events were not deficiencies under the Contract. The COR added in his reports that their refusals were continuing violations of not following terms of contract and regulatory requirements.

Where customer complaints of the food service identified in the COR Reports formed some of the basis for the unsatisfactory past performance of ODRS, ODRS was never informed of these complaints until receiving the COR Reports after a 13-month period of inspections. Based upon information provided in these COR Reports, there were approximately 24 customer complaints out of 4,556,117 meals served. (.0005% of meals served).

Even though the COR Reports indicated every month from January 2018 through January 2019 that ODRS provided marginal service, it was not until February 25, 2019, that the Army's COR Reports were given to it. These reports and inspections formed the basis for the Past Performance

Evaluation of ODRS, even though it was informed or given the opportunity to respond to the reports for over 13 months.

While ODRS did not see these COR reports at the time, because they were internal documents of the Army, ODRS maintained in its response that the COR reports presented were inaccurate and misleading as they were based upon an improper application of contract requirements. The Army never responded to these repeated complaints. The COR reports were inconsistent with other contemporaneous inspections conducted by other government inspectors at the same time. Most importantly, and despite the COR's internal reporting of marginal service, the COR did not issue any CDRs and no cure notices, and did not deduct any funds from ODRS for non-performance issues.

Interestingly, prior to the expiration of the first year of the new ODRS contract, the Army notifies ODRS it is not exercising the next year option on the contract, without justification to the Secretary of the DOE, does not exercise the option[27], and issues a new solicitation, under which ODRS is excluded from consideration within the competitive range based upon poor past performance (from primarily disputed deficiency reports). This appears to a majority of the Panel as an exerted effort to disadvantage a blind vendor.

Within the above environment, the inspections under Mr. Buchanan's direction as suspect. To be sure, there were reports of improper cooking habits (raw chicken observed being served), expired food, mislabeled food, time and temperature control checks not being performed, signing and initialing discrepancies, and pest control. However, a review of ODRS responses reveal that many of these contract deficiency reports were improperly issued because they documented alleged deficiencies for tasks for which the deadline to be accomplished had not been passed pursuant to the terms of the contract, or that represented minor signing and initialing discrepancies that did arise to the level of a defect, or that the issues were addressed within the terms and conditions of the Contract.

---

[27] Which is the first time an option year was not exercised at Ft. Sill.

The complaints of ODRS that Mr. Buchanan's inspections were improper, overzealous, and inconsistent with the contract requirements take on relevance primarily to the extent they were a large portion of the reports reviewed by the past performance evaluation team in assessing ODRS' past performance, one of three determinant factors in evaluating whether it would be in the competitive range under the new solicitation. It was suggested by the Army that Mr. Buchanan was just doing his job and being thorough, but this increased inspection activity compared to routine inspections since 2001, coupled with the reporting of incidences as defects, which were not defects under the terms of ODRS's contract, is suspect.

Further, the review of the evaluation team for past performance is suspect. The Solicitation was required to consider information from: the Past Performance Information Retrieval System (PPIRS), Federal Awardee Performance and Integrity Information System (FAPIIS), Electronic Subcontractor Reporting System (eSRS) or other databases; and may be obtained from other sources available to the Government, such as the Defense Contract Management Agency; and interviews with program managers, contracting officers, and fee determining officials. The exhibits presented and the testimony given indicates that the Army considered primarily the Buchanan Inspection team reports and did not consider any of the other relevant information provided with ODRS's past performance proposal, such as the confidential survey returned by the Ft. Sam Houston Contracting Officer showing satisfactory performance across all functional areas for Cantu and its Texas SLA teaming partner, and the Army's Food Management Assistance Team ("FMAT"), which conducts more detailed inspections than the Army's regular inspections. The evidence reflects that every other inspection conducted by someone other than Mr. Buchannan scored ODRS and its team members as "Satisfactory" or better result.

At the same time that the Army was conducting its source selection in this case, in order to allow ODRS to continue to operate the cafeteria pursuant to a bridge contract, Ms. Abraham was

certifying to her chain of command that ODRS had a satisfactory performance history, was an ethical contractor and was a responsible contractor. The Panel recognizes that Ms. Abraham was "over a barrel" because the troops needed to be fed while contract disputes were ongoing, but she testified that ODRS was capable of delivering cafeteria services.

The above, standing alone, may have passed muster based upon giving the benefit of the doubt to a contracting officer, but it does not when that contracting officer is ½ of the past performance evaluation team having a major impact on a final evaluation of the contracting officer reviewing the results of the evaluation for the solicitation. While the Army separates the proposals into Technical, Past Performance and Pricing, past performance is a major component, which was skewed in this instance.  Mr. Buchanan had a clear conflict of interest because he was not a person that was able to render impartial assistance or advice to the Government.

While Mr. Buchanan was listed as a fact witness by the Army, he was not called to challenge the testimony that his inspections were improper, overzealous and inconsistent with the contract requirements or that he was biased in performing his duties as part of the solicitation past performance evaluation team.

While other former employees of Cantu testified as to poor past performance of the Altstatt/Cantu team, the Panel did not give great weight to their testimony since they were current employees of the vendor providing cafeteria services at Ft. Sill that replaced their former employer.

Had a proper evaluation been conducted by unconflicted evaluators who considered all the past performance information provided to the Army, as well as Ms. Abraham's certification to her command on March 22, 2019, ODRS's past performance it would be more likely than not that ODRS past performance would have been found to be acceptable. For these reasons, the past performance evaluation conducted by the Army violates the Past Performance Criteria of the Solicitation and 34

C.F.R. § 395.33(b) and should not been used by the Army to exclude ODRS from the competitive range.

ODRS argues that the Army also evaluated the price of ODRS's bid unfairly because it issued a solicitation that required pricing based upon a meal band payment system that obligated the contractor to staff the contract to provide more food service than the Army would pay for. Although the Army rated ODRS as technically competent to perform the contract, the Army chose not to clarify any confusion as to how many meals would actually be served and because ODRS was not placed in the competitive range, did not conduct meaningful discussions about pricing with it. ODRS opines that, if the Army had clearly stated that it would timely provide the amount of meals to be served, as it had in past solicitations, ODRS would have submitted a price proposal acceptable to the Army just as it had done for decades.

The Army indicated that ODRS's bid was $145.7 million, which was $42 million more than Mitchco, the awardee, and approximately $36 million more than one of the other offers included within the competitive range. It was the highest price offered amongst the technically acceptable offers. Based on this information, the Army determined ODRS pricing was unreasonably high. Based upon an initial examination of whether the price was reasonable, it cannot be concluded that it was unreasonable for the pricing evaluation team to determine that ODRS's price, by itself, was unreasonable. ODRS argued that if the Army had provided it with information concerning advanced head counts, it would have bid a lower price. Further, if the Army had engaged in meaningful discussions with it about pricing, it could have provided a lower price that would have been successful. The problem with this argument is that all of the other seven offerors were given the same information and provided much lower bids and the Army was not obligated to enter into meaningful discussions until ODRS was placed in the competitive range. As a result, it cannot be concluded that the Army violated the RSA when it determined that ODRS bid was unreasonably high.

The Army did violate the terms of the RSA, however, by not including ODRS within the competitive range so that meaningful discussions could have ensued as envisioned by the RSA.

The RSA's implementing regulations require the application of the priority and meaningful discussions "if the proposal received from the State Licensing Agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award. . . ." 34 C.F.R. §395.33(a). If ODRS past performance rating was properly placed in the Satisfactory category, as it could very well have been with an unbiased evaluation team, and in light of ample evidence that it has been able to provide service at a reasonable price at the Fort Sill facility since 2001, it can be concluded that it had a "reasonable chance of being selected for final award." Under the RSA, notwithstanding its initial proposed high price, it should have been placed in the competitive range to enable it to have meaningful discussions about the price.

DOE's 1988 publication "Administration of the Randolph-Sheppard Vending Program by Federal Property Managing Agencies" (RS Manual) addresses how a competitive range is to be established as it relates to evaluating an RSA offeror:

> "The Competitive Range: Upon completion of the evaluation for scoring proposals, the FPMA will establish the competitive range to include all scored proposals which demonstrate they can provide the proposed cafeteria service and have a reasonable chance of being selected for award. Considering the clear intent of the Act, the determining factor for judging whether a proposal [of the SLA] should be within the competitive range is if the offer can be made acceptable by conducting meaningful discussions. To be more specific, this should be interpreted as meaning whether the contracting officer is of the opinion that clarification, modification, or appropriate minor revision to the SLA proposal may result in the offer being fully acceptable. This judgment would be consistent with an action involving a commercial offeror under comparable circumstances. The proposal must be considered within the competitive range unless it is technically inferior or contains unduly high selling prices to patrons that the possibility of being made acceptable through meaningful negotiations is precluded..."[28]

---

[28] At Chapter VII, (3)(b)(3)

Mitchco argues, and notably the Army did not, that the RSA Manual is not a regulation and the Army was not bound by it. While it is correct that it is not a regulation, it is the DOE's interpretative ruling on the application of the statute and its regulations and instructive to the Army. When an agency issues an interpretive ruling regarding a statute or regulation, without the benefit of the formal "notice and comment" procedures of the Administrative Procedures Act, the agency's interpretation is "persuasive evidence." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Under the *Skidmore deference*, the weight of agency interpretations and opinions "will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* Since these guidelines have been in effect since 1988, they are persuasive in determining when and how an RSA licensed vendor is to be considered in the competitive range.

While ODRS's price was the highest bid, it was found to be technically acceptable and, as discussed above, should have been found to have had a satisfactory past performance. With a technically acceptable rating and a satisfactory past performance, it should have been placed in the competitive range to initiate discussions to determine the "possibility of being made acceptable."

Because ODRS was technically acceptable and has delivered cafeteria services at Ft. Sill for many years, it is more likely than not it would have had a proposal that would be ranked among those proposals with a reasonable chance of being selected for final award, but for the Army unfairly judging its past performance and not entering into meaningful discussions about its pricing.

It is the Panel's opinion that ODRS's bid could have been lowered had the Army and both agreed to be contractually bound to provide three-day notice of meal counts and properly conducted meaningful discussions with ODRS as to its price. Instead, the Army decided to rely on biased evaluations, and on the price that ODRS believed it had to provide to staff at the higher end of the meal bands based on its past performance of the contract at Ft. Lee to disqualify ODRS.  Under these

circumstances, the Army decision to refuse to place ODRS's bid in the competitive range and to conduct meaningful discussions violated the RSA.

Conclusion

For the foregoing reasons, a majority of the Panel concludes that the non-exercise of the option period by the Army without first securing the opinion of DOE's Secretary that the non-exercise was warranted was a violation of the RSA and further finds that there was significant evidence the Army unfairly evaluated ODRS past performance with respect to the criteria set forth in the solicitation. By failing to evaluate the ODRS's bid proposal properly, the contracting officer improperly denied the SLA an opportunity to obtain the contract and, thereby, violated the RSA.

The Rules governing arbitration under the RSA state as follows:

> If the decision of the arbitration panel is that the acts or practices of the Federal agency are in violation of the Act or the regulations, the head of the Federal agency shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.

The Panel has found there was a violation of the RSA. Respondent must take action to "carry out the decision of the Panel." It is the opinion of the Panel that the actions that the head of the Federal agency should take to ensure compliance with the R-S Act is for Respondent to permit ODRS to complete the option terms of their contract and include the SLA in the competitive range and commence negotiations with it.

Dated June 22, 2020.


/s/ Jerry B. Sellman
Jerry B. Sellman, Chair

/s/ Susan Rockwell Gashel
Susan Rockwell Gashel, Member, Concurring

/s/ Steven R. Fuscher
Steven R. Fuscher, Member, Dissenting

Dissent to Majority Decision

Steve Fuscher

1.        In my opinion, the majority's position attempts to greatly expand the scope of the RSA beyond the original intent of the statute.  The majority ignores facts supporting efforts by the Army to limit bias and an organizational source selection structure designed to ensure an evaluation of all proposals consistent with the terms of the solicitation;  assumes that if ODRS was given the opportunity to participate in meaningful discussions, ODRS would have lowed its price; and relies on a 1988 DOE document to opine that the Army is bound to a definition of the competitive range that has never been incorporated into RSA regulations. The following will address these issues in some detail.

2.        The RSA is not an entitlement program. The RSA was passed by Congress to provide opportunities for blind vendors to develop management skills through the operation of dining hall facilities.  The RSA did not create an entitlement program for blind vendors through the SLAs that involves the Secretary in all contract administrative decisions made by a federal agency.  The matter before the panel specifically focuses on the obligation of the Army to justify to the Secretary a decision to not exercise an option under a food service contract and whether the SLA is required by the RSA to be placed in the competitive range even when the panel agrees that the price proposed by the SLA is unreasonably high.

3.        I agree with the majority that Mitchco's jurisdictional objections are without merit since the panel has jurisdiction under 20 U.S.C. § 107d-1(a).[29]  The panel has broad powers under the RSA and its implementing regulations to hear arbitration cases.   ODRS has petitioned the Secretary alleging violations of the RSA contract priority right under 20 U.S.C. § 107d-1(b)[30].  The Secretary has appointed this panel to

---

[29] 20 U.S.C. § 107d-1(a) states: Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d−2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

[30] 20 U.S.C. § 107d-1(b) states: Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder (including a limitation on the placement or operation of a vending facility as described in section 107(b) of this title and the Secretary's determination thereon) such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d−2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

hear the issues identified by the Appointment Letter[31] (See also 34 C.F.R. §§ 395.37). The panel has provided this opinion to advise the Secretary as to whether the Army violated the RSA.  This is the charter and limits of the panel's authority since the panel is authorized to determine only whether the federal department, agency, or instrumentality violated the RSA or its regulations. 20 U.S.C. § 107d-2(b)(2); *Md. Dep't of Educ. v. Dep't of Veterans Affairs,* 98 F.3d 165, 169 (4th Cir. 1996). The panel is not bound by the Army's decisions challenged by ODRS, and is charged with reviewing those decisions to determine if the Army complied with 20 U.S.C. § 107(b)(2) that charges federal agencies to place one or more vending facilities on Federal property "to the extent that any such facility or facilities would not adversely affect the interests of the Unites States." For purposes of the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* and 20 U.S.C. § 107d-2(a), the panel's decision is a final agency action subject to appeal and review.[32]   If such a violation is found, the head of the federal department, agency, or instrumentality, not the Secretary, is responsible for remedying the violation. 20 U.S.C.§107d-2(b)(2); *Md. Dep't of Educ.,*98 F.3d at 169.

4.      While the decision of the panel is a final agency action, the Secretary has no authority to enforce an order of the panel to direct the contracting officer to take action, such as the termination of a contract, or an order directing the contracting officer to obligate funds.  The 11th Circuit Court of Appeals in *Georgia Dep't of Human Resources v. Nash*, et al., 915 F.2d 1482 (11th Cir. 1990)  found that an arbitration panel convened under the authority of the RSA "has no remedial powers whatsoever," concluding that "[i]t may determine that certain of the federal entity's acts violate the RSA,  but the RSA leaves responsibility for remedying the violation to the federal entity itself." *Georgia Dep't of Human Resources v. Nash, et al*., 915 F.2d 1482, 1492 (11th Cir. 1990).

5.      In a subsequent court review of an RSA arbitration decision, the *Georgia Dep't of Human Resources* case was cited with approval in *Commonwealth of Kentucky v. United States*, 122914 KYWDC, 5:12-CV-

---

[31] April 12, 2019 Department of Education letter reference Oklahoma v. Department of the Army, Fort Sill, Case no. R-S/18-09, Carol L. Dobak, Acting Deputy Commissioner.

[32] See also, 34 C.F.R. §§ 395.37 (a) Whenever any State Licensing Agency determines that any department, agency, or instrumentality of the  United States which has control of the maintenance, operation, and protection of  Federal property is failing to comply with the provisions of the  Act or of this part and all informal attempts to resolve the issues have been unsuccessful, such licensing agency may file a complaint with the  Secretary.

(b) Upon receipt of a complaint filed under paragraph (a) of this section, the  Secretary shall convene an ad hoc arbitration panel which shall, in accordance with the provisions of 5 U.S.C. ch. 5, subchapter II, give notice, conduct a hearing and render its decision which shall be final and binding on the parties except that such decision shall be subject to appeal and review as a final agency action for purposes of the provisions of 5 U.S.C. ch. 7.

00132-TBR, where Judge Russell noted that "the Eleventh Circuit has concluded that an arbitration panel considering such a conflict may determine whether or not the federal entity has complied with the RSA but may not order a specific remedy." Judge Russell agreed that "although the arbitration panel's decision constitutes the [DOE]'s final agency action, the Secretary of Education has no authority to order another federal entity to act one way or another." *Commonwealth of Kentucky v. United States*, 122914 KYWDC, 5:12-CV-00132-TBR.

6.      Finally, in *Maryland State Dep't of Education v. U.S. Dep't of Veterans Affairs*, 98 F.3d 165 (4th Cir. 1996), the Fourth Circuit Court of Appeals agreed that a Section 107d-1(b) arbitration panel lacks authority to award a specific remedy for a violation of the RSA. That Court acknowledged that a federal entity could "simply refuse" to remedy the violations found by an arbitration panel, which comes close to a wrong without a remedy, something usually disdained by the courts. Therefore, while the panel may identify acts of the Army that are in violation of the RSA, the panel has no authority to order remedies for such violations. That responsibility lies with the head of the procuring agency.

7.      The scope of the panel's jurisdiction is important since if the Army appeals this decision, the courts will conduct their own *de novo* review of the matter before the panel. As will be discussed below, the courts are not required to give this decision any deference and will come to their own legal conclusions. While the facts presented by the parties to the panel will be relevant to the court, the court will weigh those facts in a manner consistent with the review standard established by the court, not the panel.

8.      The first issue before the panel addresses the obligation, if any, of the Army to justify its decision to not exercise an option to the Secretary. I concur that the issue before the panel is:

> Issue 1. Whether the Army's decision not to exercise the third option year on its contract for dining facility services with the Oklahoma SLA is a limitation on the placement or operation of a vending facility that must be justified to the Secretary of Education under 20 U.S.C. § 395.30(b), and then, whether the Army violated the Randolph Sheppard Act (RSA)(Act) at 20 U.S.C. §107(b) and implementing regulations 34 C.F.R. §§395.30(b) and 395.33(b) by not exercising its third option year on its contract with the Oklahoma SLA (placing a limitation on the operation of a vending facility) and issuing a new FFS solicitation, without fully justifying to the Secretary its decision that such operation of a vending facility (i.e., the continued operation of the Oklahoma SLA contract) would adversely affect the interests of the United States. (Arbitration Count No.1)

9.      Congress passed the RSA in 1936 to provide blind persons with increased employment opportunities through the operation of vending facilities on federal property.[33] The RSA was

---

[33] 20 U.S.C. § 107(b).

amended in 1974.  Neither the RSA nor the applicable Department of Education (DOE) regulations, 34 C.F.R. §§395 *et seq* have been amended or revised since their implementation in 1977.

10.      Under the RSA, blind vendors do not apply directly for government contracts.[34] The RSA requires blind vendors to register with a State Licensing Agency (SLA), which in turn applies for contracts involving the operation of vending facilities.[35]

11.      Cafeteria contracts, such as Full Food Service Contracts (FFS) that are subject to the RSA, may be solicited by federal agencies or awarded through direct negotiations.  This procurement action for FFS contract services was solicited by the Army and awarded through a competitive bid process.   The Army did not elect to directly negotiate with the SLA under the express authority of 34 C.F.R. § 395.33(d). Prior to the award of ID/IQ Contract W9124L-16-D-0001 on 1 April 2016, the Army elected to not exercise the third-year option in Contract W9124L-16-D-0001. Contract W9124L-16-D-0001 authorized the provision of FFS contract services for one twelve-month base year and four twelve-month option periods.   The Army contracting officer made a "decision" to issue a new solicitation to combine the work authorized by this contract at Fort Sill with another contract being performed by ODRS rather than exercise option two of the contract.  As a result, none of the remaining options were exercised under contract W9124L-16-D-0001.

12.      ODRS was provided the opportunity to compete for the award of Contract W9124L-16-D-0001 for the FFS contract services in the subsequent solicitation and was granted the priority authorized by 20 U.S.C. § 107 *et seq*.   20U.S.C . § 107-d(e) provides that "the <u>Secretary</u>, through the <u>Commissioner</u>, shall prescribe regulations to establish a priority for the operation of **cafeterias on** <u>Federal property</u> by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise."[36]

13.      Consistent with the implementing regulations, 34 C.F.R. §395.33[37], the Army invited ODRS to respond to the new solicitation.  ODRS submitted a proposal in response to the solicitation advertised

---

[34] *Id*. §107a(a)(5).

[35] 34 C.F.R. § 395.33.

[36] *Id*.

[37] 34 C.F.R. **§ 395.33 Operation of** <u>cafeterias</u> **by blind vendors.**

**(a)** Priority in the operation of <u>cafeterias</u> by blind <u>vendors</u> on <u>Federal property</u> shall be afforded when the <u>Secretary</u> determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind <u>vendors</u> to the greatest extent possible.

by the Army.  This proposal included the services provided by Contract W9124L-16-D-0001 as well as additional services that were under contract with ODRS.  ODRS continued to provide services to the Army under Contract W9124L-16-D-0001 during the source selection process.  In order to ensure continued FFS contract services during the source selection process, contract performance was extended under Contract W9124L-16-D-0001 until 30 August 2019.

14.       The new solicitation was issued on 6 June 2018 and subsequently modified and reissued on 31 August 2018.  The solicitation was modified to address, in part, corrective action required to resolve ODRS's protest to the Government Accountability Office (GAO). ODRS submitted an offer as the SLA in response to the modified solicitation.

15.       The Secretary  appointed this panel to determine, whether in the opinion of the panel, the Army's decision not to exercise the third option year on its contract for dining facility services with the Oklahoma SLA was a limitation on the placement or operation of a vending facility that must be justified to the Secretary of Education under 20 U.S.C. § 395.30(b).

16.       ODRS argues that 20 U.S.C. § 107(b)(2)[38] requires, as a precondition to issuing the solicitation, that the Army  justify to the Secretary how the Army's decision to not exercise the option adversely affects the interests of the United States because the Army's decision to not exercise the option is a limitation on the operation of a FFS facility that must be justified to the Secretary and the determination

----

**(b)** In order to establish the ability of blind vendors to operate a  cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of  cafeteria services, the appropriate  State licensing agency shall be invited to respond to solicitations for offers when a  cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. If the proposal received from the  State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the  Secretary as required under paragraph (a) of this section. If the  State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the  Secretary under the provisions of § 395.37.

[38] 20 U.S.C. § 107(b)(2) states: wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States. Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary who shall determine whether such limitation is justified. A determination made by the Secretary pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination. The Secretary shall publish such determination, along with supporting documentation, in the Federal Register.

of the Secretary is binding on the Army.[39]   The Army did not submit a justification to the Secretary of the DoE before deciding and implementing a contracting officer decision to not exercise an option under contract W9124L-16-D-0001.

17.      I concur with the Army's position that the Army is only required to invite the SLA to submit a proposal and apply the priority to the source selection process where the contract is subject to the RSA and its preference and that no cut in services are included in the new solicitation.  The action taken by the Army has not limited the SLA's priority.  The decision to issue a new solicitation and not exercise the option of the current contract is no different than the SLA competing for a new contract.  Consistent with the RSA, the SLA was invited to submit a proposal and the solicitation included the RSA priority.  34 C.F.R. § 395.33(b) states in part:

> In order to establish the ability of blind <u>vendors</u> to operate a <u>cafeteria</u> in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of <u>cafeteria</u> services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a <u>cafeteria</u> contract is contemplated by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged.

ODRS has not objected to the terms of the solicitation and the solicitation did establish criteria under which all proposals in this source selection were judged.

18.      I do not concur with the majority's interpretation of the RSA.  20 U.S.C. § 107(b)(2) states in part: "A determination made by the <u>Secretary</u> pursuant to this provision shall be binding on any department, agency, or instrumentality of the <u>United States</u> affected by such determination."[40]  The statute does not authorize the Secretary to enforce the finding except to "publish such determination, along with supporting documentation, in the Federal Register."[41]  Neither the RSA nor its implementing regulations require the Army justify its decision to not exercise the option as a precondition to issuing a solicitation for similar FFS services under a new contract with no cut in services covered by the expired contract with the SLA (ODRS).

19.      The majority argues for the expansion of the application of *SourceAmerica v. United States Dep't of Educ.*, 368 F. Supp. 3d 974, 995-996 (E.D. Va., March 15, 2019).  Citing *SourceAmerica*, the majority opines that the failure of the Army to exercise an option under the existing contract is a limitation on the operation of a facility under 20 U.S.C. § 107(b)(2).  Reliance on *SourceAmerica* is misplaced.  In *SourceAmerica* the SLA completed services under its contract with the Army; however, the SLA had no

---

[39] See footnote 2 for the full text of 34 C.F.R. § 395.33 Operation of <u>cafeterias</u> by blind vendors.
[40] *Id.*
[41] *Ibid.*

opportunity to compete for the FFS contract services under a follow-on contract because the Army was going to provide those services with Army personnel.  The facts of *SourceAmerica* are summarized by the district court as follows:

> The Army subsequently determined that it no longer needed a FFS contract because Army soldiers formerly deployed in Iraq and Afghanistan could perform most of the duties, including cooking, at the Fort Riley dining facilities. However, because Army regulations prohibited soldiers from performing DFA services, the Army was required to contract out these services. Thus, the Army decided that it would procure a new contract, effective upon the conclusion of Kansas's contract, that covered only DFA services. Specifically, this new DFA contract would be for "janitorial and custodial duties within dining facilities [and] [i]include[ ] ... cleaning, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning and other sanitation related functions." Draft of Solicitation, Offer, and Award for DFA Services 7 (July 20, 2015), at Admin. R. 1002. Believing that a contract covering only DFA services did not constitute the operation of vending facilities, the Army concluded that the new contract would not be subject to the RSA's preference for blind vendors in the operation of vending facilities. Accordingly, the Army instead sought to procure a contract pursuant to the JWOD[42]. To that end, the Commission proposed adding the Fort Riley DFA services to the JWOD's procurement list through publication in the Federal Register in July 2015. The Commission ultimately added the DFA services to the procurement list and formally designated Lakeview as the mandatory source of supply, effective February 2016. SourceAmerica facilitated the process.

> In March 2015, the Army informed Kansas that, following the conclusion of Kansas's contract, the Army would purchase only DFA services through a new contract not subject to the RSA.  Dissatisfied with this turn of events and convinced that the new DFA contract was subject to the RSA, Kansas, in May 2015, filed a request with the Secretary for arbitration with the Army. As required by the RSA, the Secretary, in October 2016, convened a three-member panel to arbitrate the dispute. *Id.* at 368 F.Supp.3d 984.

20.     There is no dispute that ODRS was invited to compete for FFS contract services and was provided the priority authorized by the RSA.   ODRS was not excluded from the opportunity to compete for FFS contract services.  It was invited to compete and did compete.  ODRS was also granted the RSA preference. Unlike the Licensed Vendor in *SourceAmerica*, ODRS was allowed to compete for a FFS contract. *SourceAmerica* does not stand for the proposition that a federal agency must fully justify a decision to not exercise an option under a contract subject to the RSA, it stands for the proposition that the RSA review requirement applies when a federal agency eliminates a requirement that had provided a licensed vendor the opportunity to provide services covered by the RSA.  The court in *SourceAmerica* stated its position as follows:

> The RSA Review Requirement directs that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such

---

[42] JWOD refers to the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 8501-8506. The Act also creates a preference for the blind in federal contracting actions.

limitation is justified."[43] *Id.* Plaintiffs and defendants argue that the Army's decision to no longer procure a contract for the operation of its vending facilities at Fort Riley did not trigger this provision because it does not constitute a "limitation on the ... operation of a vending facility." *Id.* Specifically, plaintiffs and defendants argue that the RSA Review Requirement applies only to restrictions on where or how a vending facility may be operated. This argument fails. Under the Army's plan, the operation of Fort Riley dining facilities was to be limited in that the facilities would not be operated by a vendor at all. Removing a vendor entirely is the most basic limitation on the operation of vending facilities of all. Indeed, the legislative history confirms this view. Specifically, the Senate Report explains that the RSA Review Requirement was added, in part, because "[f]ederal agencies had not done all they could to insure the establishment *and the maintenance* of blind vendors on property under their control."[22] S. Rep. No. 93-937, at 16 (1974) (emphasis added). This concern—that federal agencies were not doing all they could to ensure blind vendors continued to operate dining facilities—is directly implicated by the Army's decision to cease contracting with vendors for the operation of its dining facilities. Indeed, it is the exact scenario that motivated the Senate to add the review provision. As such, the arbitration panel correctly concluded that the *Army's decision to discontinue the operation of its vending facilities by a vendor triggered the RSA Review Requirement* [emphasis added]. And the arbitration panel correctly concluded that the Army failed to comply with this requirement. The panel's finding to this effect must be upheld.[44]

21.     Since the Army did retain the FFS requirement, invited ODRS to compete and applied the priority, the facts in this case are distinguishable.  The Army's decision to not exercise the option in Contract W9124L-16-D-000 is similar to an Army decision to compete a contract requirement rather than negotiate directly with the state licensing agency under the express authority of 34 C.F.R. § 395.33(d).  There is no requirement under 34 C.F.R. § 395.33(d) to justify to the Secretary why the parties were not able to negotiate a contract. The regulations simply state: "That the provisions of paragraphs (a) and (b) of this section shall apply in the event that the negotiations authorized by this paragraph do not result in a contract."[45]  As discussed above, paragraphs (a) and (b) describe how the RSA applies to competitive source selections.

22.     The facts in *SourceAmerica* and the finding in *SourceAmerica* do not establish a precedent to expand the RSA to include administrative decisions made by contracting officers.  Neither the RSA nor its regulations require a federal agency justify to the Secretary a decision to not exercise an option under a contract covered by the RSA. Contrary to the position taken by the majority, the Army's action to not exercise the option did not "halt, stop, or terminate a demonstrated right to a priority."  The Army's action allowed ODRS to compete for FFS dining hall services at Fort Sill just as if it were a new requirement after the expiration of an existing contract. The RSA does not create a "demonstrated right to a priority" based on the fact that the SLA has performed FFS services for the government.  The RSA provides a priority for award under certain well-defined conditions. The SLA is not "entitled" to an award.

---

[43] The court cited 20 U.S.C. § 107(b) and referenced the provisions of the statute.
[44] *SourceAmerica* at 368 F.Supp.3d at 996.
[45] *Id.*

When the federal agency initiates a competitive source selection, the SLA is required to "compete" for the award of a FFS contract with a federal agency.  In addition, there is no court precedent that specifically imposes that obligation on a federal agency.

23.     The majority argues that the "Army is not free, nor does it have the discretion, to disregard the RSA priority given to blind vendors."  This is a mischaracterization of the RSA priority.  The priority applies to the award of a contract, not the exercise of an option under an existing contract. Contrary to the opinion of the majority, the RSA does not limit the exercise of an option as suggested by the majority's reference to *Magic Brite Janitorial v. United States, Supra.*  Neither the RSA or its implementing regulations require a federal agency consult the Secretary prior to not exercising a contract option.

24.     PAST PERFORMANCE: Similarly, I do not concur with the majority's interpretation of the facts as regards the Army rating of ODRS's past performance as unacceptable.   The second issue before the panel is:

> Whether the Army violated 20 U.S.C. §107d-3(e) of the RSA and 34 C.F.R. §§395. 33(a) and (b) by failing to judge the proposal received from the Oklahoma SLA (ODRS) to be within the competitive range on solicitation W9124J-18-R-0024 for dining facility services at Fort Sill and to be ranked among those proposals which have a reasonable chance of being selected for the final award? (Arbitration Count Nos. 3,4,5,6.)

25.     My interpretation of the facts and the review standard to be applied to the facts presented by the parties is significantly different from the majority.  My opinion is based on: (1) the panel's limited jurisdiction; (2) the lack of deference granted the panel's decision; (3) the fact that the courts will conduct a *de novo* review of the contracting officer's decision;  and, (4) the review standard that has been used by the courts in reviewing the decisions of a contracting officer.

26.     While ODRS has argued bias and unfair treatment by the Army, ODRS has failed to meet its burden of proof that the Army violated 20 U.S.C. §107d-3(e) of the RSA when the Army determined ODRS was not included in the competitive range because it was not ranked among those proposes which have a reasonable chance of being selected for final award.  A short summary of the RSA and its relevant regulations is necessary to focus the analysis of the issues before the panel.

27.     All federal contract requirements that involve the obligation of federal funds are required to be competed unless there is a statutory exception to the Competition in Contracting Act (CICA)[46]. The RSA

---

[46] The Competition in Contracting Act (CICA) of 1984, 41 U.S.C. 253, is United States legislation governing the award of contract services involving the obligation of appropriated funds.  It requires U.S. federal government agencies to arrange "full and open competition through the use of competitive procedures" in their procurement activities unless otherwise authorized by law.  CICA was passed into law as a foundation for the Federal Acquisition Regulation (FAR)

provides the necessary authorization for a contracting officer to enter into sole source negotiations with a SLA for a FFS dining hall services contract.  A sole source award is permitted as long as the SLA can provide dining hall services at a "reasonable cost, with food of high quality comparable to that provided employees."[47]

28.     If a contract does not result from direct negotiations with the SLA, then the federal agency competes the contract.  In that event, 34 C.F.R §395.33(a) and (b) apply.  34 C.F.R. §395.33(a) provides the SLA with a priority for award while 34 C.F.R. §395.33(b) directs the application of the priority ". . .if the proposal received from the State Licensing Agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award. . . ."[48]

29.     However, prior to award of this competitive source selection, the contracting officer must consult with the Secretary who ". . . determines on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees. . . ."[49]  This action by the Secretary permits the contracting officer to award a contract to the SLA at a price that may be higher than the lowest priced, technically acceptable offer submitted during a competitive source selection for FFS contract services.

30.     If the SLA is "dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary under the provisions of § 395.37. . . ."[50]

31.     The Secretary is then charged with appointing an arbitration panel to determine if the federal entity is ". . .failing to comply with the provisions of the Act or of this part and all informal attempts to

---

and to foster competition and reduce costs. The theory was that more competition for procurements would reduce costs and allow more small businesses to win Federal Government contracts. Under CICA all procurements must be competed as full and open (there are some exceptions found in FAR Part 6 ) so any qualified company can submit an offer.

[47] 34 C.F.R §395.33(d) Operation of cafeterias by blind vendors states:
(d) Notwithstanding the requirements of paragraphs (a) and (b) of this section, Federal property managing departments, agencies, and instrumentalities may afford priority in the operation of cafeterias by blind vendors on Federal property through direct negotiations with State licensing agencies whenever such department, agency, or instrumentality determines, on an individual basis, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees: *Provided, however,* That the provisions of paragraphs (a) and (b) of this section shall apply in the event that the negotiations authorized by this paragraph do not result in a contract.

[48] *Id.*
[49] See 34 C.F.R. §395.33(a).
[50] See 34 C.F.R. §395.33(b).

resolve the issues have been unsuccessful. . . ."[51]  It is important to note that this arbitration panel is only authorized to determine whether the Army violated the RSA or its regulations.[52]

32.      When a sole source award is not accomplished under 34 C.F.R. §395.33(c), the RSA anticipates a completive source selection to determine who is awarded a contract.  The solicitation for that competitive source selection is required to include criteria for award.  34 C.F.R. §395.33(b) provides that "such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices."[53]

33.      The parties agree that ODRS was invited to compete for award under solicitation W9124J-18-R-0024. The solicitation did include the priority authorized by the RSA. ODRS did submit a proposal and that proposal was not included within the competitive range. ORDS argues that the Army errored in determining that ODRS's proposal under solicitation W9124J-18-R-0024 was not in the competitive range, as defined in FAR Part 15. 303(b) because (1) ODRS's proposal was unacceptable under the factor for past performance; (2) the proposed price was unreasonably high; and (3) thus not competitive.  The result of the Army's evaluation was that ODRS's proposal was judged to not be within the competitive range and, therefore, was not ranked among those proposals which have a reasonable chance of being selected for final award as required by 34 C.F.R. §395.33(a).  The consequence of that determination was that the RSA priority did not apply and ODRS no longer participated in the source selection.

34.      The majority relies on *Dickinson v. Zurko*, 527 U.S. 150,164 (1999) to apply a substantial evidence burden on the SLA rather than the abuse of discretion standard normally applied by the courts in the review of contracting officer decisions.  This reliance is misplaced since the panel's decision is not entitled to deference, the courts will conduct a *de novo* review of the issues before the panel and apply the abuse of discretion standard of review to the decisions of the Army contracting officer.

35.      The majority also relies on *Randolph-Sheppard Vendors of America v. Weinberger*, Supra., to opine that the panel's decision is subject to judicial review pursuant to the scope of the APA, not the Army's procurement decision. However, the majority fails to acknowledge the *SourceAmerica* decision below.  The district court sites *Sauer v. United States Dep't of Education., Rehab. Servs. Administration*, 668 F.3d at 650-51 (2012) where the ninth circuit ruled Chevron deference does not apply to arbitration decisions under the RSA.

---

[51] See 34 C.F.R. §395.37(a).

[52] *Id.*; *Md. Dep't of Educ. v. Dep't of Veterans Affairs,* 98 F.3d 165, 169 (4th Cir. 1996).

[53] *Id.*

36.    The district court in *SourceAmerica v. United States Dep't of Educ*., 368 F. Supp. 3d 974, 995-996 (E.D. Va., March 15, 2019) opined on the review standard to be used in the review of a RSA Arbitration decision.  The court stated:

> The RSA makes clear that an RSA arbitration decision is "subject to appeal and review as a final agency action." 20 U.S.C. § 107d-2(a). And the RSA also acknowledges that the APA provides the standards for this review. In this respect, the APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "in excess of statutory justification, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

> Judicial review of an RSA arbitration panel's decision is conducted *de novo. Sauer v. Dep't of Educ.,* 668 F.3d 644, 650 (9th Cir. 2012). The arbitration decision must be set aside if it is "not in accordance with law." 5 U.S.C. § 706(2)(A); *Sauer,* 668 F.3d at 650. Importantly, the arbitration panel's interpretation of the RSA is not entitled to *Chevron* deference. *Sauer,* 668 F.3d at 650. *Chevron* deference applies "only `when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon,* 546 U.S. 243, 255-56, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (quoting *United States v. Mead Corp.,* 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). As the Ninth Circuit has explained, *Chevron* "deference [to an RSA arbitration panel's interpretation] is inapplicable ... because the Act does not delegate interpretive authority to the arbitration panel; instead, it gives the Secretary of Education the responsibility of administering the Act and issuing interpretive regulations. *See* 20 U.S.C. § 107(b)." *Sauer,* 668 F.3d at 650.[54]

> The District Court stated in footnote 8: "As the Ninth Circuit has noted, "[a]lthough an arbitration panel's decision is considered a final action of the Secretary for purposes of appeal, *see* § 107d-2(a), this is a legal fiction: an arbitration panel is composed of members appointed by the parties to the arbitration, not of Department of Education officials whose expertise merits ... deference." *Sauer,* 668 F.3d at 650-51."[55]

37.    The majority simply ignores the inconvenient truth expressed by courts.   In a *de novo* review of the Army's action, the courts will use the abuse of discretion review standard, not the substantial evidence standard used by the majority.   While a court may consider the opinion of the panel instructive, it is not bound by that decision, nor it is required to limit its review to the reasonableness of a panel decision.  The court will conduct a *de novo* review the facts presented and render its own opinion.

38.    The panel has heard fact and opinion testimony that supplements the source selection information used by the Army to exclude ODRS from the competitive range.  In establishing a standard to determine if there has been a violation of the RSA, the panel cannot rely on the RSA and its regulations because neither the statute nor its regulations establish source selection criteria for establishing a competitive range.  34

---

[54] *Id*. at 368 F.Supp.3d 987

[55] *Id*.

C.F.R. §395.33(b) simply provides that ". . .solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices." *Id.*

39.     I concur with the opinion of the majority that the Secretary is given the responsibility to prescribe RSA regulations.  While the Secretary has authority to define the latitude, if any, of a federal agency to place a limitation on the placement or operation of a blind vending facility, the Secretary has not issued regulations on this point.  Since the opinion of the panel is not entitled to Chevron deference, the courts, not the RSA arbitration panels, will define the impact of the RSA on federal agencies.

40.     Similarly, CICA and the Federal Acquisition Regulations (FAR) apply to source selections that include the RSA priority.  CICA provides the authority for a federal agency to award a contract to a SLA even when the SLA's price is not the lowest priced, technically acceptable offer proposed by an offeror to the government.   In addition, the FAR defines the source selection process so a competition for the award of a dining hall services contract is possible.  Even ODRS acknowledged that the FAR applied to this source selection. [56]

41.      The Army did not refuse to include the RSA priority in this source selection.  Therefore, the Army complied with the RSA statutory requirement to include the RSA priority in this competitive source selection.

42.     In the absence of statutory or regulatory guidance on the criteria to determine if ODRS should have been included or excluded from the competitive range, the panel must look to the Army's regulations and the FAR that control the competitive source selection process used by the Army to make an award decision. The majority's reliance on DOE's 1988 publication "Administration of the Randolph-Sheppard Vending Program by Federal Property Managing Agencies" does not recognize the undisputed fact that this publication is not a regulation and does not comply with the APA.  While this document may be informative, it is not a regulation issued by the Secretary that is binding on the Army. In addition, ODRS has failed to document whether or not this document represents the current policy of the Secretary.  The  panel simply does not have the authority to legislate and/or regulate the actions of a federal agency as regards the determination of a federal contracting officer to include or exclude SLA from the competitive range.

43.     The solicitation included source selection terms as well as a number of regulatory and statutory clauses that are required by the FAR and Army procurement regulations.  ODRS did not object to these terms and conditions nor did ODRS allege that the terms and conditions in the solicitation violated the RSA. Solicitation W9124J-18-R-0024 included the RSA priority and ODRS submitted a proposal in response to this

---

[56] *ODRS Post Hearing Response Brief* at para. 58, pg. 25.

solicitation.  In fact, ODRS acknowledged in its post hearing response brief that "[t]his acquisition is subject to the FAR. *See* FAR § 1.101."[57]

44.     ODRS's objection is that its proposal was not included within the competitive range.  The standard for reviewing a contracting officer's decision to determine which proposals are included in the competitive range was stated in *Southfork Systems v. United States*, 141 F.3d 1124 (Fed. Cir, 1998). The review standard is "abuse of discretion." The court ruled that "[t]he contracting officer had broad discretion to consider the evaluation of each factor as part of a totality of the circumstances in order to determine whether a proposal belonged in the competitive range. *Southfork* has not shown that the contracting officer abused that discretion."[58] This holding is consistent with 5 U.S.C. § 706(2)(A).

45.     Since the parties are not alleging a violation of the RSA as regards the invitation to submit a proposal or the inclusion of the RSA priority, the matter before the panel is akin to a bid protest.  ODRS is arguing the Army erred in not including ODRS's proposal in the competitive range.  ODRS asks the panel to step into the shoes of the contracting officer and substitute the judgement of the panel for the judgment of the contracting officer.  Since this is a question regarding the judgement of the contracting officer, it is instructive to explore the United States Court of Federal Claims (COFC) for guidance as to how to evaluate the contracting officer's decision to exclude ODRS from the competitive range.   In *Halter Marine, Inc. v. United States*, 56 Fed. Cl. 144, 172 (2003), the COFC summarized the review standard for matters such as this.  The court stated:

> Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, 103 S.Ct. 2856. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 646 (2001). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

---

[57] *Id.*
[58] *Id*. at para. 59.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136(1971) (citations omitted); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d *158433 (1975); *In re Sang-Su Lee, 277* F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed. Cir.1993); *ManTech Telecomms, and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 63; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them.") (citing *Florida Power & Light Co. v. Lorian,* 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); *Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 672 (1997); *Commercial Energies, Inc. v. United States,* 20 Cl. Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed. Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) II248, at 3 [1994 WL 129008] (Apr. 8,1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

H: * * * * *

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); ...

*E. W. Bliss Co. v. United States, 77* F.3d 445, 449 (Fed.Cir.1996); *see also JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd* 279 F.3d 985 (Fed.Cir.2002). *Id* at 157-8.

46.     The Government Accountability Office (GAO) is an administrative body with authority to review federal procurement source selection decisions.   The GAO reviews the actions of the procuring agency to determine whether the agency's judgment was reasonable and in accordance with the solicitation's evaluation criteria.[59]  The GAO has taken the position that the GAO lacks jurisdiction to hear an SLA challenge to its elimination from the competitive range.[60] However, that does not mean that the panel can ignore the GAO review standard to determine if the elimination of ODRS from the competitive range under these set of facts is a violation of the RSA.  The GAO is the federal agency with subject matter expertise on federal contracting source selection decisions and is charged with ensuring "all" offerors are treated fairly when competing for the award of federal contract services

47.     For example, the GAO as stated that:

> In considering protests that challenge the propriety of an agency's evaluation of technical proposals, our Office does not independently evaluate proposals. Rather, we review the agency's evaluation to ensure that it is consistent with the terms of the solicitation and applicable statutes and regulations. SOS Int'l, Ltd., B-402558.3, B-402558.9, June 3, 2010, 2010 CPD ¶ 131 at 2. A protester's mere disagreement with the agency's evaluation conclusions does not provide a basis for our Office to object to the evaluation. OPTIMUS Corp., B-400777, Jan. 26, 2009, 2009 CPD¶ 33 at 6. [61]

48.     The GAO will not challenge the past performance evaluation of an agency unless the GAO finds the evaluation was unreasonable, inconsistent with the solicitation criteria or undocumented.[62]

49.     Even when the contractor disputes the agency's interpretation of the underlying facts, the GAO will not challenge the judgement of the agency as long as the agency's past performance was based on a reasonable perception of inadequate prior performance.[63]

50.     The panel should have looked to GAO decisions and court precedent as instructive as to whether the Army contracting officer's decision to exclude ODRS from the competitive range was an abuse of discretion and, if so, whether the exclusion of ODRS from the competitive range was a violation of the RSA.

51.     The panel relies heavily on allegations of bias and an alleged conflict of interest by the Army Contracting Officer Representative (COR), Mr. Buchanan,[64] who conducted regular inspections of the dining hall facility where ODRS was performing FFS contract services through is licensed vendors and their team partners.  The majority finds that Mr. Buchanan had a clear conflict of interest because he was not a

---

[59] *All Phase Servs., Inc., B-406856, Aug. 17, 2012,* 2012 CPD ¶ 274 at 4.
[60] *Georgia Bus. Enter. Programing-Vocal Rehab. Agency*, B-416182.2, Nov. 23, 2018, 2018 CPD ¶ 400 at 4.
[61] *GHG Corp., B-407949, Apr. 12, 2013,* 2013 CPD ¶ 102 at 2.
[62] *Sonetronics, Inc., B-289459.2, Mar. 18, 2002, 2002* CPD ¶ 48 at 3; *IGIT,Inc., B-275299.2, June 23, 1997,* 97-2 CPD ¶ 7 at 5.
[63] *Ready Transp., Inc., B-285283.3, B-285283.4, May 8, 2001*, 2001 CPD ¶ 90 at 5.
[64] TR. 1-176:12-15.

person that was able to render impartial assistance or advice to the Government.  This finding is based on alleged bias and aggressive documentation of contract deficiencies.  Little weight is given to the undisputed fact that Mr. Buchanan was not the only person involved in the evaluation of the past performance of ODRS.  There is also no acknowledgement that Mr. Buchanan may have been just doing his job.

52.     Mr. Stevens was the contracting officer responsible for the solicitation, evaluation and award of the contract.[65]  ODRS has not argued that Mr. Stevens was biased in this source selection.  He was responsible for the award of the contract, including the source selection process used to determine who is awarded a contract.    After award, the responsibility for the administration of the contract is transferred to the local contracting office who manages the contractor's performance of the contract.[66]

53.     The majority gives little weight to the actions taken by the Army to limit the possibility for bias during source selection. The source selection process involved separate teams that evaluated parts of an offeror's proposal.  The Army separated the proposals into Technical, Past Performance and Pricing.  There was a separate team that evaluated ODRS's technical proposal for compliance and conformance to the technical requirements of the solicitation.  A different team evaluated the past performance of offerors.  Finally, a pricing team conducted a cost and price analysis of proposals.[67] Each team was sequestered from the other two teams, so the three teams did not have access to proposal information that was evaluated by another team.  The names of the offerors were redacted so the members of these evaluation teams did not know the name of an offeror who submitted a proposal.  This is standard practice to help ensure any personal bias against any particular offeror is eliminated from the review process.[68]

54.     Mr. Colson and Mr. Buchanan, the Contracting Officer's Representative (COR), provided the past performance report to the contracting officer, Mr. Stevens.  The Report was added to the source selection file.  Mr. Stevens accepted and reviewed the report.  He found nothing in the report that suggested bias by either Mr. Colson or Mr. Buchanan.[69]

55.     The majority argues that the Army relied primarily on Mr. Buchanan's inspection team reports and failed to consider other relevant information that ODRS provided the Army regarding local COR reports and investigations, and a confidential survey from Ft. Sam Houston.  However, there is no reference to the broad range of past performance information that was evaluated by the Army that included review and consideration of ODRS's responses to adverse past performance documentation that included responses to

---

[65] *TR.* Stevens, pg. 2-256.
[66] *TR.* 2-259.
[67] *TR.* 2-277.
[68] *TR.* 2-270 to 2-274.
[69] TR. 2-298 to 2-301.

the COR monthly reports, quality assurance inspections and monthly meeting notes that were communicated to ODRS on 25 February 2019.

56.     The following is a summary of some of the other relevant past performance information evaluated by the Army prior to making a decision regarding past performance:

(a)     An interview of the COR for the ODRS's Fort Sill contracts who provided documented evidence of poor performance as indicated within the Army's Past Performance report for ODRS.[70]

(b)     A review of the information in PPIRS (past performance information record system), which found ODRS received unsatisfactory ratings in management, and unsatisfactory ratings in regulatory compliance for the performance period between 1 April 2016 to 31 March 2017. The PPIRS information also showed ODRS received a marginal rating in management and a marginal rating in regulatory compliance for performance period between 1 April 2017 to 31 March 2018.  The contracting officer noted she would not recommend contracting with ODRS again for this requirement.[71]

(c)     A review of the COR monthly reports for ODRS Fort Sill contracts for the performance period from January 2018 to January 2019. This review included the associated quality assurance inspection reports. These monthly reports showed a continued and trending unsatisfactory to marginal performance concerning sanitation issues, cooking issues, deliverables, and customer satisfaction, staffing.[72]

(d)     A review and consideration of ODRS's response to the adverse past performance which included the above COR monthly reports, quality assurance inspections, monthly meeting notes that were communicated to ODRS on 25 February 2019.[73]

(e)     A review and consideration of the Contracting Officer's response to ODRS comments to the adverse past performance information for ODRS's current contracts where the Contracting Officer disagreed with ODRS's response.[74]

57.     Upon receipt of the Technical Report, Past Performance Report and Pricing Report, Mr. Stevens initiated the competitive range determination.  The competitive range determination summarized the evaluation results of the Technical Panel, the Past Performance Panel and the Pricing Team.   In

---

[70] See ODRS Exhibit 11 and Agency Record Tab 64, pages 4233-4245.

[71] *Id*.

[72] *Id*.

[73] *Id.*

[74] *Id.,* pages 4242 to 4243 and Mr. Stevens testimony at TR 2-296-207

addition to Technical and Pricing issues, the document summarized offerors whose past performance was acceptable or unacceptable.[75]

58.     Contrary to the majority's characterization of the facts, the Army did take reasonable and prudent action to ensure an open and transparent source selection process that treated all offers equally and provided an objective evaluation of the ODRS proposal.

59.     Upon notice that ODRS was not determined to be in the competitive range, ODRS initiated administrative and legal proceedings that prevented the Army from awarding the contract to Mitchco who submitted the lowest price technically acceptable offer.[76] Mr. Stevens discussed the CICA stay that prevented an award to Mitchco.   Since the requirement to feed the troops remained, the contract with ODRS had to be extended to avoid a brake in service.   The CICA stay and the need to continue FFS contract services to feed the troops provided additional justification to extend ODRS's contract.[77]

60.     Ms. Abraham provided testimony as the administrative contracting officer (ACO) for contract W9124L-16-D-0001.[78] Ms. Abraham administered the contract from the end of 2017 to the middle of 2019.  This is roughly the time frame of the Altstatt/Cantu team's performance under contract W9124L-16-D-0001.[79] Ms. Abraham testified that the Army Logistics Readiness Center (LRC), who is responsible for Army food service, made the decision to not exercise the option under contract W9124L-16-D-0001.  She did not know the exact reasons for the LRS's decision to not exercise the contract option, but the LRC was dissatisfied with the performance of ODRS.[80]

61.     Ms. Abraham was the contracting officer for the bridge contract that continued FFS contract services during the source selection process for solicitation W9124J-18-R-0024.  This interim contract was executed to ensure a continuation of FFS services during the gap in contract coverage from the end of ODRS contract, W9124L-16-D-0001, and the beginning of contract W9124J-19-D0012 with Mitcho.[81]   In her role as contracting officer, she certified that ODRS was a responsible contractor to perform the bridge contract.[82] She testified that ODRS's past performance was not good, but that a termination of the contract was not warranted; therefore, ODRS was a responsible contractor for the

---

[75] *TR.* 2-300.
[76] *TR.* 2-310.
[77] *TR.* 2-306 to 2-309.
[78] *TR.* 1-313.
[79] *TR.* 1-314.
[80] *TR.* 1-314 to 1-317.
[81] *TR.* 1-331 to 332.
[82] *TR.* 1-347.

bridge contract.[83] She was not accountable for determining if ODRS was a responsible contractor for award of the contract under solicitation W9124J-18-R-0024.

62.     ODRS argues that the testimony of Ms. Abraham establishes that ODRS was a responsible contractor and the evaluation of ODRS's past performance under solicitation W9124J-18-R-0024 was flawed.  Ms. Abraham clearly limited her certification to the bridge contract.  As Mr. Stevens testified, the CICA stay gives the government more latitude in negotiating a sole source bridge contract to the contractor providing services under the expiring contract because the soldiers need to be fed so they can continue their mission.[84]

63.     The administrative record includes inspections by the Installation Medical Authority (IMA) for compliance with certain contract requirements.  These inspections were conducted monthly at Fort Sill.  The inspections were unscheduled, and the IMA inspections scored ODRS as "fully compliant".  Two such inspections were concluded with accolades of "Facility was well cleaned and maintained.  However, these inspections are not a substitute for the inspections of the COR, Mr. Buchanan,  who conducted regular inspections of the dining hall facility for compliance with the full range of contract requirements included in the ODRS contract.  While the IMA found the facility was clean, the COR documented a number of contract performance issues by ODRS's licensees.  There is undisputed evidence that ODRS had performance issues over the life of the contract.  ODRS replaced the original licensed agent with Cantu Services because of performance issues of the replaced licensee.[85]

64.     From October 1, 2001 to September 30, 2015, ODRS, through a licensed blind vendor and his teaming partner, provided cafeteria services at Fort Sill for multiple dining facilities. Each contract covered all of the dining facilities and was for five (5) years, consisting of a base year with four one-year options.[86]

65.     Initially, the blind licensed vendor for ODRS was Mr. Robert Brown along with his teaming partner, Blackstone.  This management team managed the contract for a time.[87] However, in 2017, Ft. Sill believed it had "relationship" problems with the blind manager, Robert Brown, and rated his management on the 2016 Contract as unsatisfactory from April, 2016 through March 31, 2017.[88]

---

[83] *TR.* 3-14.

[84] TR. 2-306.

[85] ODRS Ex. 11 at AR 4233.

[86] See R/S 15-10, September 2, 2016, available at https://www2.ed.gov/programs/rsarsp/arbitration- decisions/r-s-15-10.pdf  (the "Arbitration Decision), at FOF 16

[87] TR1-177-178.

[88] ODRS Ex. 11 at AR 4233-4234.

66.      August 1, 2017, ODRS replaced the management team on both contracts with a new manager, David Altstatt, and his new teaming partner, Cantu Services, Inc.[89]   Cantu remained as the teaming partner with David Altstatt until the end of ODRS's contract with the Army.   The facts support a history of performance issues by ODRS licensed vendors at Fort Sill prior to the transfer of management to Mr. Altstatt and Cantu Services.

67.      ODRS complained to the Contracting Officer, Ms. Abraham, on numerous occasions that Mr. Buchanan's inspections were improper, overzealous, and inconsistent with the contract requirements: letter dated October 11, 2017[90]; letter dated October 16, 2017[91];  letter dated December 11, 2017[92]; 164-167 (letter dated January 11, 2018, memo attached[93]; letter dated March 26, 2018[94]; letter dated September 6, 2018[95];  letter dated October 22, 2017, forwarded to Army.[96]

68.       25 February 2019 and during the initial evaluation of proposals, the Army sent a communication to ODRS under the authority of Federal Acquisition Regulation (FAR) 15.306(b)(i). These communications with ODRS were conducted before establishment of the competitive range. The communication's purpose was to provide ODRS with the opportunity to review and respond to the adverse past performance information concerning contract W9124L-16-D-0001 and contract W9124J-09-D-0003.  The adverse performance information included internal Army COR reports, quality assurance inspections reports, monthly meetings between the Army and ODRS, interactive customer entries comments (ICE comments), and other information that the Army was seeking feedback from ODRS to utilize in establishing the competitive range.

69.      On 1 March 2019, ODRS provided a response to the Army's communications regarding the adverse past performance.  ODRS was therefore given an opportunity to address a full range of internal COR reports as well as a full range of negative past performance information and provide its feedback to the Army prior to the decision of the Army to exclude ODRS from the competitive range.

70.      The source selection team, therefore, had conflicting past performance information when it was reviewing the Army's quality assurance reports and other inspection documentation.  The panel

---

[89] ODRS Ex. 11 at AR 4233.
[90] ODRS Exs. 17 & 18 at ODRS at 114-116.
[91] *Id*. at 121-123.
[92] *Id*. at 140-147.
[93] *Id*. at 164-167.
[94] *Id.* at 173-186.
[95] *Id*. at 188-192.
[96] *Id*. at 208-218.

has been presented with a long record of facts.  Depending on the interpretation and selection of facts, reasonable people can come to different conclusions.   The majority has selected facts that suggest errors by the Army while ignoring facts that support actions by the Army to limit bias and encourage transparency. Even under the majority's interpretation of the facts, abuse of discretion is illusive.

71.     In addition, the panel not only had testimony from Army personnel, the panel also had direct testimony from two former employees of ODRS's licensee, David Altstatt, and his teaming partner, Cantu Services, Inc.  These former employees now work for Mitchco under the new contract and the majority has given little weight to their testimony.  However, there is no allegation that the facts presented by these witnesses is false.  Their sworn testimony is unchallenged. The facts presented support another unfortunate truth, ODRS did have performance issues during the performance of this contract.  The testimony of these witnesses describes a Cantu Service corporate culture that supports the Army's findings of unacceptable past performance.

72.     Mr. Marco Lindsay testified as to ODRS past performance issues.  He was a project manager for Cantu Services from November 21, 2017 to April 15, 2019 under contract W9124L-16-D-0001.[97]    He was hired by Cantu Services because there were "major issues at Fort Sill."[98]  The highest number of complaints by the Army was undercooked food.[99] The government did write up the contractor for improper cooking.[100] As an example, cooks were being asked to cook 40 cases of chicken when they should have scheduled to cook 10 cases.  Rather than one cook, there should have been four. [101]    He described an example where one cook was taking shortcuts in order to get the food out on the line.  The food was cooked on the outside but raw on the inside.[102]

73.     When he started performance as project manager, staffing was a major issue for him.  Staffing was established by Cantu Corporate.[103]  He opined that this short staffing was done to benefit Cantu because it would reduce cost and increase profit.[104]  He did not know if understaffing was Cantu Corporate Policy, but it was "definitely practice."[105]  If he, as project manager, did not meet certain

---

[97] TR. 3-37.
[98] TR. 3-40.
[99] TR. 3-42.
[100] TR. 3-56.
[101] TR. 3-45.
[102] TR. 3-46.
[103] TR. 3-44.
[104] TR. 3-46.
[105] TR. 3-49.

man-hour targets, Mr. Cantu would call him to ask him why he was wasting hours.[106] Mr. Lindsay was directed to not replace staff who called in and were not present to work (no-shows).  He was directed to make the existing staff "work harder."[107] This forced the existing staff to "pick up their slack and do multiple tasks."[108] Mr. Cantu would challenge him to explain why the company was receiving low ratings while Mr. Lindsay and the QC manager received high ratings.[109]

74.     Thelma Bunn, an assistant manager for Cantu on the ODRS contract, provided testimony describing an operating culture similar to the testimony provided by Mr. Lindsay.[110] She observed undercooked chicken.[111] Understaffed cooks.[112] Time and temperature check not being performed.[113] Inadequate sanitation.[114] Working in her building until 2 or 3 in the morning to clean the facility because management would not approve overtime of staff to assist her in cleaning the facility.[115] Improper storage of food, exposing raw food items.[116] Not preparing required menu items.[117]  Missing high value substance items.[118] Dirty cookware and dinnerware provided to soldiers.[119] Failing to pay for vacation hours at the expiration of the contract.[120] Submitting rosters to the Government that included no-shows as if they were present.[121]

75.     Their testimony helps explain why the IMA's unscheduled inspections found the facilities clean while the COR found discrepancies in other areas of contract performance.  Thelma Bunn took personal responsibility for cleaning the facilities even if she had to work until 2AM by herself because Cantu would not approve overtime.  But there were other contract issues that she could not address because of understaffing.  It is therefore reasonable for the facility to be spotless while food was stored improperly, and undercooked food was served to soldiers. While the documented cases of

---

[106] TR. 3-49.
[107] TR. 3-50.
[108] TR. 3-51.
[109] TR. 3-52.
[110] T.R.3-176 to 3-256.
[111] TR.190.
[112] TR. 3-191.
[113] TR.3-205.
[114] TR. 3-207.
[115] TR.3-210
[116] TR.3-214.
[117] TR. 3-216.
[118] TR. 3-220.
[119] TR.3-222.
[120] TR.3-226.
[121] TR.  3-252.

undercooked food may have been small as compared to the number of meals served.  This does not mean that "all" cases of undercooked food were documented.  In addition, there is documented evidence and now testimony of systemic operational issues that warranted documentation and inspection by the Army.

76.     This testimony also explains Cantu's aggressive challenges to the inspection reports submitted by the COR.  If the COR inspection reports were not challenged and Cantu received an unsatisfactory performance rating like the prior licensee, Cantu had a reasonable concern that ODRS would replace them with another blind vendor licensee and teaming partner.  Cantu was well aware of the fact that ODRS had replaced the blind licensed vendor, Mr. Robert Brown, along with his partner, Blackstone, because of an unsatisfactory performance rating at Fort Sill.

77.     As noted above, the Army released a broad range of documentation to ODRS for comment and ODRS was provided an opportunity to address any negative information contained in those reports.  The majority suggests that the Army ignored the responses from ODRS, but that is not supported by the testimony and documentation presented to the panel.  To the contrary, the testimony of Mr. Stevens suggests the Army took deliberate steps to provide a structured, disciplined and transparent process to conduct a past performance evaluation that included not only negative ODRS information but also included ODRS's rebuttal to that information.

78.     If soldiers had the option of purchasing food from any number of commercial restaurants, it is not unreasonable to assume they would avoid spending their money at a restaurant that served undercooked food.  If Cantu Services was running its own family restaurant and served undercooked food, it would lose customers with a high probably that it would go out of business.  Since soldiers do not have the option of buying their meals at a number of different restaurants who are all competing for that business, it is reasonable to require ODRS to provide soldiers with fully cooked food. It is also reasonable for the Army to insist Cantu Services and ODRS comply with the terms of the contract.

79.     Given the contracting officer had broad discretion to consider the evaluation of each factor as part of a totality of the circumstances in order to determine whether a proposal belonged in the competitive range, ODRS has not shown that the contracting officer abused his discretion when rating ODRS's past performance as unsatisfactory.  In addition, ODRS has not shown that the contracting officer's decision was unreasonable based on the documentation used by the Army to rate ODRS's past performance as unsatisfactory and the testimony presented to the panel of

serious performance issues by the ODRS licensed blind vendor and his teaming partner, Cantu Services, during contract performance. As discussed above, the panel, like the courts, should not substitute its judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.  ODRS has simply failed to demonstrate that the Army abused its discretion in rating ODRS's past performance unsatisfactory.

80.      PRICE: Mr. Stevens testified as to the Army's strategy for competing dining hall service contracts. One of the major drivers was to standardize the competition of FFS contract competitions.  The goal was to increase competition, comply with the RSA, and realize savings.[122]  Since the use of the standardized enterprise approach to FFS contract competitions, the Army has been able to provide quality food service while savings millions of dollars a year.  The program goal is to save about five percent a year.  Over the life of the current contracts, the Army has saved about sixteen (16) percent.  These savings have not significantly impacted the number of contracts awarded to SLAs.  He testified that, to date, there has been only one other FFS contract that was not awarded to an SLA.  For the source selection that did not result in an award to the SLA, the SLA did not submit a proposal.[123]  Since all contracting officers have an obligation to be good stewards of taxpayer dollars, there is a rational basis for the Army's standardized program.  In addition, these competitions provide documentation to assist contracting officers in their consultation with the Secretary since the Secretary is required by the RSA to determine if the price submitted is reasonable.[124]

81.      I concur with the finding of the majority that the price proposed by ODRS was unreasonably high. However, I am unwilling to speculate that meaningful discussions with ORDS would result in a fair and reasonable price. The majority charges that the Army improperly chose not to conduct meaningful discussions with ODRS.  Their position is that the Army was required to clarify issues regarding anticipated daily head counts.  The majority speculates that if the Army had conducted these meaningful discussions, ORDR would have submitted a price acceptable to the Army.  However, the majority fails to acknowledge ODRS counsel's admission that he could not speculate as to whether or not ODRS would change their price if they had this information.[125]

82.      Solicitation W9124J-18-R-0024 was structured to require offerors to bid a firm price for "meal bands."  Mr. Stevens, explained that about two and a half years prior to the hearing, the Army established

---

[122] TR. 2-258.
[123] TR. 2-259.
[124] See 34 C.F.R. §395.33(a).
[125] TR1-149.

a payment system based on meal bands.[126] This payment strategy was designed to address the fact that different numbers of soldiers would go through a dining facility for breakfast, lunch or dinner.  For example, a meal band could be from a low end of 100 meals up to a high-end of 1500 meals or a low-end of 1500 meals to a high end of 3,000 meals.[127] The meal bands give some idea as to the staffing required in a dining facility for the number of soldiers to be served.[128]

83.    Offerors were given historical data to assist them in their pricing and, in the opinion of Mr. Stevens, put all offerors on a very equal playing field, so they should all be able to properly staff for a meal band.[129] He acknowledged that labor costs are the preponderance or the majority of cost of a services contract and that the cost of labor is partially set by union contract.[130] Mr. Stevens opined the number of contractor staff is not necessarily dependent on the number of meals served because, depending on the circumstances, efficiencies may be possible.[131] MR. Stevens acknowledged that he was not an expert in full food service management, rather, his expertise was contracting. [132]

84.    In preparing proposals, offerors completed a matrix where they entered a unit price.  This unit pricing allowed the source selection team to establish a total evaluated price and whether that price was going to be acceptable or not.[133] Mr. Stevens was not part of the team that established meal bands and did not know the reasoning behind that decision.  He did not testify as to how these meals bands would work during contract performance.[134] The solicitation stated: "Anticipated daily head counts shall be determined by the contractor using AFMIS data and Government-provided variances.  The Government will provide the variance data in accordance with standard operating procedures at the installation."[135] This data was both historical data and current data as to the number of soldiers fed for a meal for a day.[136]

85.    As regards an offeror's pricing strategy, Mr. Stevens testified as follows:

They can bid however they want to.  It's  in each offeror's best interest to bid their proposal how it best suits them based on their knowledge of the requirement, based on their knowledge

---

[126] TR.1-72.
[127] TR. 1-72.
[128] TR.1-72,
[129] TR.1-73.
[130] TR. 1-81 10 1-82.
[131] TR.1-82.
[132] TR. 1-84.
[133] TR. 1-94.
[134] TR.1-113.
[135] TR. 1-118.
[136] TR. 1-119.

of the solicitation and how they're going to propose on it that - - and we as the Government have no control over that.   I am not going to try to guess how one contractor or one offeror is going to propose on a contract.   They have to take it as their own business decision.   Am I going to bid mid?  Am I going to bid low?  Am I going to bid high?  Am I going to use historical data to figure out where I should be at?  I mean if we've done it for the last 10 years, am I to use that as part of my bid process?[137]

84.   Mr. Stevens testified that discussions were not anticipated.   The Government could have conducted discussions if the Army felt it was necessary but since ODRS was not in the competitive range, discussions with ODRS were not held.   One of the main reasons ODRS was not included in the competitive range was its past performance rating of unacceptable.   In addition, ODRS's price was forty plus million dollars higher than the low responsive offeror and he did not see how the Army could get ODRS to an acceptable price even if ODRS had acceptable past performance.[138]

85.   The solicitation was not amended to provide additional information to offerors to assist in their pricing.   The Army received seven proposals.   Two of those proposals were included in the competitive range.   These two proposals were found to be technically acceptable with acceptable past performance and a price that was reasonable.   These two proposals represented the two lowest priced offers among the technically acceptable proposals.[139]

86.   The  exclusion of the five offerors from the competitive range was based on their initial evaluations where the proposals were rated as one or more of the following: (1) technically unacceptable, (2) unacceptable past performance and/or (3) unreasonably high price that was not competitive with the other prices, or the price was unreasonably and not competitive.[140]

87.   Prior to submission of proposals, the Army conducted a site visit. ODRS was present during the site visit.  In response to a question raised at the site visit, the Army stated that the contractor would be put on notice of projected meal counts, generally three days in advance.[141] While the three-day notice was not included in the contract, all offerors who attended the site visit were aware that the advance notice of projected meal counts was anticipated during contract performance.  In addition, all offerors had access to historical meal count data and current meal count data.  Therefore, all offerors had access to the same information that was provided by the Army.

---

[137] TR. 1-136.
[138] TR. 1-144.
[139] *See* ODRS exhibit 12 and Agency Record Tab 65, pages 4252-4299.
[140] *Id.*
[141] TR. 2-177.

88.    ODRS argues that the Army is required to place ODRS in the competitive range so ODRS can have meaningful discussions with the Army to negotiate a competitive price.  This argument assumes that the Army must put the SLA in the competitive range regardless of the terms of the solicitation because meaningful discussions with the SLA are required in all source selections where the RSA applies.  This argument is not supported by the RSA or its implementing regulations.  Neither the RSA nor its implementing regulations require the federal agency place the SLA within the competitive range and conduct meaningful discussions with the SLA in all competitive source selections.

89.    In addition, there is no requirement in the RSA for a federal agency to justify to the Secretary why a SLA is not included within the competitive range.  The RSA implementing regulations only require the application of the priority and meaningful discussions "if the proposal received from the State Licensing Agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award. . . ." 34 C.F.R. §395.33(a).

90.    In this competitive acquisition, the contracting officer made a determination that ODRS was not in the competitive range and, therefore, did not have a reasonable chance of being selected for final award.  The competitive source selection process will become extremely complicated and lengthy if the RSA requires the inclusion of the SLA proposal in the competitive range in all cases.

91.    The federal agency would be required to put the source selection on hold and attempt to negotiate a competitive price.  If the parties were unable to agree to a reasonable price, the federal agency would have to justify a non-award to the Secretary.  The Secretary would need to make a decision as to whether the Secretary agreed with the federal agency or disagreed with the federal agency.

92.    If the Secretary agreed with the federal agency, the federal agency could award to the offeror who submitted a proposal consistent the terms of the solicitation and the source selection criteria included in the solicitation. If the SLA disagreed with the Secretary's decision, then, presumably, the SLA could ask for an arbitration to review the decision of the federal agency.  Technically, under the rules and regulations of the RSA as discussed above, this arbitration would need to be completed before a court had jurisdiction to hear the case.  The question is then whose decision is in question.  The decision of the Secretary that agrees with the federal agency or the decision of the federal agency that had determined the price is unreasonable.  If the decision of the panel is correct, then there are a number of significant and numerous untended consequences.   This interpretation of the RSA would greatly increase the time required to conduct a competitive source selection where the RSA applies and would greatly increase the involvement of the Secretary in source selection decisions. Such a position is not supported by the RSA

93.      There is no allegation that the Army conducted its price analysis for reasonableness, balance and completeness in violation of FAR 15.404-1(b).   The Army documented its findings in the price report, source selection report and competitive range determination. There no allegation that the Army used a flawed or biased price analysis to determine ODRS's price was unreasonably high.  Nor is there an allegation that the Army's comparison with the independent government estimate (IGE), the average price among technical acceptable offers, and historical pricing at Fort Sill for dinning facility services was in violation of the terms in the solicitation.

94.      The majority decision finds that a federal agency has an obligation to conduct meaningful discussions with the SLA even when the price of the SLA is unreasonable, and the federal agency has excluded the SLA from the competitive range. This position of the majority is not supported by the RSA. The majority is speculating that meaningful discussions would have resulted in a reasonable price from ODRS.  Even ODRS counsel refused to speculate whether ODRS would change its price, stating:

> So, we give it to everybody, okay.  So, I cannot speculate whether ODRS would change their proposal if they had additional information.  I do know that we had offerors that did not have any additional information outside of what ODRS did.  It had technically acceptable comparable competitive rates or pricing so it was actually three that did it so.[142]

95.      Since there is documentation and testimony of past performance issues and agreement that ODRS's price was unreasonably high, ODRS has failed to establish that the Army abused its discretion in excluding ODRS from the competitive range.  The Army's determination that ODRS's past performance was unreasonable is supported by the record.  The RSA does not include a mandatory requirement to include the SLA proposal in the competitive range and conduct meaningful discussions in all competitive source selections.  Finally, even if the Army conducted meaningful discussions with ODRS, it is only speculation that ODRS would reduce its price to a competitive level.  Therefore, the Army did not violate the RSA by excluding ODRS from the competitive range.



Steven R. Fuscher
Arbitrator
Dissenting

---

[142] TR. 1-149.